## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DAVID YANOFSKY**

       Plaintiff,

   v.

**UNITED STATES DEPARTMENT**
**OF COMMERCE**

       Defendant.

Civil Action No. 19-2290 (KBJ)

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Katie Townsend
Adam A. Marshall
THE REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
Email: ktownsend@rcfp.org
Email: amarshall@rcfp.org

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ....................................................................................................... 1

ARGUMENT .............................................................................................................. 3

    I.    DOC is withholding the I-92 and I-94 Data Files requested by Plaintiff. ........................ 3

      A.   DOC is withholding its I-92 Data File ................................................................ 3

      B.   DOC is withholding its I-94 Data File ................................................................ 5

    II.   The records requested by Plaintiff are not subject to any FOIA exemption. ..................... 8

    III.  DOC's "undue burden" argument misstates the law, contravenes the evidence, and is contrary to Congress' direction regarding FOIA's fee structure. ............................................... 10

      A.   An agency may not refuse to answer a FOIA request because it claims providing copies of already-located responsive records would be an undue burden............................ 10

      B.   DOC's purported "burden" argument contravenes the plain text of FOIA's fee-recovery structure. ................................................................................................. 11

      C.   DOC has failed to establish the purported "burden" of providing the I-92 and I-94 Data Files to Plaintiff. ........................................................................................... 14

    IV.  The DOC-CBP "Memorandum of Understanding" does not allow DOC to withhold responsive records. ................................................................................................. 15

CONCLUSION ......................................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667

    (D.C. Cir. 2016) ................................................................................................9, 15

*Ancient Coin Collectors Guild v. U.S. Dep't of State*, 866 F. Supp. 2d 28 (D.D.C. 2012) .....10, 11

*Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508 (D.C. Cir. 1996) .........................7, 8

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Veterans Affairs*,

    828 F. Supp. 2d 325 (D.D.C. 2011) ............................................................................5

*Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842 (D.C. Cir. 2010) ................................................9, 15

*Institute for Justice v. IRS*, 941 F.3d 567 (D.C. Cir. 2019) .....................................................1, 4, 6

*Landmark Legal Found. v. E.P.A.*, 272 F. Supp. 2d 59 (D.D.C. 2003) ...........................................5

*Schrecker v. DOJ*, 349 F.3d 657 (D.C. Cir. 2003) ......................................................................10

*See Pharm. Research & Mfrs. of America v. United States Dep't of Health and Human Servs.*,

    43 F. Supp. 3d 28 (D.D.C. 2014) ...............................................................................12

*U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) ....................................................9, 15

*United States ex rel Schneider v. J.P. Morgan Chase Bank, N.A.*, 224 F. Supp. 3d 48

    (D.D.C. 2016) ...........................................................................................................2

*Yanofsky v. United States Dep't of Commerce*, 306 F. Supp. 3d 292 (D.D.C. 2018) ..................15

## STATUTES

5 U.S.C. § 552 ………………………………………………………………….. *passim*

## RULES

Fed. R. Evid. 201…………………………………………………………….....12

## OTHER AUTHORITIES

1996 U.S.C.C.A.N. 3448 .............................................................................................12

*Department of Commerce FOIA Annual Report – 2018*,

    http://www.osec.doc.gov/opog/FOIA/Documents/Reports_Annual/Annual_FOIA_Report-

    FY2018_(DOC).pdf…………………………………………………………..12, 14

H.R. REP. 104-795 ................................................................................................12

*Summary of House Changes to the Freedom of Information Act Amendments in the Anti Drug*

*Abuse Act of 1986*, 132 Cong. Rec. 29617 (Oct 8, 1986) ..........................................13

## INTRODUCTION

Defendant Department of Commerce's ("DOC") Reply makes perfectly clear that it is unlawfully withholding the data files requested by Plaintiff David Yanofsky ("Plaintiff" or "Mr. Yanofsky") under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA" or the "Act"), and that summary judgment should be granted in Mr. Yanofsky's favor.  Notwithstanding DOC's changing use of terminology and other efforts to obfuscate, all of the evidence—including the evidence submitted by DOC—establishes that DOC maintains two data files that it uses to generate both its (1) "standardized" reports, which consist of aggregated information, and (2) any "custom" reports, which can contain additional information not included in its standardized reports.  It is those underlying data files that Plaintiff requested, and DOC does not dispute that it understands Plaintiff's request to be seeking those underlying data files.  *See* Pl.'s Combined Statement of Undisputed Material Facts ("Pl.'s SMF") ¶89; Def.'s Resp. to Pl.'s Additional Statement of Material Facts ¶89.  DOC has asserted no exemptions to withhold the requested data files from Plaintiff; it is simply refusing to release them.  Such conduct is impermissible under FOIA.

In an attempt to avoid being ordered to comply with its obligations under the Act, DOC tries to muddy the waters by playing word games and asserting wholly contradictory arguments and explanations for its actions.  DOC *admits* that it "has confusingly used 'data', 'data file' and 'database' interchangeably."  Def.'s Resp. to Pl.'s Additional Statement of Material Facts ¶84. And not only does it continue to do so throughout its Reply, but it also argues—somehow simultaneously—that it has both (1) already produced the data files (or databases) that Plaintiff requested, and (2) that it need not produce the data files (or databases) Plaintiff requested. *Compare* Def.'s Resp. at 3–5 *with id.* at 6–8.  DOC is wrong on both counts.  First, the record is clear that Defendant has only produced copies of its "standardized" reports to Plaintiff, not the

underlying data files used to create them, which contain additional and non-aggregated data.  Pl.'s SMF ¶¶75–83.  And, indeed, it defies logic for DOC to contend that Plaintiff would find it necessary to file a *second* FOIA lawsuit to obtain copies of the data files he first requested in 2016 if DOC had already provided him the data he requested.  Moreover, each of DOC's arguments for why it need not produce the requested data files to Plaintiff—that (1) a contractor maintains its I-94 Data File, (2) it would be "burdensome" to produce copies of the responsive nonexempt data files, and/or (3) a purported "memorandum of understanding" with another agency shields the data files from disclosure—are specious.  Such arguments are foreclosed by FOIA's text and prior decisions of the D.C. Circuit.

To be clear, the relevant facts and legal issues in this case are not in dispute.  DOC knows precisely what records are at issue in this case.  It does not contest—and therefore concedes—that the I-92 and I-94 Data Files requested by Plaintiff are agency records subject to FOIA.  *Compare* Pl.'s Mem. of L. at 13 *with* Def.'s Reply; *cf. United States ex rel Schneider v. J.P. Morgan Chase Bank, N.A.*, 224 F. Supp. 3d 48, 58 n. 8 (D.D.C. 2016) (failure to respond to argument constitutes waiver).  And DOC does not dispute that the data files requested by Plaintiff are not subject to any FOIA exemption.  *Compare* Pl.'s Mem. of L. at 13–14 *with* Def.'s Reply.  FOIA does not countenance gamesmanship on the part of agencies who simply do not want to comply with the Act's requirements.  *See Institute for Justice v. IRS*, 941 F.3d 567 (D.C. Cir. 2019).

DOC's assertion that it "makes valuable information available, at whatever granularity of detail desired, to any who wish to access it" is true only if those who "wish to access it" are willing to pay DOC exorbitant fees to obtain that "valuable information."  Def.'s Reply at 6.  Plaintiff, a data journalist, has spent almost five years trying to obtain DOC's data files, through the filing of multiple FOIA requests and two lawsuits; Defendant now should be ordered to provide him with

copies of those non-exempt records.  For the reasons herein, Plaintiff respectfully requests that the Court grant his cross-motion for summary judgment, deny DOC's motion for summary judgment, and order DOC to produce the requested I-92 and I-94 Data Files.

## ARGUMENT

I.   **DOC is withholding the I-92 and I-94 Data Files requested by Plaintiff.**

A.   DOC is withholding its I-92 Data File.

DOC devotes the first half of its Reply to disingenuously trying to convince the Court that it has "released all data files Plaintiff requested."  Reply at 3.  That assertion is flatly contradicted by all the evidence before this Court—including each of the declarations filed by DOC in *Yanofsky I* and *Yanofsky II*—and defies common sense.  Regardless of what DOC has now decided to *call* the data file at issue (*e.g.*, data, a database, data files),[1] the record could not be more clear:  DOC is withholding the I-92 Data File *from which* it creates its standardized and custom reports, which is the I-92 Data File that was requested by Plaintiff.  *See, e.g.*, Dec. of Adam A. Marshall, Ex. 1 at ¶4 (the "Erdmann Decl."); *id.* Ex. 2 ¶12 (the "First Hill Declaration"); Second Declaration of Isabel Hill at ¶¶8–10 (hereinafter, the "Second Hill Declaration").  Indeed, even the January 2020 Hill Declaration affirms that DOC maintains a separate I-92 Data File that has not been produced to Plaintiff.  *See* Jan. 2020 Hill Decl. ¶¶ 9–11.  DOC's contention that the I-92 Data File is simply the same as the standardized report but in Excel format, *see* Def.'s Resp. at 4, is belied by the record.  Defendant's own website makes clear that the Excel version of DOC's standardized reports is different from—and sold at a significantly lower price—than the I-92 Data File.  *See* Second Hill Decl. Ex. 3.  For example, the 2015 I-92 Annual Report in "printfile *& Excel*" costs $1,990, while a Data File costs $23,745, nearly twelve times as much.  *Id.* (emphasis added).

---

[1] *See* Def.'s Resp. to Pl.'s Additional Statement of Material Facts ¶84 (conceding that "Defendant has confusingly used 'data', 'data file' and 'database' interchangeably.")

The record also establishes that the DOC's I-92 Data File has more particularized information in it than the I-92 standardized reports released to Plaintiff.  Pl.'s SMF ¶¶48, 49, 51. For example, the date of individual flights is aggregated in the I-92 standardized reports, but that particularized, non-aggregated, individual flight information can be produced in a "customized" report, which is created from DOC's underlying I-92 Data File.  *See* Pl.'s SMF ¶¶47–51.  Thus, DOC's assertion that the "I-92 data file and an I-92 standardized report contain identical information[,]" Reply at 3, is simply false.  It would be *impossible* for DOC to generate and sell "customized" I-92 reports with additional data not contained in its standardized reports—as it does—if it did not have an underlying I-92 Data File that contained that additional information.  It is that underlying data file that Plaintiff has requested, as DOC is well-aware.  Marshall Decl. Ex. 5 (DOC counsel confirming that the agency understands Plaintiff's FOIA request to be seeking "an electronic copy of the databases used to create I-92 and I-94 reports[.]")

DOC's attempt to confuse the straightforward issue before the Court by relabeling the requested I-92 Data File, and then arguing that no additional "data files" exist, Reply at 3, must fail.  As the D.C. Circuit recently explained, "a request certainly should not fail where the agency knew or should have known what the requester was seeking all along."  *Institute for Justice*, 941 F.3d at 572.  Here, Defendant knows precisely what records Mr. Yanofsky is seeking, and it is withholding those records in violation of FOIA.  Accordingly, Plaintiff's motion for summary judgment as to the I-92 Data File should be granted.

Plaintiff is concerned by averments in the Second Hill Declaration indicating that the I-92 Data File previously maintained by DOC in SQL format[2] was recently "decommissioned" and "migrated" to a "Microsoft Power BI" system.  Jan. 2020. Hill Decl. ¶10.  Ms. Hill's most recent

---

[2] SQL, the acronym for Structured Query Language, is a computer language designed for managing and retrieving information in databases.

declaration does not identify (1) the date of this "decommission[ing]," (2) the date of the migration of the relevant data to the Microsoft Power BI system, (3) why the SQL system was "decommissioned," or (4) the effect of migrating the I-92 Data File.  To the extent all of the data previously contained in the I-92 Data File has been migrated to the new system and can be released to Plaintiff, there should not be any need for the parties or the Court to address DOC's decommissioning of the I-92 Data File in SQL.  However, if all of the data was not migrated, DOC's actions could amount to the destruction of responsive records while this lawsuit was pending.  In that case, or if the Court believes further factual development is necessary with respect to DOC's actions or the new system housing its I-92 Data File, DOC's motion for summary judgment should be denied and Plaintiff afforded an opportunity to conduct discovery to develop the factual record.  *See Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Veterans Affairs*, 828 F. Supp. 2d 325, 334 (D.D.C. 2011) (granting "additional discovery for the purpose of determining whether the explanation for the current state of affairs is document destruction, incompetence, or something in between."); *Landmark Legal Found. v. E.P.A.*, 272 F. Supp. 2d 59, 67 (D.D.C. 2003) ("Reconstruction of the destroyed documents to the extent possible is an appropriate remedy for bad faith document destruction.").

      B.   <u>DOC is withholding its I-94 Data File.</u>

      The undisputed facts also make clear that DOC is withholding its I-94 Data File, which is maintained by CIC, a DOC contractor.  Pl.'s SMF ¶¶54–58, 80–83.  Indeed, Ms. Hill's latest declaration *expressly affirms* that CIC "maintains a database of visitor arrival records," Jan. 2020 Decl. ¶ 20, that DOC has "the right to require CIC to extract records from its database[,]" *id.* ¶22, and that DOC "could require CIC to extract all visitor arrival records from its database from 2011–2015[,]" *id.* at 24.  Like its I-92 Data File, DOC's I-94 Data File contains more detailed information

than the I-92 standardized reports DOC released to Plaintiff.  Pl.'s SMF ¶¶62–64.  Indeed, while

Defendant argues that the I-94 standardized reports contain the same information as the I-94 Data

File, that contention is belied by the evidence.  As is true of the I-92 Data File, DOC's own website

dispels any suggestion that the I-94 Data File is simply the Excel version of a standardized report.

*Compare* Def.'s Reply at 4 *with* Second Hill Decl. Ex 4 (showing Excel version of 2015 Annual

Report costs $1,650 while the "Annual datafile" costs $13,820).  Furthermore, it is undisputed that

DOC can generate a "customized" I-94 report containing additional and more granular information

than what is contained in its I-94 standardized reports.  Pl.'s SMF ¶63; *see also* Pl.'s Mem. of L.

at 15; Marshall Decl. Ex. 7.  That is because the underlying I-94 Data File—the record that Plaintiff

has requested—contains that additional information.  *See* Marshall Decl. Ex. 5; *cf. Institute for

Justice*, 941 F.3d at 572.

Any suggestion that Plaintiff has not requested the I-94 Data File maintained by CIC,

DOC's contractor is false.  *See* Def.'s Reply at 4.  To be sure, DOC's referral of CDs of "raw"

CBP data is irrelevant because Plaintiff did not request those CDs.  *Compare* Dec. of David

Yanofsky at Ex 1 (requesting I-94 Data Files for 2011–2015) *and* Marshall Decl. Ex. 5. (DOC's

counsel stating "it is our understanding that [Plaintiff is] seeking an electronic copy of the

databases used to create I-92 and I-94 reports,") *with* Second Hill Decl. Ex. 6 (referring "original

CDs (containing DHS data)" to CBP).[3]  But, as the record clearly shows, the CBP data is simply

one source for data contained in the I-94 Data File maintained by DOC's contractor.  CIC compiles,

processes, and manipulates CBP and other data from Statistics Canada and the Instituto Nacional

de Estrádística y Geográfia ("INEGI") in Mexico to create the I-94 Data File.  Pl.'s SMF ¶¶54–

---

[3] Likewise, any suggestion that Plaintiff has not requested the DOC's I-92 Data File is belied by the record.  DOC's
"referral" of "raw" I-92 data it receives from CBP is either irrelevant or unlawful for the reasons set forth in
Plaintiff's memorandum in support of his motion for summary judgment.  *See* Pl.'s Mem. of L. at Sections I(B), (D).

57.   Indeed, the newly produced DOC-CIC contract further illustrates how the DOC's I-94 Data File differs from the CDs of "raw" CBP data referred to by Defendant.  *See* Jan. 2020 Hill Decl. Ex. 1.  Pursuant to the DOC's contract with CIC, after CIC receives the "raw" CBP data it (1) removes duplicate data, re-sorts data, removes certain types of visitor entries, selects specific visa types, and combines different data sources together.  *See id.* at p. 10.  This evidence, too, makes clear that the DOC's I-94 Data File is a distinct record that has not produced to Plaintiff.

At various points in its Reply, DOC appears to take the position that it need not release the I-94 Data File requested by Plaintiff because it purportedly "does not have possession or control of the I-94 database," DOC Reply at 7.[4]  That argument is both legally unsound and flatly contradicted by the record.  First, both the text of FOIA and binding caselaw from the D.C. Circuit make clear that an agency may not circumvent FOIA's disclosure requirements by arguing that a contractor is in physical possession of requested records.  *See* 5 U.S.C. § 552(f)(2) ("record" under FOIA includes agency records "maintained for an agency by an entity under Government contract, for the purposes of records management."); *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (agency exercised "constructive control" of data held by contractor).  There is no dispute here that the I-94 Data File is maintained by CIC, a DOC contractor, pursuant to a contract between DOC and CIC, *see* Pl.'s SMF ¶¶54, 46; Second Hill Decl. ¶¶15–16.  Nor is there any dispute that it is an agency record subject to FOIA, *see generally* Def.'s Reply.[5]

---

[4] While DOC claims that its "representations to the Court have been consistent in this matter and in *Yanofsky I*[,]" Reply at 5, it does not explain how its current argument can be reconciled with its admission in *Yanofsky I* that it has "possession, custody, and/or control" of the I-94 Data File.  *See* Def.'s Resp. to Pl.'s Statement of Material Facts as to Which There is No Genuine Issue, ECF No. 24-1, *Yanofsky v. U.S. Dep't of Commerce*, No. 16-cv-951 (KBJ) (D.D.C., filed Nov. 30, 2016).

[5] DOC admitted in response to an earlier request by Mr. Yanofsky for I-94 data from 2011–2014 that the I-94 Data Files are "agency records".  Compl., Ex. F (ECF 1-7), at ECF Page No. 20 (DOC Assistant General Counsel stating, *inter alia*, "you correctly argue that the I-94 records are in fact 'agency records' for FOIA purposes.").

Even if the I-94 Data File is solely in CIC's physical possession, DOC has control over that record; Ms. Hill explicitly avers that DOC has "the right to require [its contractor] to extract records from its database . . . ."  Jan. 2020 Hill Decl. ¶22.  Moreover, the newly submitted DOC-CIC contract suggests that DOC *itself* also has possession of annual copies of the I-94 Data File.  *Cf. Burka*, 87 F.3d at 515.  Specifically, Section C.5.4.2.5 of the DOC-CIC contract, which is titled "Data Backup", states

> On an annual basis, the contractor *shall provide* the Office of Travel and Tourism Industries (OTTI) with *a copy* of *all current data files* and program files.  OTTI will store the backup files in a secure storage location.

Jan. 2020 Hill Decl. Ex. 1 at p. 9 (emphasis added).[6]  On its face, this section suggests that DOC should have in its possession yearly "backup" copies of the I-94 Data File, casting serious doubt on its claim that "DOC does not have possession" of the "I-94 database[.]"  Reply Br. at 7.

## II.     The records requested by Plaintiff are not subject to any FOIA exemption.

Thus far, throughout the entirety of *Yanofsky I* and *Yanofsky II*, DOC has *never* asserted any FOIA exemption to withhold the I-92 Data File or I-94 Data File requested by Plaintiff, or indeed any of its related reports, data, or information.  Nor could it.  As Plaintiff's Motion for Summary Judgment explains, it is impossible to conceive how anonymized data that *DOC sells to commercial entities upon request* could be subject to any FOIA exemption.  Nonetheless, DOC's most recent submissions to the Court are peppered with references to "personally identifying information" and "business proprietary information", coupled with suggestions that such information cannot be released.  *See, e.g.*, Reply at 5 n.4, 7; Jan. 2020 Hill Decl. ¶¶9, 11, 24.  However, neither "personally identifying information" nor "business proprietary information" are exemptions under FOIA, *see* 5 U.S.C. § 552(b), and cannot be cited as a basis to withhold

---

[6] OTTI is now called the National Travel and Tourism Office ("NTTO").  *See* Ans., ECF No. 8, ¶7.

information from the public.   As the U.S. Supreme Court has noted, "[a]n agency must disclose

agency records to any person under § 552(a), unless they may be withheld pursuant to one of the

nine enumerated exemptions listed in § 552(b)[,]" which are "explicitly exclusive." *U.S. Dep't of*

*Justice v. Tax Analysts*, 492 U.S. 136, 150–51 (1989) (internal quotations and citations omitted).

*See also Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667,

677 (D.C. Cir. 2016) ("The sole FOIA provision enabling the government to withhold responsive

records is section 552(b), which sets forth the nine statutory exemptions."); *Elliott v. U.S. Dep't of*

*Agric.*, 596 F.3d 842, 845 (D.C. Cir. 2010) ("agencies may withhold only those documents or

portions thereof that fall under one of nine delineated statutory exemptions.").

Moreover, the record is clear that the data files at issue *do not* contain any "personally-

identifying information."  As the Erdmann Declaration avers, the "I-92 Data File . . . consists of

*anonymized data* about air travelers between the United States and other countries[,]" and the "I-

94 Data File . . . consists of *anonymized data* about foreign visitors to the United States."  Marshall

Decl. Ex. 1 at ¶¶4–5 (emphasis added).  Likewise, the Second Hill Declaration notes that "I-92

Data does not contain personally identifiable information[.]" Second Hill Decl. ¶11.  Finally, DOC

does not dispute that neither the I-92 Data File nor the I-94 Data File "permit information to be

retrieved by the name of the individual or by some identifying number, symbol, or other identifying

particular assigned to the individual." *See* Def.'s Resp. to Pl.'s Additional Statement of Material

Facts ¶¶44, 58.  Accordingly, there is simply no legal or factual basis for DOC to now contend that

it may withhold the data files sought by Plaintiff because those data files purportedly contain

"personally identifying information" and/or "business proprietary information."

III.   **DOC's "undue burden" argument misstates the law, contravenes the evidence, and is contrary to Congress' direction regarding FOIA's fee structure.**

While the DOC devotes a significant portion of its Reply to wrongly arguing that it has already provided Plaintiff with the records he requested, it spends the remainder of its Reply arguing that it does not have to release the requested data files because doing so would cause it "undue burden."  Def.'s Reply at 6–7.  As an initial matter, this internally inconsistent argument effectively concedes what Plaintiff has stated all along: that DOC is still withholding the I-92 and I-94 Data Files Plaintiff requested.  Further, DOC's contention that purported "burden" justifies its withholding of those data files is legally and factually baseless, directly conflicts with FOIA's text, and should be disregarded.

A.   An agency may not refuse to answer a FOIA request because it claims providing copies of already-located responsive records would be an undue burden.

DOC cites no authority, whatsoever, for the proposition that an agency can withhold responsive, non-exempt records it has already located because providing copies would require the agency to expend financial resources, and Plaintiff is unaware of any FOIA case standing for that proposition.  Indeed, as set forth in Section III(B) below, such an argument is irreconcilable with FOIA's fee-recovery schedule.  *See* 5 U.S.C. § 552(a)(4)(A).

The only two cases cited by Defendant—*Schrecker v. DOJ*, 349 F.3d 657 (D.C. Cir. 2003) and *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 866 F. Supp. 2d 28 (D.D.C. 2012)—are inapposite.  *Schrecker* concerned a dispute over the government's method for determining whether persons mentioned in FBI files were dead or alive, following a ruling from the D.C. Circuit that courts must assure themselves "that the Government has made a reasonable effort to ascertain life status."  349 F.3d at 662.  The court's reference to the "limits" an agency must go to in responding to a FOIA request concerned whether the agency was required to "research nonresponsive records

10

for the relevant individuals' social security numbers[]" to determine if they were alive or dead. *Id.* at 664.  The court concluded that such an effort, even if undertaken, would have only "dubious prospects of success." *Id.  Schrecker* simply has no application where, as here, an agency has (1) already located the records requested, (2) there are no exemptions at issue, and (3) the agency has confirmed that it can produce the records Plaintiff seeks. *See* Jan. 2020 Hill Decl. ¶¶11, 22–24.

*Ancient Coin Collectors Guild* is similarly inapplicable.  The relevant portion of that case deals with the sufficiency of the agency's search; specifically, whether the agency had to search archived backup tapes for responsive email records. *See* 866 F. Supp. 2d at 33.  The district court determined that a search of that system was unwarranted because it "would reveal no additional communications not previously uncovered in the initial FOIA searches[.]" *Id.* at 34.  That case has no application here.  DOC has already located the records responsive to Plaintiff's FOIA Request; it has simply refused to release them.  This is not a dispute about the sufficiency of DOC's search.

> B.   DOC's purported "burden" argument contravenes the plain text of FOIA's fee-recovery structure.

The purported "burden" DOC identifies with respect to providing copies of the I-92 and I-94 Data Files requested by Plaintiff appears to be premised on a supposed need to delete certain information from the data files before providing them to Plaintiff.  As an initial matter, as set forth above, *see supra* Section II, there is no such need because there is nothing to delete.  DOC has not asserted any FOIA exemptions to withhold information in the data files, nor could it.

In any event, even assuming, *arguendo*, that DOC needed to expend some amount of money or resources to respond to Plaintiff's FOIA Request (which, as set forth below, is entirely unclear), DOC is *expressly required* by FOIA to bear those costs.  Congress is well aware that responding to FOIA requests requires agency resources, and it has set up a carefully crafted

framework for agencies to recover fees for certain requests in order to offset those expenditures. *See* 5 U.S.C. § 552(a)(4)(A).  For example, in responding to a FOIA request from a commercial entity, agencies like DOC may recover search, review, and duplication fees.   *Id.* at § 552(a)(4)(A)(ii)(II).  For requests by representatives of the news media, an agency may only charge duplication fees after the first 100 pages, *id.* at § 552(a)(4)(A)(ii)(II), unless the requester is entitled to a fee waiver, *id.* at 552(a)(4)(A)(iii).  DOC is very familiar with these provisions; it collected $123,716.26 in FOIA fees in FY2018.[7]

Congress also expressly considered how searching for and producing copies of electronic records would fit into FOIA's fee framework when it passed the 1996 E-FOIA amendments to strengthen access to electronic records under the Act.  For example, the House Report noted:

> Computer records found in a database rather than in a file cabinet may require the application of codes or some form of programming to retrieve the information. Under the definition of "search" in the bill, the review of computerized records would not amount to the creation of records. Otherwise, it would be virtually impossible to get records maintained completely in an electronic format, like computer database information, because some manipulation of the information likely would be necessary to search the records.

> Current law provides that most requestors receive the first two hours of search time for free.  Ten years ago, computer time was expensive and carefully metered. Today, computer time is generally no longer a scarce resource.  Except in unusual cases, the cost of computer time should not be a factor in calculating the two free hours of search time. Often, searching by computer will reduce costs because computer searches are generally faster, more thorough and more accurate, than manual searches.   In those unusual cases, where the cost of conducting a computerized search significantly detracts from the agencies' ordinary operations, no more than the dollar equivalent of two hours manual search time shall be allowed for two hours free search time. For any searches conducted beyond the first two hours, an agency shall only charge the direct costs of conducting such searches.

---

[7] *Department of Commerce FOIA Annual Report – 2018*,
http://www.osec.doc.gov/opog/FOIA/Documents/Reports_Annual/Annual_FOIA_Report-FY2018_(DOC).pdf.
Plaintiff respectfully requests that the Court take judicial notice of this report pursuant to Fed. R. Evid. 201.  *See Pharm. Research & Mfrs. of America v. United States Dep't of Health and Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (taking judicial notice of a Food and Drug Administration website and noting that "[c]ourts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies").

H.R. REP. 104-795, 22, 1996 U.S.C.C.A.N. 3448, 3465.  As this legislative history makes clear, Congress rightfully anticipated that FOIA requests for electronic records would be less burdensome for an agency to respond to and, in the rare case where a search for electronic records required extensive time, the direct costs associated with it would fit into FOIA's existing fee structure.

Congress also has made an equally clear decision that agencies must bear the search and review costs for FOIA requests made by representatives of the news media, like Plaintiff.  In passing the 1986 amendments to FOIA, which established the Act's current fee structure, Congress deliberately chose to exclude search and review fees from the types of fees that can be assessed against a representative of the news media because of the valuable role that journalists and news organizations play in society.  As the House Report notes:

> The purpose of low fees for the news media is to further the availability of non-exempt information in government files to the public. . . . Th[is] bill provides the most favorable fee provision for those in the information dissemination business because the use of the FOIA for public dissemination of information in government files is in the public interest. . . . Easy and inexpensive access to government information by news media *will prevent agencies from monopolizing information distribution* and from controlling public debate in any way.

*Summary of House Changes to the Freedom of Information Act Amendments in the Anti Drug Abuse Act of 1986*, 132 Cong. Rec. 29617 (Oct 8, 1986) (statement of Rep. English) (emphasis added).  Thus, while Congress permitted agencies to recover search and review fees from commercial requesters, it did not permit such fees to be assessed against representatives of the news media.

Here, if DOC must expend money or resources in order to respond to Plaintiff's FOIA Request, Congress has required it to do so.  As a member of the news media who seeks the data files at issue in order to inform the public, Mr. Yanofsky is fulfilling the valuable role Congress

intended.   DOC may not "monopoliz[e] information distribution" by arguing that purported anticipated costs associated with responding to Plaintiff's Request—costs Congress requires it to bear—permit it to withhold requested agency records from Plaintiff.

        C.    <u>DOC has failed to establish the purported "burden" of providing the I-92 and I-94 Data Files to Plaintiff.</u>

Even assuming, *arguendo*, that FOIA would permit DOC to assert "undue burden" as a basis for refusing to release a copy of the I-92 and I-94 Data Files to Plaintiff, DOC has not actually established such "undue burden."   At best, it has made conflicting representations about the purported cost of complying with its obligations under the Act and, with respect to the I-92 Data File, does not bother to specify any dollar amount.   Though the January 2020 Hill Declaration speculates that it could cost "thousands of dollars" to release the data files requested by Plaintiff, there is neither an amount identified nor any basis to determine how that unspecified amount would be arrived at.   *See* Jan. 2020 Hill Decl. ¶11.   An agency cannot avoid its obligations under FOIA simply by speculating it will cost an unspecified amount of money to respond to a FOIA request. Indeed, if permitted, such an argument would permit DOC to refuse to respond to *any* FOIA request.   Responding to FOIA requests always requires some expenditure of resources and, indeed, in FY2018 the DOC's FOIA program cost an average of more than $6,616 per request.[8]

With respect to the I-94 Data File, DOC has presented conflicting representations as to how much it claims it would have to pay its contractor for copies of the DOC data files Plaintiff requested.   While paragraph 25 of the January 2020 Hill Declaration states that it would be $32,640, DOC's Reply states in footnote 4 that it would cost $11,285, less than half that amount. DOC offers no explanation for these differing numbers, and such inconsistencies cast doubt on

---

[8] *See Department of Commerce FOIA Annual Report – 2018*, *supra* fn. 3, at p. 13, 34 (DOC spent $13,073,431.30 on its FOIA program in FY2018, during which it processed 1,976 FOIA requests).

any of its representations as to the purported "burden."  Moreover, the most recent Hill Declaration states that the former estimate "does not include *any margin for profit as permitted by the contract*."  Jan. 2020 Hill Decl. ¶25.  In other words, DOC is arguing that Plaintiff—and the public—should be denied access to government records because its contractor should be allowed to make a profit.  That argument makes a mockery of FOIA.  Just as "the federal government should not profit from its dissemination of documents in response to FOIA requests[,]" *Yanofsky v. United States Dep't of Commerce*, 306 F. Supp. 3d 292, 293 (D.D.C. 2018), it cannot deny access to agency records because of the profit interests of its contractor.

## IV.   The DOC-CBP "Memorandum of Understanding" does not allow DOC to withhold responsive records.

In a last-ditch effort to avoid releasing the I-92 and I-94 Data Files, DOC advances a new argument.  It claims a purported 2002 "Memorandum of Understanding" between it and CBP (hereinafter, the "MOU") somehow prohibits it from releasing the data files requested by Plaintiff. *See* Reply at 7.  DOC's argument fails for at least the following reasons.

First, DOC cannot rely on a purported "understanding" with another agency to withhold nonexempt records under FOIA.  Both the statute and binding caselaw make clear that "[a]n agency must disclose agency records to any person under § 552(a), unless they may be withheld pursuant to one of the nine enumerated exemptions listed in § 552(b)[,]" which are "explicitly exclusive." *Tax Analysts*, 492 U.S. at 150–51 (internal quotations and citations omitted).  *See also Am. Immigration Lawyers Ass'n*, 830 F.3d at 677; *Elliott v. U.S. Dep't of Agric.*, 596 F.3d at 845.  As noted above, DOC has not asserted that any FOIA exemptions apply to the I-92 or I-94 Data Files, and accordingly they must be released.

Second, DOC's contention that it cannot release the I-92 and I-94 Data Files is belied by the fact that, as it has repeatedly made clear, it sells such data upon request.  *See, e.g.*, Second Hill

Decl. ¶¶11, 18, 42.  DOC does not attempt to explain—nor could it—how it can sell its data to commercial clients but then withhold that data under the "MOU" when it is requested under FOIA. As set forth above, DOC's I-92 and I-94 Data Files consist of anonymized data.  Thus, even under the terms of the MOU, DOC is not prohibited from releasing those data files to Plaintiff.

Third and finally, even assuming, *arguendo*, that the text of the 2002 MOU has any relevance to this case whatsoever, which it does not, there is no evidence in the record that it was (1) ever executed, or (2) is currently in effect.  The MOU submitted as Exhibit 1 to the Second Hill Declaration is neither dated nor signed.  Even if it was enacted in 2002, under its express terms it had to be renewed by written agreement after five years, and DOC admits that there has been no such written renewal.  *See* Second Declaration of Isabel Hill ¶9.  Accordingly, even assuming the MOU was once in effect, there is no evidence that it is currently in effect.

## **CONCLUSION**

For the reasons set forth herein, Plaintiff respectfully requests that the Court grant his cross-motion for summary judgment, deny DOC's motion for summary judgment, and order DOC to produce the requested I-92 and I-94 Data Files without delay.

Dated: February 14, 2020                         Respectfully Submitted,

*/s/ Katie Townsend*
Katie Townsend, DC Bar No. 1026115
Adam A. Marshall, DC Bar No. 1029423
THE REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
Email: ktownsend@rcfp.org
Email: amarshall@rcfp.org

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that on February 14, 2020, a true and correct copy of Plaintiff's Reply Memorandum of Law in Support of Plaintiff's Cross-Motion for Summary Judgment was transmitted via email to Defendant's counsel of record, William J. Chang, at william.chang2@usdoj.gov.


Dated: February 14, 2020                                        /s/ Adam A. Marshall