UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID YANOFSKY, | |
| PLAINTIFF, | |
| v. | CIV. A. NO. 19-2290 (KBJ) |
| U.S. DEPARTMENT OF COMMERCE, | |
| DEFENDANT. | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS
RENEWED MOTION FOR SUMMARY JUDGMENT
AND
MEMEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT**

# **CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ............................................................................................................................... 2

I.  Plaintiff Fails to Establish Defendant's Interpretation of the FOIA Request Is
    Unreasonable Or that Defendant's Argument Regarding Its Interpretation is
    Foreclosed ...................................................................................................................... 2

    A.  The Court Should Exercise Its Discretion to Revise the Portion of its
        October 2020 Decision Interpreting Plaintiff's FOIA Request as Seeking
        I-92 and I-94 Databases ..................................................................................... 3

    B.  The FOIA Request Is Properly Interpreted as Seeking the Standardized
        Reports of I-92 and I-94 Data Already Produced by Defendant ........................... 6

        1.  Plaintiff's Misplaced Reliance on this Court's Decision in *Conservation
            Force v. Ashe*, 979 F. Supp. 2d 90, 102 (D.D.C. 2013) ............................. 7

        2.  Defendant Properly Interpreted the FOIA Request as Seeking the
            Standardized Reports ................................................................................. 8

        3.  Plaintiff's Improper Reliance on Statements Made in September 2019 ... 16

II. Even If The FOIA Request Had Sought I-92 and I-94 Databases, Defendant's Refusal
    To Produce the Data From Which the Standardized Reports Are Created Is Lawful ...... 18

    A.  The I-92 and I-94 Data Records Plaintiff Seeks Are Not "Agency
        Records" .............................................................................................................. 18

        1.  The "Created or Obtained" Prong .............................................................. 19

        2.  The "Control" Prong .................................................................................. 20

    B.  The Department Does Not Own the I-92 and I-94 Data; Therefore, the
        Department Properly Referred the Data to CBP .................................................. 23

    C.  Even If the Records Were Subject to FOIA, They Would Properly Be
        Withheld Under FOIA Exemptions ...................................................................... 26

        1.  The I-92 Data Contains Business Confidential Information Subject to the
            Protections of FOIA Exemption 4 ............................................................. 26

        2.  The I-94 Database Contains Personally Identifying Information that is
            Exempt from Disclosure Under FOIA Exemption 6 ................................... 30

        3.  There is No Reasonably Segregable I-92 data or I-94 data that Can Be
            Produced from the Databases ..................................................................... 35

III. There is No Basis Upon Which to Order Discovery or Hold a Hearing in this Matter .... 37

    A.  Discovery Is Unwarranted .................................................................................... 37

    B.  Oral Argument Is Unnecessary ............................................................................ 39

CONCLUSION ........................................................................................................................... 39

## **TABLE OF AUTHORITIES**

### CASES

Advocates for Highway & Auto Safety v. Fed. Highway Admin.,
818 F. Supp. 2d 122 (D.D.C. 2011) ........................................................................ 32

Al Bahlul v. United States,
967 F.3d 858 (D.C. Cir. 2020) ................................................................................. 4

Am. Chemistry Council, Inc. v. Dep't of Health & Human Servs.,
922 F. Supp. 2d 56 (D.D.C. 2013) ........................................................................ 13

Animals v. Natl Institutes of Health,
543 F. Supp. 2d 83 (D.D.C. 2008) ........................................................................ 25

Arizona v. California,
460 U.S. 605 (1983) .................................................................................................. 4

Armstrong v. Exec. Off. of the President,
97 F.3d 575 (D.C. Cir. 1996) ................................................................................. 36

Awan v. Dep't of Justice,
46 F. Supp. 90 (D.D.C. 2014) .................................................................................. 3

Baker & Hostetler LLP v. Dep't of Commerce,
473 F.3d 312 (D.C. Cir. 2006) ............................................................................... 30

Bd. of Trade v. CFTC,
627 F.2d 392 (D.C. Cir. 1980) ............................................................................... 26

Besson v. Dep't of Commerce,
Civ. A. No. 18-2527 (APM), 2020 WL 4500894 (D.D.C. Aug. 5, 2020) ............... 29

Billington v. Dep't of Justice,
233 F.3d 581 (D.C. Cir. 2000) ............................................................................... 35

Bradley v. Nat'l Collegiate Athletic Ass'n,
464 F. Supp. 3d 273 (D.D.C. 2020) ...................................................................... 25

Breen v. Peters, Civ. A.,
No. 05-0654 (RWR), 2009 WL 10718520 (D.D.C. Jan. 6, 2009) ............................ 5

Burka v. Dep't of Health & Human Servs.,
87 F. 3d 508 (D.C. Cir. 1996) ................................................................... 18, 19, 20

Campaign Legal Ctr. v. Dep't of Justice,
373 F. Supp. 3d 160 (D.D.C. 2019) ...................................................................... 35

Canning v. Dep't of Justice,
567 F. Supp. 2d 104 (D.D.C. 2008) ...................................................................... 36

Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.,
630 F.3d 217 (D.C. Cir. 2011) ................................................................................. 3

Carter v. Dep't of Commerce,
   830 F.2d 388 (D.C. Cir. 1987) ................................................................. 33

Competitive Enter. Inst. v. Off. of Sci. & Tech. Policy,
   161 F. Supp. 3d 120 (D.D.C. 2016) .......................................................... 37

*Conservation Force v. Ashe*,
   979 F. Supp. 2d 90 (D.D.C. 2013) ...................................................... 1, 7, 8

Consumer Fed'n of Am. v. Dep't of Agric.,
   455 F.3d 283 (D.C. Cir. 2006) ........................................................... 20, 22

Convertino v. Dep't of Justice,
   684 F.3d 93 (D.C. Cir. 2012) .................................................................. 39

Cromartie v. District of Columbia,
   479 F. App'x 355 (D.C. Cir. 2012) .......................................................... 25

Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.,
   436 F. Supp. 3d 90 (D.D.C. 2019) ........................................................... 28

Dep't of Def. v. FLRA,
   510 U.S. 487 (1994) ......................................................................... 33, 35

Dep't. of Justice v. Reporters Comm. for Freedom of the Press,
   489 U.S. 749 (1989) ......................................................................... 32, 33

Dep't of Justice v. Tax Analysts,
   492 U.S. 136 (1989) .............................................................................. 18

Dep't of State v. Wash. Post Co.,
   465 U.S. 595 (1982) .............................................................................. 31

Dillon v. Dep't of Justice,
   444 F. Supp. 3d 67 (D.D.C. 2020) ........................................................... 18

Ditlow v. Shultz,
   379 F. Supp. 326 (D.D.C. 1974) .............................................................. 34

Filebark v. Dep't of Transp.,
   555 F.3d 1009 (D.C. Cir. 2009) ................................................................ 4

Flowers v. IRS,
   307 F. Supp. 2d 60 (D.D.C. 2004) ........................................................... 38

Food Marketing Inst. v. Argus Leader,
   139 S. Ct. 2356 (2019) ................................................................ 27, 28, 30

Forest Cnty. Potawatomi Cmty. v. Zinke,
   278 F. Supp. 3d 181 (D.D.C. 2017) .............................................. 19, 22, 23

Freedom Watch v. Bureau of Land Mgmt., Civ. A.,
   No. 16-992 (CKK), 2016 WL 6304653 (D.D.C. Oct. 27, 2016) ............................. 37

Gellman v. Dep't of Homeland Sec., Civ. A.,
   No. 16-0635 (CRC), 2020 WL 1323896 n.12 (D.D.C. Mar. 20, 2020) .................... 28

Hemenway v. Hughes,
   601 F. Supp. 1002 (D.D.C. 1985) ........................................................ 34, 35

Hopkins v. Dep't of Hous. & Urban Dev.,
  929 F.2d 81 (2d Cir.1991) ........................................................................................ 33, 34

John Simmons Co. v. Grier Bros. Co.,
  258 U.S. 82 (1922) .......................................................................................................... 4

Judicial Watch, Inc. v. Dep't of Justice,
  102 F. Supp. 2d 6 .......................................................................................................... 18

Judicial Watch, Inc. v. Fed. Hous. Fin. Agency,
  646 F.3d 924 (D.C. Cir. 2011) ...................................................................................... 22

Judicial Watch, Inc. v. U.S. Secret Serv.,
  726 F.3d 208 (D.C. Cir. 2013) ...................................................................................... 18

Kahn v. Fed. Motor Carrier Safety Admin.,
  648 F. Supp. 2d 31 (D.D.C. 2009) ................................................................................ 27

Landmark Legal Found. v. EPA,
  272 F. Supp. 2d 59 (D.D.C.2003) ................................................................................. 13

Langevine v. District of Columbia,
  106 F.3d 1018 (D.C. Cir. 1997) ...................................................................................... 4

Lederman v. United States,
  539 F. Supp. 2d 1 (D.D.C. 2008) ............................................................................... 5, 16

Long v. Immigr. & Customs,
  279 F. Supp. 3d 226 (D.D.C. 2017) .............................................................................. 10

Mead Data Cent., Inc. v. Dep't of Air Force,
  566 F.2d 242 (D.C. Cir. 1977) ...................................................................................... 36

Multi Ag Media LLC v. Dep't of Agric.,
  515 F.3d 1224 (D.C. Cir. 2008) .................................................................................... 32

N.Y. Times Co. v. NASA,
  920 F.2d 1002 (D.C. Cir. 1990) .................................................................................... 31

Nat. Res. Def. Council, Inc. v. EPA,
  2020 WL 5632410 (D.D.C. Sept. 21, 2020) ................................................................... 4

Nat'l Ass'n of Home Builders v. Norton,
  309 F.3d 26 (D.C. Cir. 2002) ........................................................................................ 32

Nat'l Ass'n of Retired Fed. Emps. v. Horner,
  879 F.2d 873 (D.C. Cir. 1989) ...................................................................................... 32

Nat'l Parks & Conservation Ass'n v. Morton,
  498 F.2d 765 (D.C. Cir. 1974) ...................................................................................... 27

Nix v. United States,
  572 F.2d 998 (4th Cir. 1978) ........................................................................................ 32

Ocasio v. Dep't of Justice,
  67 F. Supp. 3d 438 (D.D.C. 2014) ................................................................................ 38

OSHA Data/CIH, Inc. v. Dep't of Labor,
  220 F.3d 153 (3d Cir. 2000) .......................................................................................... 30

iv

Painting & Drywall Work Pres. Fund, Inc. v. Dep't of Hous. & Urban Dev.,
    936 F.2d 1300 (D.C. Cir. 1991) ............................................................................. 32

Perrin v. United States,
    444 U.S. 37 (1979) ................................................................................................. 27

Physicians Comm. for Responsible Med. v. Dep't of Agric.,
    316 F. Supp. 3d 1 (D.D.C. 2018) ........................................................................... 22

Pinson v. Dep't of Justice,
    202 F. Supp. 3d 86 (D.D.C. 2016) ..................................................................... 32, 33

Presidential Bank, FSB v. 1733 27th St. SE LLC,
    404 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................... 25

Pub. Citizen Health Rsch. Grp. v. FDA,
    704 F.2d 1280 (D.C. Cir. 1983) ....................................................................... 26, 30

Pub. Citizen v. Dep't of Health & Human Servs.,
    Civ. A. No. 11-1681 (BAH), 2013 WL 12329926 (D.D.C. Dec. 3, 2013)................................ 3

Ramcharan v. DEA,
    Civ. A. No. 18-2759 (EGS), 2020 WL 5366473 (D.D.C. Sept. 8, 2020) .................................. 25

Reliant Energy Power Generation, Inc. v. FERC,
    520 F. Supp. 2d 194 (D.D.C. 2007) ........................................................................ 18

Renewable Fuels Ass'n & Growth Energy v. EPA,
    No. CV 18-2031 (JEB), 2021 WL 394841 (D.D.C. Feb. 4, 2021) .................................... 27, 28

Rodriguez v. Dep't of Army,
    31 F. Supp. 3d 218 (D.D.C. 2014) .......................................................................... 18

S. All. for Clean Energy v. Dep't of Energy,
    853 F. Supp. 2d 60 (D.D.C. 2012) .......................................................................... 30

SafeCard Servs., Inc. v. SEC,
    926 F.2d 1197 (D.C. Cir. 1991) ............................................................................. 38

Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela,
    Civ. A. No. 20-0129 (RC), 2021 WL 326079 (D.D.C. Feb. 1, 2021) ........................................ 4

Schoen v. Wash. Post,
    246 F.2d 670 (D.C. Cir. 1957) ................................................................................ 4

Scott-Blanton v. Universal City Studios,
    Prods. LLP, 246 F.R.D. 344 (D.D.C. 2007) ............................................................. 37

Shapiro v. Dep't of Justice,
    Civ. A. No. 12-0313 (BAH) 2020 WL 3615511 (July 2, 2020)............................................. 28

Sherman v. Dep't of Army,
    244 F.3d 357 (5th Cir. 2001) ................................................................................. 31

Singh v. George Wash. Univ.,
    383 F. Supp. 2d 99 (D.D.C. 2005) ............................................................................ 5

Smith v. Exec. Off. for U.S. Attorneys,
    69 F. Supp. 3d 228 (D.D.C. 2014) .......................................................................... 25

Stella v. Mineta,
  284 F.3d 135 (D.C. Cir. 2002) ................................................................................ 37

Stotter v. U.S. Agency for Int'l Dev.,
  Civ. A. No. 14-2156 (KBJ), 2020 WL 5878033 (D.D.C. Oct. 3, 2020) ............... 27, 35

Sussman v. U.S. Marshals Serv.,
  494 F.3d 1106 (D.C. Cir. 2007) ........................................................................... 25, 36

Tax Analysis v. Dep't of Justice,
  845 F.2d 1060 (D.C. Cir. 1988) ............................................................................... 20

Truesdale v. Dep't of Justice,
  Civ. A. No. 03-1332 (GK), 2005 WL 3294004 (D.D.C. Dec. 5, 2005) .................... 36

United States v. Palmer,
  122 F.3d 215 (5th Cir. 1997) ..................................................................................... 4

Wallick v. Agric. Mktg. Serv.,
  281 F. Supp. 3d 56 (D.D.C. 2017) ........................................................................... 8, 9

Wash. Post Co. v. Dep't of Health & Human Servs.,
  690 F.2d 252 (D.C. Cir. 1982) ............................................................................... 26, 32

Wash. Post,
  456 U.S. ................................................................................................................. 31, 34

Williams v. Johanns,
  555 F.Supp.2d 162 (D.D.C. 2008) ............................................................................ 5

Wilson v. Dep't of Transp.,
  No. 10-5295, 2010 WL 5479580 (D.C. Cir. Dec. 30, 2010) ................................... 37

Yanofsky v. Department of Commerce,
  306 F. Supp. 3d 292 (D.D.C. 2018) ........................................................................... 2

Yanofsky v. Dep't of Commerce,
  Civ. A. No. 16-0951 (KBJ), 2019 WL 5110502 (D.D.C. Apr. 25, 2019) .................. 3

## STATUTES

5 U.S.C. § 551(2) ........................................................................................................... 27

5 U.S.C. § 552(b)(6) ...................................................................................................... 31

5 U.S.C. § 552(b) ........................................................................................................... 35

19 U.S.C. 1436 ............................................................................................................... 29

## RULES

Fed. R. Civ. P. 54(b) ....................................................................................................... 3

Fed. R. Civ. P. 56(e) ...................................................................................................... 24

## REGULATIONS

15 C.F.R. § 4.5 ............................................................................................................... 26

## PRELIMINARY STATEMENT

Defendant Department of Commerce ("the Department" or "Defendant" or "DOC"), on behalf of its component the International Trade Administration ("ITA"), through undersigned counsel, respectfully submits this Memorandum in further support of Defendant's Renewed Motion for Summary Judgment ("Renewed Motion") and in Opposition to Renewed Cross-Motion for Summary Judgment filed by Plaintiff David Yanofsky ("Plaintiff" or "Yanofsky").

Plaintiff's combined Renewed Cross-Motion for Summary Judgment and Opposition to Defendant's Renewed Motion for Summary Judgment (collectively, "Opposition") relies on mischaracterizations and omissions of relevant facts and law to try to persuade the Court that it cannot consider or must reject Defendant's arguments.  In reality, both the law and the facts support Defendant's position, and this Court should grant summary judgment in Defendant's favor.  More specifically, Defendant is entitled to summary judgment for the reasons summarized below:

(1)  The FOIA request is properly interpreted as seeking the Standardized Reports of I-92 and I-94 Data that the Department creates from raw data supplied and owned by U.S. Customs and Border Protection ("CBP") (not the non-aggregated data from which the Standardized Reports are created), and Defendant has already produced the responsive records.[1]

(2)  To the extent the FOIA request can be interpreted as seeking the raw data from which the Standardized Reports are created, the Department has lawfully not produced such records to Plaintiff because:

  i.  The records are not "agency records" within the meaning of FOIA and, therefore, do not need to be produced;

  ii.  The records are owned by CBP and the Department went above and beyond its responsibility in referring the records to CBP for processing and response to Plaintiff;

---

[1]  On June 5, 2018, Defendant released 35 Excel spreadsheets containing I-92 Data – i.e., seven Excel spreadsheets for each of the five years of data requested by Plaintiff– that were the Standardized Reports of I-92 Data known as the "U.S. International Air Travel Statistics Report." The Department also released five Excel spreadsheets—i.e., one Excel spreadsheet for each of the five years of data requested by Plaintiff—that were the Standardized Reports of I-94 Data known as the "Summary of International Travel to the United States" report.  3d Hill Decl. ¶¶ 5, 9-10.

iii. Even if the records were agency records of the Department, the data is properly withheld under FOIA exemptions.  More specifically,

1.  the I-92 Data contains business confidential information that is not reasonably segregable from the remaining data and exempt from disclosure under FOIA Exemption 4, and

2.  the I-94 Data contains personally identifiable information that is exempt from disclosure under FOIA Exemption 6.

## **ARGUMENT**

**I.    PLAINTIFF FAILS TO ESTABLISH DEFENDANT'S INTERPRETATION OF THE FOIA REQUEST IS UNREASONABLE OR THAT DEFENDANT'S ARGUMENT REGARDING ITS INTERPRETATION IS FORECLOSED**

This Court should flatly reject Plaintiff's assertion that "[the Department's] contention that it lawfully 'interpreted' Plaintiff's request . . . is foreclosed by this Court's prior decision, the plain text of Plaintiff's Request, [the Department's] own confirmation that it knew Plaintiff to be seeking the underlying databases, and binding caselaw requiring agencies to liberally construe FOIA requests."  Pl's Opp. at 2; see also id. at 11-16.  Plaintiff's repeated claims that his request was clear and that databases were improperly withheld is belied by the record and his arguments are unsupported by case law.[2]

---

[2]      Notably, this is not the first time Plaintiff has mischaracterized what has been "foreclosed" by a decision of this Court.  In Yanofsky v. Department of Commerce, 306 F. Supp. 3d 292 (D.D.C. 2018) ("Yanofsky I"), this Court's March 2018 Order ruled on the sole issue before it:  whether the agency had properly determined that certain statutes displaced the FOIA's fee-setting and fee-waiver provisions, requiring Plaintiff to pay fees pursuant to those statutes before receiving records responsive to the FOIA request that is the subject of this suit.  Despite the fact that the parties' briefing in Yanofsky I never addressed the merits of any issue other than fees and nowhere in the Court's March 2018 Order did the Court rule on – or even discuss – whether Defendant could lawfully withhold responsive records for non-fee-related reasons, Plaintiff filed a motion in December 2018 that mischaracterized the Court's March 2018 Order as foreclosing the withholding of any records.  The motion also inaccurately alleged that Defendant was "in flagrant violation" of "this Court's March 30, 2018 Order."  Yanofsky I: ECF No. 43 at 1.  The Court rightly rejected Plaintiff's mischaracterization of its ruling and explained that Plaintiff's argument was unsound because "neither the original complaint nor [Plaintiff's] summary judgment motion actually addressed any substantive issues regarding withholdings, nor could they possibly have done so, because at that stage of the litigation, the fee issue was a predicate barrier to the records

A.    **The Court Should Exercise Its Discretion to Revise the Portion of its October 2020 Decision Interpreting Plaintiff's FOIA Request as Seeking I-92 and I-94 Databases**

Contrary to Plaintiff's assertion, this Court's October 6, 2020, decision [ECF No. 24] ("October 2020 Decision") denying both parties' first motions for summary judgment does not foreclose Defendant from presenting an argument in its Renewed Motion regarding its interpretation of the FOIA request.  "Denial of a summary judgment motion is an interlocutory order and district courts have discretion to entertain successive summary judgment motions on the same (or different) grounds."  Awan v. Dep't of Justice, 46 F. Supp. 3d 90, 91–92 (D.D.C. 2014); Pub. Citizen v. Dep't of Health & Human Servs., Civ. A. No. 11-1681 (BAH), 2013 WL 12329926, at *2 (D.D.C. Dec. 3, 2013).  Moreover, pursuant to Federal Rule of Civil Procedure 54, a district court may "revise[]" any of its interlocutory decisions "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b); see Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc., 630 F.3d 217, 227 (D.C. Cir. 2011) (stating that Rule 54 "recognizes [the Court's] inherent power to reconsider an interlocutory order 'as justice requires.'" (alteration in original)).

Plaintiff argues (at 11) that "[u]nder the law-of-the-case doctrine [the Department] cannot now, on renewed motions for summary judgment, argue that it can advance a different . . . 'interpretation' of Plaintiff's [FOIA] Request," but this argument fails because (i) Defendant has never stated that the agency interpreted the FOIA request as seeking something other than the Standardized Reports; and (ii) Plaintiff's argument is plainly wrong under well-established case law.  The D.C. Circuit has repeatedly held that "[i]nterlocutory orders are not subject to the law of

---

release."  Yanofsky v. Dep't of Commerce, Civ. A. No. 16-0951 (KBJ), 2019 WL 5110502, at *3 (D.D.C. Apr. 25, 2019) (emphasis in original).

the case doctrine and may always be reconsidered prior to final judgment," Filebark v. Dep't of Transp., 555 F.3d 1009, 1013 (D.C. Cir. 2009) (quoting Langevine v. District of Columbia, 106 F.3d 1018, 1023 (D.C. Cir. 1997)); see also United States v. Palmer, 122 F.3d 215, 220 (5th Cir. 1997) ("[I]n civil cases, a district court is not precluded by the law-of-the-case doctrine from reconsidering previous rulings on interlocutory orders such as summary judgment motions, as those rulings are not immutable and lack res judicata effect.").  "So long as the court has jurisdiction over an action, it should have complete power over interlocutory orders made therein and should be able to revise them when it is consonant with equity to do so." Schoen v. Wash. Post, 246 F.2d 670, 673 (D.C. Cir. 1957) (quoting John Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 90-91 (1922) (quotation marks omitted)) (emphasis added).  Thus, the law of the case doctrine does not preclude the Court from considering and ruling on Defendant's argument in its Renewed Motion regarding the proper interpretation of the FOIA request.

Even if the law of the case doctrine did apply, that doctrine does not present an insuperable hurdle as Plaintiff implies.[3]  While the doctrine is generally understood to mean "that the same issue presented a second time in the same case in the same court should lead to the same result," absent extraordinary circumstances," Al Bahlul v. United States, 967 F.3d 858, 875 (D.C. Cir. 2020) (quotation omitted), the doctrine simply "directs a court's discretion, it does not limit the tribunal's power," Arizona v. California, 460 U.S. 605, 618 (1983) (citation omitted) (emphasis added).  Therefore, as the Supreme Court has explained, "[u]nder law of the case doctrine . . . it is

---

[3]     To be sure, some Courts in this Federal district have held that "a court's discretion under Rule 54(b) is 'limited by the law of the case doctrine.'"  See, e.g., Nat. Res. Def. Council, Inc. v. EPA, Civ. A. No. 16-1861 (JDB), 2020 WL 5632410, at *3 (D.D.C. Sept. 21, 2020); Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela, Civ. A. No. 20-0129 (RC), 2021 WL 326079, at *6 (D.D.C. Feb. 1, 2021) ("Even though interlocutory orders are not "subject to" the law of the case doctrine, "nothing prevents the court from applying the rationale of that doctrine to guide a Rule 54(b) decision.").

<u>not</u> improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." <u>Id.</u> at 618 & n.8 (citations omitted).

Notably, the Supreme Court's statement is virtually identical to the standard applied in this Circuit under Rule 54(b), which defines "extraordinary circumstances" warranting reconsideration as including circumstances "where the initial decision was clearly erroneous and would work a manifest injustice." <u>Lederman v. United States</u>, 539 F. Supp. 2d 1, 2 (D.D.C. 2008). The Rule 54(b) standard has been further elaborated on in cases explaining that reconsideration of an interlocutory order is appropriate when "the court 'patently' misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or . . . a controlling or significant change in the law has occurred." <u>Williams v. Johanns</u>, 555 F.Supp.2d 162, 164 (D.D.C. 2008) (citing <u>Singh v. George Wash. Univ.</u>, 383 F. Supp. 2d 99, 101 (D.D.C. 2005)).

This case presents the type of "extraordinary" circumstances warranting revision of the portion of the October 2020 Decision interpreting Plaintiff's FOIA request as seeking "the data <u>from which</u> both [the Department's] annual reports and customized reports are created," ECF No. 24 at 4 (emphasis in original), because that portion of the Court's decision "fail[ed] to consider controlling decisions and data" "that might reasonably be expected to alter the conclusion reached by the court." <u>See</u> <u>Breen v. Peters</u>, Civ. A. No. 05-0654 (RWR), 2009 WL 10718520, at *1 (D.D.C. Jan. 6, 2009) (explaining that "[r]econsideration may be warranted where . . . a court made an error of apprehension," and "[e]rrors of apprehension may include a Court's failure to consider 'data . . . that might reasonably be expected to alter the conclusion reached by the court." (internal citations omitted)). More specifically, the Court "fail[ed] to consider controlling decisions and data" when it (i) did not take into consideration the extensive case law that limits the interpretation

of a FOIA request to the plain language within the four corners of the request; and (ii) took into consideration Plaintiff's September 2019 "clarification" of the records the FOIA request sought but neglected to consider the fact that the alleged clarification was not provided to Defendant until 15 months _after_ Defendant had already interpreted and responded to the FOIA request.

In Section I.B.2 of this memorandum (below), Defendant details at length the case law and "data" available at the time it interpreted the FOIA request and why such data does not lend itself to Plaintiff's (and the Court's) interpretation of the FOIA request but, instead, supports Defendant's interpretation of the FOIA request as seeking the I-92 and I-94 Standardized Reports that were in the form of Excel spreadsheets that Defendant has already produced to Plaintiff. Defendant also addresses the arguments in Plaintiff's Opposition regarding his new interpretation of the FOIA request and the error innate in Plaintiff's (and the Court's) reliance on the September 2019 email exchange between the parties when reaching a conclusion regarding the proper interpretation of the FOIA request.  A review of the facts and law will show that the Court did not consider controlling law and facts, thus warranting revision of the portion of the October 2020 Decision interpreting the records requested by the FOIA request.

### B.     The FOIA Request Is Properly Interpreted as Seeking the Standardized Reports of I-92 and I-94 Data Already Produced by Defendant

Plaintiff argues (at 12) that Defendant's interpretation of the FOIA request seeking the "Air Arrivals I-94 Annual Datafile" and "U.S. International Air Travel Statistics Report (APIS/I-92) Data Files" was unreasonable because "every aspect of the Request" revealed that "Plaintiff's FOIA Request clearly requested non-aggregated 'data from which both [the Department's] annual reports and customized reports are created.'"  Plaintiff's arguments, however, are misplaced and each argument is discussed below.

1.      **Plaintiff's Misplaced Reliance on this Court's Decision in *Conservation Force v. Ashe*, 979 F. Supp. 2d 90, 102 (D.D.C. 2013)**

Plaintiff argues (at 12-14) that if the FOIA request was ambiguous, then Defendant was duty bound to interpret the request in a way likely to "yield the greatest number of responsive documents" and, thus, the agency should have interpreted the request as seeking the underlying databases.  Plaintiff's argument misses the mark.  As an initial matter—and putting aside for the moment issues of whether the databases are agency records subject to FOIA and whether the data is owned by Defendant—had the agency interpreted the FOIA request as Plaintiff now asserts (i.e., as asking for databases) there would only have been six files responsive to the request because there are only six databases for the relevant period.  See Def's Ex. C at ¶¶ 5, 10 (J. Hall Decl.); Def's Ex. D at ¶¶ 5, 13 (Hull Decl.).  In contrast, it is undisputed that Defendant produced 40 data files corresponding to I-94 and I-92 Standardized Reports to Plaintiff under its (proper) interpretation of the FOIA request.  DSOMF ¶ 4; PSOMF ¶ 4.[4]  By Plaintiff's own logic, the agency was duty bound to interpret the request as seeking the data files corresponding to Standardized Reports because this interpretation would have yielded more records than if it had interpreted the request as seeking databases.  In short, Plaintiff's argument regarding applying the interpretation that "yields the most responsive records" stands in blatant disregard for the mathematical realities of this case.

Plaintiff's attempt to buttress this argument by relying on this Court's decision in Conservation Force also fails, as the facts of that case are inapposite to the case at bar.  In Conservation Force, the FOIA request at issue described the records sought in a manner that

---

[4]      Defendant employs the following acronyms in its citations: (1) "DSOMF" for Defendant's Statement of Material Facts Not in Genuine Dispute and Defendant's Response to Plaintiff's Additional Facts; and (2) "PSOMF" for Plaintiff's Responses to Defendant's Facts and Plaintiff's Additional Facts.

allowed the agency to identify the documents sought, but the agency narrowed the scope of the FOIA request based on a parenthetical statement within the request.  979 F. Supp. 2d at 102.  The Court's analysis of the request found that, while the parenthetical statement made the FOIA request somewhat ambiguous, there were only two interpretations of the request and, "assuming that the FOIA request is subject to both of [those] reasonable readings, the [agency] had a duty under the FOIA to select the interpretation that would likely yield the greatest number of responsive documents."  Id. at 102.  In contrast, as discussed in more detail below (and in Defendant's Renewed Motion), the FOIA request at issue in this case had one reasonable interpretation, namely that the I-92 "Datafiles" and I-94 "Data files" that Plaintiff sought were the data files consisting of the Excel data spreadsheets of Standardized Reports.  Although "[a]gencies must interpret FOIA requests liberally and reasonably, . . . they need not extend the meaning of the request to include things not asked for."  Wallick v. Agric. Mktg. Serv., 281 F. Supp. 3d 56, 68 (D.D.C. 2017). The agency's interpretation of the scope of Plaintiff's FOIA request was consistent with the plain language of the request itself and the law.

      **2.**        **Defendant Properly Interpreted the FOIA Request as Seeking the Standardized Reports**

Plaintiff asserts that his "FOIA Request clearly requested non-aggregated data from which both [the Department's] annual reports and customized reports are created, which is evident from every aspect of the Request", Pl's Opp. at 13 (internal punctuation and citation omitted); however, a review of the text of Plaintiff's request quickly reveals how hollow this argument rings. Plaintiff's attempt to circumvent the limited and plain language of the FOIA request by pointing to out of context statements and immaterial representations made long after the agency had received, interpreted, and responded to his request should be flatly rejected by the Court.

### (a)   Text of the FOIA Request

The section titled "FOIA Request" in Plaintiff's February 26, 2016, letter ("February 2016 Letter") describes the records sought, and it states in full:

> I now write on Mr. Yanofsky's behalf to resubmit his March 10, 2015 FOIA request, attached hereto as Attachment A, and to update that request to include records from 2015. Accordingly, you should consider this letter to be a new FOIA request by Mr. Yanofsky for the following records:
>
> Mr. Yanofsky requests access to and copies of [National Travel & Tourism Office's] "Air Arrivals 1-94 Annual **Datafile**" from 2015, 2014, 2013, 2012 and 2011 and its associated technical documentation.  Mr. Yanofsky also requests access to and copies of [National Travel & Tourism Office's] "U.S. International Air Travel Statistics Report (APIS/I- 92) **Data Files**" for 2015, 2014, 2013, 2012 and 2011 and its associated technical documentation. Mr. Yanofsky would like to receive the requested records in electronic format.

Def's Ex. E at 2 (February 2016 Letter) (emphasis added).  Here, Plaintiff uses the words "Datafiles" and "Data files"—rather than "databases"—to describe the records sought. The FOIA request does <u>not</u> otherwise describe the data sought, does <u>not</u> state that Plaintiff was seeking non-aggregated data, and does <u>not</u> specify that Plaintiff was requesting the data "from which" the Standardized Reports were created.  <u>See id.</u>  An agency is permitted to assume that the requester's words have meaning in the normal context of the subject matter at hand; thus, based on the plain language of the FOIA request, the subject matter experts who reviewed the request reasonably interpreted the request as seeking the Excel spreadsheets of data that are the Standardized Reports. <u>See Wallick</u>, 281 F. Supp. 3d at 67; <u>see also</u> Powers Decl. ¶¶ 9-10.  This interpretation was also consistent with the fact that Defendant reasonably presumed that the requester was seeking agency records in its actual possession (rather than non-agency records not in its actual possession) and the Standardized Reports, along with custom reports that Plaintiff has disclaimed interest in, are

the only agency records in Defendant's possession that contain I-92 Data and I-94 Data.  Def's Ex. C at ¶¶ 10-11 (J. Hall Decl.); Def's Ex. D at ¶¶ 9, 13 (W. Hull Decl.).

Plaintiff attempts (at 13) to bolster support for his current interpretation of the FOIA request by pointing to the fact that "[t]he Request also sought 'associated technical documentation' for the data," which, Plaintiff claims "databases commonly have."  In support of this argument, Plaintiff cites to a single case—Long v. Immigr. & Customs Enf't, 279 F. Supp. 3d 226, 235 (D.D.C. 2017)—that does not come close to standing for the proposition that a request for "technical documentation" indicates a request for databases or the proposition that databases often contain technical documentation.  His reliance on this case is even more baffling when one looks at the number cases that use the phrase "technical documentation," when not referring to databases.

Further, although Plaintiff asserts that databases commonly have associated technical documentation, he fails to establish that datafiles (e.g., Excel files) typically do not have such technical documents; thus, he fails to explain why Defendant should have understood the request for "technical documentation" to refer to databases when the request plainly sought "Datafiles" and "Data files."  In any event, there is no technical documentation for either the databases that Plaintiff claims are the subject of the request or the Standardized Report data files that were produced in response to the request, so the reference to associated technical documentation is not enlightening.  Consequently, and contrary to Plaintiff's assertions otherwise, the language of the FOIA request does not clearly seek databases nor does it otherwise "clearly request non-aggregated data from which both [the Department's] annual reports and customized reports are created."

Defendant's view that the FOIA request does not seek the data from which Standardized Reports are created is further buttressed by the stark contrast in language between Plaintiff's multiple requests for datafiles of the U.S. International Air Travel Statistics Program and Visitor

Arrivals Program and the language of his request that does seek <u>databases</u>. More specifically, Plaintiff's March 2015, November 2015, and February 2016 requests all refer to seeking "Data files" or "Datafiles," whereas his August 2020 request seeks "access to and copies of all 'Detail Arrival Records' in the National Travel & Tourism Offices' (NTTO) 'Air Arrivals I-94 Database' with entry dates from January 1, 2018 to the present." <u>Compare</u> Def's Ex. I (Powers Decl.): Atts. 1, 3, 4 <u>with</u> Def's Ex. I (Powers Decl.): Att. 6.

### (b)   The February 2016 Letter Supports Defendant's Interpretation of the FOIA Request

Plaintiff's arguments (at 13-14) relying on other parts of the February 2016 Letter and its attachments fare no better than his arguments relying on the text of the FOIA request. First, Plaintiff unavailingly points to language submitted in the "Request for a Fee Waiver" section of the letter as evidence that ITA should have interpreted its FOIA request differently. Specifically, Plaintiff asserts that Defendant should have known that the FOIA request sought databases because the letter contained language stating that "the records sought would 'provide . . . official and up-to-date data on foreign travel to and from the United States, which will allow the public to test and evaluate the accuracy of official [Department] and other government statistics on travel that are <u>calculated using this data</u>[.]'" Pl's Opp. at 13 (emphasis in original) (citing February 2016 Letter at 4). Plaintiff fails to explain why this language should have clued Defendant in that Plaintiff was allegedly requesting databases of data as opposed to the "data files" that Defendant believes were responsive to the request and which are used in calculations by other agencies.

Plaintiff's Opposition then ignores other language in the February 2016 Letter that evidences Defendant's interpretation of the FOIA request as seeking the Standardized Reports is reasonable and accurate. This includes language in the "Request for a Fee Waiver" section asserting that if the records are not made available to Plaintiff under FOIA, then "Mr. Yanofsky

would be required to pay the fees listed on the [National Travel & Tourism Office] website in order to obtain the requested records." Def's Ex. 2 at 4 (February 2016 Letter). This language clearly indicates that the records National Travel & Tourism Office sells are the same records that are being requested, and it is undisputed that the records National Travel & Tourism Office sells are the Standardized Reports. The "Request for a Fee Waiver" section of the February 2016 Letter also asserts that the data requested "will provide . . . insight into the data that policy makers use to make decisions, such as visa allocation and levels of infrastructure investment at ports and border crossings." Def's Ex. 2 at 3 (February 2016 Letter). Given that National Travel & Tourism Office provides the official government summary statistics on travel, and does not release non-aggregated data, it was reasonable to conclude that Plaintiff was seeking the summary statistics that National Travel & Tourism Office produces and which are used by policymakers to craft their decisions.[5]

> **(c)** **The Attachments to the FOIA Request and Other Information Support Defendant's Interpretation of the FOIA Request**

Plaintiff next cites language from a December 2015 request for reconsideration ("December 2015 Letter") of the determination of his appeal of the agency's response to a different FOIA request as evidence of how Defendant should have interpreted the February 2016 FOIA request. See Pl's Opp. at 13-14 (referring to the December 2015 Letter as "an attachment to the Request"). As an initial matter, the language in the December 2015 Letter is irrelevant, as it is neither explicitly included as part of the February 2016 request describing the records sought nor

---

[5]   Among other things, Defendant is statutorily charged with providing official government estimates for travel to and from the United States, which in turn is used by the Bureau of Economic Analysis (another component of DOC) as part of its calculation of the Gross Domestic Product.

is there any reference incorporating this language into the FOIA request in this case.[6]  See Am. Chemistry Council, Inc. v. Dep't of Health & Human Servs., 922 F. Supp. 2d 56, 62 (D.D.C. 2013) ("Agencies . . . need not expand their searches beyond 'the four corners of the request,' nor are they 'required to divine a requester's intent.'"  (quoting Landmark Legal Found. v. EPA, 272 F. Supp. 2d 59, 64 (D.D.C.2003))).  To the extent that the December 2015 Letter is relevant at all, Plaintiff's Opposition mischaracterizes the statements therein by cobbling together two sentences that are paragraphs apart in order to make it seem as though Defendant should have read the letter as seeking "data sets" underlying the Standardized Reports.  See Pl's Opp. at 13-14 compare Def's Ex. 2: Att. E at 2 (December 2015 Letter).

Plaintiff also mischaracterizes the December 2015 Letter's content by omitting a critical phrase at the beginning of the quoted sentence.  The letter actually states that "[t]he data in the requested reports could be used to provide critical understanding of the 'operations and activities of the government[.]'"  Pl's Opp. at 13-14 (emphasis added to identify language Plaintiff omitted when quoting the December 2015 Letter, available at Def's Ex. 2: Att. E at 2).  Plaintiff likely omitted this portion of the sentence because the December 2015 Letter's reference to "reports" when discussing the records sought undermines Plaintiff's argument that interpreting the FOIA request as seeking the Standardized Reports was unreasonable.  Given these facts, the language of the December 2015 Letter only reinforces the fact that the agency appropriately construed the

---

[6]     To be sure, there are references to the December 2015 Letter in the February 2016 Letter but none of the references are in the section describing the records sought (i.e., the section titled "FOIA Request").  Additionally, the references to the December 2015 Letter do not purport to provide any information about the records sought and instead only describes why Plaintiff believes the records should be available under FOIA without having to pay the fees listed on NTTO's website.  See Def's Ex. E at 3-4 (referring Defendant to the December 2015 Letter only for purposes of reviewing arguments challenging the Department's determination that the records are not available under FOIA).

February 2016 FOIA request as seeking the Standardized Reports, not the underlying data from which the reports were created.

Significantly, to the extent the Court will incorporate information from the attachments to the February 2016 Letter into its analysis of what records were requested, the content of those documents reinforces the reasonableness of Defendant's interpretation of the FOIA request as seeking the Standardized Reports created by Defendant. The attachments submitted along with the FOIA request – including the December 2015 Letter – contained repeated references to the requested records being the <u>same documents</u> that Defendant's National Travel & Tourism Office offered for sale on its website, and it is undisputed that the Standardized Reports and customized data files are the only records offered for sale on the website. Examples of these references include the following:

- Def's Ex. 2: Att. C at 1, 3 (July 2015 Appeal re: March 2015 Request) – referring to requested records as "I-94 Documents", asserting that "ITA … compiles and offers for sale the I-94 Documents on its own website for a fee. The mere existence of the data I am requesting on the [National Travel & Tourism Office's] website belies their assertion that they do not maintain the I-94 Documents.");

- Def's Ex. Att. C at 1, 4 (July 2015 Appeal re March 2015 FOIA Request) – referring to requested records as the "I-92 Documents", noting that "it is true that the I-92 Documents are provided for sale on its website", and providing a link to the page selling National Travel & Tourism Office's Standardized Reports;

- Def's Ex. 2: Att. E (December 2015 Letter) – complaining that "the . . . fees demanded <u>for the requested records</u> bear no relationship to the 'actual or estimated costs' of making them available in electronic format" (emphasis added).

This is but a small sample of the details in the attachment that supports Defendant's contention that it reasonably concluded that Plaintiff was seeking the "data files" corresponding to the Standardized Reports it produces, and not the databases containing copies of CBP's data that Defendant uses in creating its data files.

14

In <u>Yanofsky I</u>, Plaintiff litigated whether fees could be charged under FOIA <u>for the documents the National Travel & Tourism Office sells</u>. After Plaintiff prevailed in <u>Yanofsky I</u> on the fee issue, Defendant provided the requested documents to Plaintiff free of charge, but now Plaintiff insists the documents National Travel & Tourism Office sells are not what he wanted after all.  Plaintiff's litigation reflects not recalcitrance on the Department's part in providing the requested data, but instead a requester disappointed that what he asked for was not what he was hoping it would be.  For example, Plaintiff has repeatedly characterized in his news publications that he was seeking anonymous immigrant data, despite the fact that the National Travel & Tourism Office provides only data about visitors (a.k.a. tourists), and by definition immigrants are not visitors. See, e.g., "Why a Quartz reporter is suing the government for immigration data", Chris Roush, Talking Biz News (Dec. 20, 2016) (available at https://talkingbiznews.com/they-talk-biz-news/why-a-quartz-reporter-is-suing-the-government-for-immigration-data/) ("Yanofsky writes, 'My lawsuit concerns two databases maintained by the ITA: One contains anonymous immigrations records; the other, statistics about international air travelers.'" Presumably he was referring to the Visitor Arrivals Program data as "anonymous immigrations [sic] records".).[7]  But Plaintiff's disappointment does not entitle him to obtain production from Defendant of non-agency

---

[7]    See also "Quartz reporter wins lawsuit against U.S. Department of Commerce", Chris Roush, Talking Biz News (Apr. 3, 2018) (available at https://talkingbiznews.com/they-talk-biz-news/quartz-reporter-wins-lawsuit-against-u-s-department-of-commerce/) ("Quartz reporter David Yanofsky and his lawyers from the Reporters Committee for Freedom of Press have won their lawsuit against the U.S. Department of Commerce's International Trade Administration and can now access previously paywalled immigration data maintained."); "Federal Government Finds Few Buyers for Its Paywalled Immigration Data", David Yanofsky, Nextgov (Aug. 8, 2018) ("I'm suing for the data in question, which include anonymous immigration records and statistics about international air travelers."); "The US government is finding few buyers for its paywalled immigration data", David Yanofsky, Quartz (Aug. 8, 2018) ("I'm suing for the data in question, which include anonymous immigration records and statistics about international air travelers."); ECF 1-7 at p. 25 (suggesting that the data sought can provide an "official and up-to-date source[] of information on … immigration").

records that were not even reasonably understood as covered by his request.  As much as Plaintiff may wish that his request had unambiguously sought the underlying databases from which the Standardized Report datafiles are created, the only way to reach that conclusion is to simply ignore the plain language of its request, the language of Plaintiff's request for a fee waiver, and Plaintiff's pre-production statements.

### 3.     Plaintiff's Improper Reliance on Statements Made in September 2019

Plaintiff's final argument (at 14-15) regarding interpretation of the February 2016 FOIA request asserts that, based on statements made in September 2019, Defendant necessarily understood Plaintiff to be seeking databases at least as early as June 2018 when it responded to the FOIA request, if not by February 2016 or even March 2015.  More specifically, Plaintiff asserts that the memorialization of the "meet and confer" session held nearly 15 months <u>after</u> Defendant issued its response to the FOIA request somehow demonstrates that Defendant always interpreted Plaintiff's request as seeking I-94 and I-92 databases and not the Standardized Reports.

A review of the correspondence at issue confirms that Plaintiff's assertion is illogical. Indeed, the September 16, 2019, email from Plaintiff's counsel begins by noting that during the parties meet-and-confer discussion held the prior week Defendant explicitly asked for clarification of the FOIA request and the records at issue in the case.  Def's Ex. F at 1 (Pl's 9/16/2019 Email) (emphasis in original).  The email goes on to articulate, for the first time, Plaintiff's interpretation of the FOIA request as seeking "the underlying I-92 data in [the Department's] database . . . <u>from which</u> both [the Department's] annual reports and customized reports are created" and "the underlying I-94 data stored in the [the Department's] contractor's database, <u>from which</u> the annual issues are generated."  The email also noted that, "[t]o the extent [the Department] ha[d] sold 'annual datafiles' in the past, [Plaintiff believed] those would also be responsive."  <u>Id.</u> at 1-2.  In response, Defendant's counsel acknowledged Plaintiff's new interpretation with a professional

confirmation: "it is our understanding that [Plaintiff is] seeking an electronic copy of the databases used to create I-92 and I-94 reports, and the Department believes that its non-production of those databases is proper under FOIA. However, we are not interested in having this argument in the JSR and we can each fully set forth our arguments in our briefings." Def's Ex. G (9/19/2019 Email from Defendant).

Given the timing of these communications in September 2019 and their unambiguous language, Plaintiff's assertion (at 14) that this email exchange evidences that the Department "interpret[ed] Plaintiff's Request as seeking the underlying I-92 Database and I-94 Databases" in February 2016 when it first received the FOIA request or in June 2018 when it responded to the request is simply illogical. It is telling that, although Plaintiff had plenty of opportunities to do so in his Opposition, Plaintiff fails to cite a single record showing that, prior to September 2019, Defendant indicated it understood that Plaintiff's 2016 FOIA request allegedly sought databases. Plaintiff similarly fails to cite to any case law (or other legal authority) supporting his assertion that the "clarification" of a FOIA request provided over a year after the final production has been made should be considered as evidence of how the agency interpreted the request at the time of fulfilling it.

## II.   EVEN IF THE FOIA REQUEST HAD SOUGHT I-92 AND I-94 DATABASES, DEFENDANT'S REFUSAL TO PRODUCE THE DATA FROM WHICH THE STANDARDIZED REPORTS ARE CREATED IS LAWFUL[8]

### A.   The I-92 and I-94 Data Records Plaintiff Seeks Are Not "Agency Records"

Plaintiff (at 18) falsely asserts (without any factual or legal analysis) that "there is no question that the I-92 Database and I-94 Databases are agency records" and that "there is no dispute that [the Department] has control of the I-92 Database and I-94 Databases."  Both assertions are indisputably wrong.  It is well-established that "not all documents in the possession of a FOIA-covered agency are 'agency records' for the purpose of [the FOIA]."  Judicial Watch, Inc. v. U.S. Secret Serv., 726 F.3d 208, 216 (D.C. Cir. 2013).  The Supreme Court has held that for requested materials to qualify as "agency records", an agency must (i) create or obtain the requested materials, and (ii) "must be in control of the requested materials at the time the FOIA request is made."  Dep't of Justice v. Tax Analysts, 492 U.S. 136, 144-45 (1989); Burka v. Dep't of Health & Human Servs., 87 F. 3d 508, 515 (D.C. Cir. 1996).  Both parts of the test must be satisfied; such that "[a] document that an agency 'created or obtained' is not an 'agency record' within FOIA's meaning if the agency lacked "control of [the record] at the time the FOIA request [wa]s made.'"

---

[8]   If Plaintiff claims that Defendant has waived the ability to assert FOIA exemptions or other bases to withhold the records because those bases were not asserted in the opening brief of its Renewed Motion, this argument has been squarely rejected in cases where, as here, the Plaintiff will have an opportunity to respond to the arguments made by the Defendant in a reply brief.  See, e.g., Dillon v. Dep't of Justice, 444 F. Supp. 3d 67, 96 (D.D.C. 2020) (holding that defendant had not waived argument because "Plaintiff had the opportunity to respond to the arguments in Defendant's reply in its own reply in support of Plaintiff's cross motion"); Rodriguez v. Dep't of Army, 31 F. Supp. 3d 218, 236 n5 (D.D.C. 2014) ("The defendant's failure to raise this exemption in its motion for summary judgment does not constitute a waiver as the plaintiff had an opportunity to reply."); Reliant Energy Power Generation, Inc. v. FERC, 520 F. Supp. 2d 194, 202 (D.D.C. 2007) (concluding that FERC did not waive its right to invoke a FOIA exemption in its second motion for summary judgment by failing to include the exemption in its first motion); Judicial Watch, Inc. v. Dep't of Justice, 102 F. Supp. 2d 6, 12 n. 4 (D.D.C. 2000) (explaining that an agency may raise a new basis for withholding if the plaintiff has an opportunity to respond).

Forest Cnty. Potawatomi Cmty. v. Zinke, 278 F. Supp. 3d 181, 196 (D.D.C. 2017) (second alteration in original) (quoting Burka, 87 F.3d at 515).  Defendant concedes that it has "obtain[ed]" the requested materials; however, Defendant does not "control" the database records within the meaning of the FOIA; therefore, the database records that Plaintiff seeks are not "agency records" subject to FOIA.  Each of these two elements is discussed below.

### 1.    The "Created or Obtained" Prong

Although Defendant does not deny that it "obtained" the records within the meaning of the standard for determining whether they are "agency records," it cannot be denied that the records were created by CBP, not the Department.  Indeed, Plaintiff does not dispute that CBP provides the I-92 data and I-94 data to the Department.  See PSOMF ¶ 5 ("Undisputed that CBP provides data collected from the I-92 Program to [the International Trade Administration's Office of Chief Information Officer] as part of the U.S. International Air Travel Statistics Program."); PSOMF ¶ 15 ("Undisputed that CBP transmits data collected as part of the I-94 Program to CIC Research.").  Further, to the extent that Plaintiff will attempt to argue that Defendant creates the I-92 data or I-92 database because it uploads the raw data from CBP into a database and converts it to a readable form; there is no legal authority in this Circuit that Defendant could find supporting the assertion that simply uploading a file in a readable format constitutes "creating" the document for the purposes of any part of the test to determine whether the material is an "agency record."

Further, if Plaintiff argues that Defendant indirectly created the I-94 database because its contractor supplements the raw I-94 data received from CBP, see PSOMF ¶ 17, this argument should also be rejected.  Plaintiff makes much of the fact that, in addition to the fields of data provided by CBP to ITA's Contractor, the Contractor calculates information missing from the arrival records and populates additional fields containing meta-data about each entry provided by CBP, e.g., "geographic reporting area for the port of entry, whether the record constitutes a tourist

record, the class of admission, and the number of nights stayed." Hull Decl. ¶ 8. These additional

fields, however, contain information about CBP's data that is derivable from CBP's data; thus,

data in the I-94 database is either an exact copy of data provided by CBP or non-aggregated

information derived using the raw I-94 data received from CBP. Creation of this derivative data

does not change any of the data provided by CBP, but it allows the Contractor to generate the

Standardized Reports more efficiently than deriving the information from CBP's data anew with

each report.

### 2. The "Control" Prong

The D.C. Circuit has adopted a four-factor test to determine whether the criteria of

"control" is met:

> [1] the intent of the document's creator to retain or relinquish control over the
> records; [2] the ability of the agency to use and dispose of the record as it sees fit;
> [3] the extent to which agency personnel have read or relied upon the document;
> and [4] the degree to which the document was integrated into the agency's record
> system or files.

Tax Analysis v. Dep't of Justice, 845 F.2d 1060 (D.C. Cir. 1988); Burka, 87 F. 3d at 515. No one

factor is determinative, as the D.C. Circuit has also "adopted a totality of the circumstances test . .

. [that includes] focus[ing] on a variety of factors surrounding the creation, possession, control,

and use of the document by an agency." Consumer Fed'n of Am. v. Dep't of Agric., 455 F.3d

283, 287 (D.C. Cir. 2006). Here, the factors overwhelmingly support the conclusion that the

Department does not control the data Plaintiff seeks.

### (a) The Creator of the Requested Records Intended to Maintain Control of the Records and Defendant's Use and Disposal of the Records Is Limited

The first prong and second prongs of the "agency records" analysis—i.e., the intent of the

creator of the records and the ability of the agency to use and dispose of the records—

unquestioningly lie in favor of finding that the underlying I-92 data and I-94-data are not agency

records.  The terms of the Memorandum of Understanding ("MOU") and Interconnection Security Agreement ("ISA") that collectively governed CBP's provision of I-92 and I-94 data records for 2011-2015 to Defendant reflect unequivocally that CBP, as the creator of the data, intended to retain control over the records and Defendant lacked the ability to use and dispose of the records as it pleased.  Def's Ex. H at ¶¶ 6-14 (Huether Decl.) & Huether Att. 1, 2, 3 (MOUs and ISA in effect 2011-2015).

The clear terms of the MOU reflect that that the I-92 and I-94 data were provided to Defendant for a limited purpose, with restrictions on disclosure, with specified security procedures for the transmission, storage, and access to the data, and with provisions permitting CBP the right to monitor compliance with these terms and limitations.  For example, Section 1.D. of the MOU, mandates that "[n]one of the information [CBP] provides to [the Department] is to be released in any form identifiable to any individuals," it explicitly limits the categories of information that the Department is permitted to release to "the number of arrivals into the United States; the total number of travelers using business, pleasure, and student visas; estimates on the number of individuals arriving by air, land, and sea; and age group data falling under selected categories, including the destination and port-of-entry at the time of arrival,", and requires that only "process[ed] . . . statistical information" be released, i.e., the Department is not permitted to release the original non-processed data and may only release the aggregated statistical data contained in the standardized and customized reports.

CBP's intent to maintain control of the data and limit Defendant's use and disposal of the records is also reflected in Section 2.B. of the MOU, which explains that CBP will only provide the I-92 and I-94 data to Defendant "upon advanced adequate written assurances that the data will be used solely as a statistical research or reporting record, and that the record will be transferred

in a form that is not individually identifiable."  Similarly, Section 4.B. of the MOU explicitly limits Defendant's use of the data to the specifically articulated actions that "advance the purposes of th[e] MOU."  Further, Section 6.B. of the MOU requires that Defendant comply with storage and handling procedures of CBP, reflecting that "[r]ecords and reports made in furtherance of this MOU shall be prepared and classified in accordance with the record-keeping requirements and procedures of the originating party."

**(b)**      **Agency Personnel Have Neither Read Nor Relied On the Requested Records**

The third prong of the "agency record" analysis – i.e., whether agency personnel have read or relied on the requested records – weighs in favor of finding the requested I-92 and I-94 data are not agency records.  As reflected in the Powers Declaration, the National Tourism and Travel Office personnel do not rely on the non-aggregated I-92 and I-94 database entries that Plaintiff asserts are the subject of his FOIA request.  Def's Ex. I at ¶¶ 17-18 (Powers Decl.).  Rather, the only data that the Department's employees do rely on and use are contained in the Standardized Reports of I-92 and I-94 data.  Id.  Further, the Department's personnel do not have access or actual possession of the I-92 and I-94 database entries being sought, so they simply cannot have read or relied upon those entries. Id.  "'[W]here an agency has neither created nor referenced a document in the 'conduct of its official duties,' the agency has not exercised the degree of control required to subject the document to disclosure under FOIA.'"  Physicians Comm. for Responsible Med. v. Dep't of Agric., 316 F. Supp. 3d 1, 10 (D.D.C. 2018) (alteration in original) (quoting Judicial Watch, Inc. v. Fed. Hous. Fin. Agency, 646 F.3d 924 (D.C. Cir. 2011)); Forest Cnty., 278 F. Supp. 3d at 198 (finding third factor supported requested documents not being agency records because the agency's personnel "not rely upon those documents in making its decisions").

(c)     **Integration into the Agency's IT Systems**

The fourth factor—i.e., the degree to which the requested records were integrated into the Department's record system or files—is neutral with respect to the I-92 data but weighs in favor of finding the I-94 data are not agency records.  The I-92 data is maintained in a stand-alone database residing on Defendant's IT servers, but National Travel and Tourism Office personnel do not have access to this database, and there is no interaction of this database with any other data or computer program, except the tool that creates the Standardized Reports (and any customized reports that are ordered).  The I-94 database entries Plaintiff seeks have never been integrated into the Department's record system or files.  Def's Ex. I at ¶¶ 17-18 (Powers Decl.).  The databases are maintained by a contractor on the contractor's own servers and IT systems, with the stipulation that they must abide by all the limitations and security procedures in the MOU and Interconnection Security Agreement.  Id.

**B.     The Department Does Not Own the I-92 and I-94 Data; Therefore, the**
<u>**Department Properly Referred the Data to CBP**</u>

To the extent that the Court deems the records of data from which the I-92 and I-94 Standardized Reports are created to be records subject to FOIA, Defendant has properly refused to produce the records because Defendant does not own the data and has properly referred the records to their owner—i.e., CBP—for its processing and direct response to Plaintiff.  Plaintiff concedes that CBP—not the Department—owns the data from which the Standardized Reports are created, because Plaintiff's Opposition fails to respond to the following assertions in the Department's Renewed Motion:

1)     The raw I-92 Data is owned by CBP, not by the Department;

2)     the information in the Department's I-92 Database is an exact copy of the data provided by CBP, unchanged by the Department; and

3)     The raw I-94 Data is owned by CBP.

23

Plaintiff does not address these facts at all in the Opposition nor does he sufficiently dispute them in response to the numbered paragraphs of the DSOMF. For example, in response to DSOMF ¶ 13, which asserts (in part) that the database of I-92 Data "contains [no] information other than the raw I-92 Data owned and provided by CBP," Plaintiff tries to dodge the issue by responding that the Department's "contention that the I-92 data is 'owned' by CBP consists of argument and/or legal conclusions which should be disregarded by the Court." Similarly, in response to DSOMF ¶ 14, which asserts that "[t]he I-92 Data that CBP sends to ITA is owned by CBP," and DSOMF ¶ 26, which asserts that "[t]he raw I-94 Data is owned by CBP," Plaintiff again tries to skirt this issue by saying ownership of the data is "argument and/or legal conclusions" and "has no bearing on [the Department's] obligations to Plaintiff under FOIA," PSOMF ¶¶ 14, 26.

Significantly, regardless of whether CBP's ownership of the I-92 Data and I-94 Data is a fact, argument, or legal conclusion, Plaintiff's failure to address this contention in its Opposition or in the PSOMF by disputing it with evidence or argument establishing that CBP does not own the data has effectively conceded this point. See LCvR 7(h)(1) ("[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."); see also Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion; [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it.").

Although "a motion for summary judgment may not be granted as conceded[,] . . . the court may assume uncontested facts as admitted and then enter summary judgment . . . if, after fully

24

considering the merits of the motion, it finds that it is warranted." Presidential Bank, FSB v. 1733 27th St. SE LLC, 404 F. Supp. 3d 1, 8 (D.D.C. 2019) (internal citations omitted)); see also Bradley v. Nat'l Collegiate Athletic Ass'n, 464 F. Supp. 3d 273, 298–99 (D.D.C. 2020) (granting summary judgment in defendant's favor after "because the plaintiff did not address the [defendant's] argument that it did not proximately cause her injuries" (citing cases)); Ramcharan v. DEA, Civ. A. No. 18-2759 (EGS), 2020 WL 5366473, at *2 (D.D.C. Sept. 8, 2020) granting summary judgment in defendant's favor where plaintiff did not respond to the motion and the record reflected that the agency "ha[d] explained its withholdings in sufficient detail, and its justifications are consistent with D.C. Circuit law."); Cromartie v. District of Columbia, 479 F. App'x 355, 356 (D.C. Cir. 2012) (accepting certain "facts as having been conceded by [Plaintiff] due to his failure to respond" to facts alleged in summary judgment motion, citing Rule 7(h)(1)).  Here, the record reflects that CBP owns the data records that Plaintiff claims are responsive to the FOIA request.

When processing agency records that originated from or are owned by another agency, "[t]he FOIA contemplates 'consultation . . . with [that] agency having a substantial interest in the determination of the request", Smith v. Exec. Off. for U.S. Attorneys, 69 F. Supp. 3d 228, 238 (D.D.C. 2014) (quoting 5 U.S.C. § 552(a)(6)(B)(iii)(III)), and "[i]t also permits 'outright referral' of records to another agency," id (citing Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1118 (D.C. Cir. 2007); see also In Def. of Animals v. Natl Institutes of Health, 543 F. Supp. 2d 83, 112 (D.D.C. 2008) ("[a]n agency possessing records that originated from another government agency may refer those records to the originating agency for determination as to whether those documents should be released under FOIA.").  Consistent with these legal authorities, Defendant's FOIA regulations require that "[w]hen the Department or a component receives a request for a record . . . in its possession that originated with another . . . Federal agency subject to the FOIA, the

Department or component should typically refer the record to the . . . originating agency for direct response to the requester." 15 C.F.R. § 4.5. Here, it is undisputed that Defendant referred the data to CBP for its direct response to Plaintiff and, to the extent that the I-92 and I-94 data files are deemed "agency records," Defendant maintains that the referral to CBP of this data that is created and owned by CBP for a direct response to the requester was lawful and appropriate. To the extent they are not "agency records," Defendant's actions to facilitate Plaintiff in obtaining the records it seeks goes above and beyond the requirements of FOIA.

### C.   Even If the Records Were Subject to FOIA, They Would Properly Be Withheld Under FOIA Exemptions

#### 1.   The I-92 Data Contains Business Confidential Information Subject to the Protections of FOIA Exemption 4

##### (a)   Legal Parameters of Exemption 4

Assuming <u>arguendo</u> that the I-92 data records are "agency records" subject to FOIA and should not have been referred to CBP for processing, the records are still lawfully withheld because the I-92 Data contains confidential business information that would be exempt from disclosure pursuant to FOIA Exemption 4. Exemption 4 protects information that is (i) commercial or financial information, (ii) obtained from a person, (iii) that is privileged or confidential. <u>Pub. Citizen Health Rsch. Grp. v. FDA</u>, 704 F.2d 1280, 1290 (D.C. Cir. 1983).

#### *"Commercial or Financial Information"*

The courts in this Circuit have long held that "commercial or financial information" are broad terms to be given their "ordinary meanings" and protected so long as the submitter of the information has a "commercial interest" in them. <u>Pub. Citizen</u>, 704 F.2d at 1290 (citing <u>Wash. Post Co. v. Dep't of Health & Human Servs.</u>, 690 F.2d 252, 266 (D.C. Cir. 1982), and <u>Bd. of Trade v. CFTC</u>, 627 F.2d 392, 403 (D.C. Cir. 1980)). Thus, "'[t]he question of whether information is 'commercial' boils down to a common sense inquiry into whether the proponent has a business

interest in that information.'"  Renewable Fuels Ass'n & Growth Energy v. EPA, No. CV 18-2031 (JEB), 2021 WL 394841, at *4 (D.D.C. Feb. 4, 2021) (quoting Kahn v. Fed. Motor Carrier Safety Admin., 648 F. Supp. 2d 31, 36 (D.D.C. 2009)).

### *"Obtained from a Person"*

"Person" is defined in FOIA to include corporations, partnerships, associations, and other private organizations.  Renewable Fuels, 2021 WL 394841, at *5 (citing 5 U.S.C. § 551(2)).

### *Confidentiality*

In Food Marketing Institute, the Supreme Court articulated that "confidential," as it is used in Exemption 4, must be given its "ordinary, contemporary, common meaning" at the time the statute was enacted in 1966 and that "[t]he term 'confidential' meant then, as it does now, 'private' or 'secret.'"  Food Marketing Inst. v. Argus Leader, 139 S. Ct. 2356, 2362-63 (2019) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)).  The Court rejected the "competitive harm" standard, which had required a showing that disclosure of the information was "likely to cause substantial harm to the competitive position of the person from whom the information was obtained." Food Marketing Inst., 139 S. Ct. at 2367 (quoting Nat'l Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974)); see Stotter v. U.S. Agency for Int'l Dev., Civ. A. No. 14-2156 (KBJ), 2020 WL 5878033, at *11 (D.D.C. Oct. 3, 2020) (stating that "the Supreme Court abrogated the D.C. Circuit's competitive-harm test").  The Court further explained that "FOIA expressly recognizes that 'important interests [are] served by [its] exemptions,' . . . and '[t]hose exemptions are as much part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirements.' . . . So just as [the Court] cannot properly expand Exemption 4 beyond what its terms permit, [it] cannot arbitrarily constrict it either by adding limitations found nowhere

in its terms." <u>Food Marketing Inst.</u>, 139 S. Ct. at 2366 (citations omitted, alterations and emphasis in original).

The Supreme Court further suggested two conditions that may evidence whether information is "confidential." <u>Id.</u> at 2363. First, "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it." <u>Id.</u> This condition is mandatory, and applies whether the information was provided to a government agency voluntarily or otherwise. <u>Id.</u> Second, "information might be considered confidential only if the party receiving it provides some assurance that it will remain secret." <u>Id.</u> The Court did not "need to resolve" whether the second condition was necessary in every case, but Courts in this jurisdiction that have since addressed the issue have held that this prong is at least relevant to determining whether commercial information is "confidential." <u>Shapiro v. Dep't of Justice</u>, Civ. A. No. 12-0313 (BAH) 2020 WL 3615511 at *26 (July 2, 2020); <u>Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.</u>, 436 F. Supp. 3d 90, 109 (D.D.C. 2019). Since the Supreme Court's decision in <u>Food Marketing Institute</u>, at least one court in this jurisdiction has also held that it would be improper to "read the word 'confidential' to impose a blanket requirement that the government provide an assurance of privacy in every case in which it asserts Exemption 4," and "[t]he better approach would be that privately held information is generally confidential absent an express statement by the [government] agency that it would not keep information private, or a clear implication to that effect (for example, a history of releasing the information at issue)." <u>Renewable Fuels</u>, 2021 WL 394841, at *8 (citing <u>Gellman v. Dep't of Homeland Sec.</u>, Civ. A. No. 16-0635 (CRC), 2020 WL 1323896, at *11 n.12 (D.D.C. Mar. 20, 2020).

**(b)   Application of Exemption 4 to the I-92 Data**

Defendant properly asserts Exemption 4 to protect from disclosure confidential business information provided by air carriers to CBP pursuant to statutory mandate.[9]  Defendant asserts this exemption to withhold data that consists of non-aggregated, detailed records of arrival or departure by air that include an air carrier name, flight number, an arrival or departure date, and closely-guarded competitive data of airlines' passenger volume for various routes at various times of the day and throughout the year, as well as information about the nationality of its passengers.

This information qualifies as "commercial or financial information" within the meaning of Exemption 4 because it is valuable data that is used in the business of the provider of the information—i.e., the air carriers.  For example, each I-92 database contains a years' worth of data that, when analyzed, would reveal customer patterns, popular flight routes and times, and information about the nationality of the airline's passengers, which necessarily reveals information about the markets and clients served most by that airline.  Airlines have a commercial stake in such information, because this type of information provides insight into the practices that would allow a competitor to, for example, determine that a particular airline serves a large number of passengers traveling on a particular route and that it might be profitable to try to siphon some of that business by adding that route at a lower price or popular time.  See Besson v. Dep't of Commerce, Civ. A.

---

[9]    All private aircraft are statutorily mandated to transmit electronically to CBP, by way of CBP's Advance Passenger Information System ("APIS") manifest information pertaining to passengers and crew members on board commercial aircraft and vessels arriving in, or departing from, the United States.  See 19 U.S.C. 1436 and 1644; see also "Guidelines for the Assessment and Mitigation of Penalties for Failure to Comply with The Electronic Passenger and Crew Manifest Requirements for Vessel and Aircraft," https://www.cbp.gov/sites/default/files/assets/documents/2018-Apr/APIS%20Guidelines%20Updated%20April%202018_0.pdf (last visited February 17, 2021); " CBP Private Air APIS Guide," https://www.cbp.gov/sites/default/files/documents/CBP%20Private%20Air%20Guide%203%200%20%28Jan%202015%29.pdf (last visited February 17, 2021).

No. 18-2527 (APM), 2020 WL 4500894 (D.D.C. Aug. 5, 2020) ("A company may have a commercial stake in requested information when its disclosure would cause commercial consequences.") (citing Baker & Hostetler LLP v. Dep't of Commerce, 473 F.3d 312, 320 (D.C. Cir. 2006)); Pub. Citizen, 704 F.2d at 1290 (noted that the D.C. Circuit has held that Exemption 4 is not confined to records that "reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business.").[10]   The confidentiality standard was met because the owners of the information—private and commercial airlines—"customarily do not disclose" the information "or make it publicly available 'in any way.'"   Food Marketing Inst., 139 S. Ct. at 2363.   The data sought by Plaintiff contain commercially sensitive information that is treated as private by the submitting airlines in the ordinary course of business and that is customarily not released to the public by airlines.

### 2.   The I-94 Database Contains Personally Identifying Information that is Exempt from Disclosure Under FOIA Exemption 6

Even assuming arguendo that the I-94 data records are "agency records" subject to FOIA and should not have been referred to CBP for processing, they would still be subject to withholding as the I-94 Data contains personally identifying information that would be exempt from disclosure pursuant to FOIA Exemption 6.

---

[10]   If Plaintiff argues that the data is not commercial data because it is not in the form that was provided by the airlines, this argument should be rejected.   Indeed, courts have held repeatedly that information provided by a private party is shielded by Exemption 4 even if the information is "slightly modified by the agency."   S. All. for Clean Energy v. Dep't of Energy, 853 F. Supp. 2d 60, 68 (D.D.C. 2012); see also OSHA Data/CIH, Inc. v. Dep't of Labor, 220 F.3d 153, 162 n.23 (3d Cir. 2000) (holding that disclosure of a ratio derived by an agency from the numbers supplied by employers was information "obtained from a person" and protected by Exemption 4).

**(a)      Legal Standard for Exemption 6**

Exemption 6 requires an agency to consider the personal privacy of the subject of the requested records.  Specifically, Exemption 6 prohibits the release of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The purpose of Exemption 6 is to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information."  Dep't of State v. Wash. Post Co., 465 U.S. 595, 599 (1982).

### *Threshold Question for Exemption 6*

The threshold question for an agency justifying its withholding of a record pursuant to Exemption 6 is whether the records in question contain personnel, medical, or similar information.  N.Y. Times Co. v. NASA, 920 F.2d 1002, 1004 (D.C. Cir. 1990).  While "personnel and medical files" are easily identified, the term "similar files" is not.  The Supreme Court, however, has firmly held that the term is to be interpreted broadly rather than narrowly.  Wash. Post, 456 U.S. at 599-603.  The Court stated that the protection of an individual's privacy "surely was not intended to turn upon the label of the file which contains the damaging information."  Id. at 601.

Rather, the Court made clear that all information that "applies to a particular individual" meets the threshold requirement for Exemption 6 protection.  Id. at 602; see also Sherman v. Dep't of Army, 244 F.3d 357, 361 (5th Cir. 2001) (recognizing the "Supreme Court has interpreted exemption 6 'files' broadly to include any 'information which applies to a particular individual'").  Therefore, the threshold inquiry requires a court to look not to the "'the nature of the file[ ] in which the information [is] contained,' but solely to whether the information in the file 'applies to a particular individual.'"  N.Y. Times, 920 F.2d at 1007 (citing Wash. Post, 456 U.S. at 599, 602).

Significantly, in considering the scope of the "similar files" language, the D.C. Circuit "has observed that Exemption 6 'is designed to protect personal information in public records, even if

it is not embarrassing or of an intimate nature[.]'" Nat'l Ass'n of Home Builders v. Norton, 309

F.3d 26, 32 (D.C. Cir. 2002) (citing Nat'l Ass'n of Retired Fed. Emps. v. Horner, 879 F.2d 873,

875 (D.C. Cir. 1989)).  The D.C. Circuit has previously described this threshold as "minimal."

Wash. Post, 690 F.2d at 260; see also Dep't. of Justice v. Reporters Comm. for Freedom of the

Press, 489 U.S. 749, 776 (1989) ("categorical decisions may be appropriate and individual

circumstances disregarded when a case fits into a genus in which the balance characteristically tips

in one direction").

### *Privacy Interests of Individual*

Once the threshold determination is satisfied, the court must weigh the privacy interests

implicated by the release of the requested records against the public's interest in their disclosure.

Reporters Comm., 489 U.S. at 762; see also Nix v. United States, 572 F.2d 998, 1002 (4th Cir.

1978).  Exemption 6 bars any disclosure that "would constitute" an invasion of privacy that is

"clearly unwarranted."  Wash. Post, 690 F.2d at 260.  An individual's privacy interest in non-

disclosure of information is "substantial" if it is more than de minimis.  See Multi Ag Media LLC

v. Dep't of Agric., 515 F.3d 1224, 1229-30 (D.C. Cir. 2008) ("A substantial privacy interest is

anything greater than a de minimis privacy interest.").  Notably, "[p]rivacy encompasses the ability

of the individual to control information concerning his or her person.  Exemption 6 is designed to

protect personal information, even if it is not embarrassing or of an intimate nature."  Advocates

for Highway & Auto Safety v. Fed. Highway Admin., 818 F. Supp. 2d 122, 128 (D.D.C. 2011)

(internal citations omitted).  Indeed, "[i]nformation such as an individual's name . . . ha[s] been

found to constitute a substantial privacy interest."  Pinson v. Dep't of Justice, 202 F. Supp. 3d 86,

99 (D.D.C. 2016).  Privacy is of particular importance in the FOIA context because a disclosure

required by the FOIA is a disclosure to the public at large.  See Painting & Drywall Work Pres.

Fund, Inc. v. Dep't of Hous. & Urban Dev., 936 F.2d 1300, 1302 (D.C. Cir. 1991) (finding that if information "must be released to one requester, it must be released to all, regardless of the uses to which it might be put").

"The burden of establishing that disclosure would serve the public interest is on the requester, and mere speculation about hypothetical public benefits cannot outweigh a demonstrably significant invasion of privacy." Pinson, 202 F. Supp. 3d at 101 (internal citations and quotations omitted); see also Carter v. Dep't of Commerce, 830 F.2d 388, 391 n.13 (D.C. Cir. 1987).  The "only relevant public interest to be weighed in this balance is the extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government." Dep't of Def. v. FLRA, 510 U.S. 487, 495 (1994) (internal citation omitted) (internal citation and quotation marks omitted).  "Thus, information that does not directly reveal the behavior of federal government employees or agencies 'falls outside the ambit of the public interest that the FOIA was enacted to serve.'" Pinson, 202 F. Supp. 3d at 100 (quoting Reporters Comm., 489 U.S. at 774-75); see also Hopkins v. Dep't of Hous. & Urban Dev., 929 F.2d 81, 88 (2d Cir.1991) (explaining that disclosure of personal information having an "attenuated" relationship to government activity is insufficient to overcome FOIA privacy exemptions).[11]

---

[11]     Plaintiff asserts that the Department's "arguments about 'anonymized' data are irrelevant", apparently suggesting that because Plaintiff wants non-aggregated data, including non-anonymized data, whether the I-94 data contains personally identifiable information should not be part of this Court's decision calculus.  Pl's Opp. at 19.  This is without foundation in FOIA and Plaintiff should be held to the Exemption 6 requirement of establishing a public interest that outweighs the significant private interests at stake.

**(b)      Application of Exemption 6**

In this case, Defendant properly asserts Exemption 6 to protect individuals' personal information that is collected by CBP and transmitted to the Department as part of the I-94 Data. Def's Ex. I at ¶ 15 (Huether Decl.).  The data withheld under Exemption 6 includes information revealing the individual traveler's country of residence, country of citizenship, nationality, age, gender, visa class, city and country where visa was issued, first address of intended visit in the United States, passport issuing country, and a record identification number unique to that passenger and visit, which can be used to ascertain the identity of the passenger.  Id.  This data satisfies the threshold requirement to fall within the category of "similar files" that can properly be withheld under Exemption 6because it is information that "applies to a particular individual." See Wash. Post, 456 U.S. at 602 (holding that passport information satisfied Exemption 6's "similar files" requirement, and explaining that nondisclosure "should have been sustained upon a showing by the Government that release of the information would constitute a clearly unwarranted invasion of personal privacy."); Hemenway v. Hughes, 601 F. Supp. 1002, 1006 (D.D.C. 1985) ("individual's citizenship, like medical records, religious and sexual preferences, or nationality, is not a matter that is normally exposed to public view."); Wash. Post, 456 U.S. at 602 (holding that an individual's "citizenship information . . . satisfies the 'similar files' requirement of Exemption 6").

The I-94 data that Defendant has identified as protected by Exemption 6 is also the type of data commonly found by the courts to implicate substantial privacy interests of individuals.  See Ditlow v. Shultz, 379 F. Supp. 326, 329 (D.D.C. 1974) (finding that information such as "names, ages, citizenship, residency, permanent addresses, addresses while in the United States, the names and relationship of family members, personal finances, [and] when and where their visas were issued" constitutes "'intimate details' of a 'highly personal' nature and are 'similar files' within

the meaning of Exemption (6)"); see also Campaign Legal Ctr. v. Dep't of Justice, 373 F. Supp.

3d 160, 173 (D.D.C. 2019) (finding "a privacy interest in . . . personal travel plans").  Indeed, the

privacy interest here is substantial because "[u]nder certain circumstances it is not inconceivable

that revelation of one's citizenship could place an individual in jeopardy.  Nationals from some

countries face persistent discrimination within particular communities in this country.  Similarly,

nationals from certain parts of the world are potential targets for terrorist attacks."  Hemenway,

601 F. Supp. at 1006.

Plaintiff has not shown—and cannot show—that the alleged public interest in the

information sought is sufficient to overcome the substantial privacy interests of the third-parties

whose personal information is contained within the I-94 data.  "[T]he only relevant 'public interest

in disclosure' to be weighed in this balance is the extent to which disclosure would serve the 'core

purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding of the

operations or activities of the government.'"  Stotter, 2020 WL 5878033, at *5 (emphasis and

second alteration in original) (quoting FLRA, 510 U.S. at 495 (emphasis in original).  The facts

related to these third-parties' travel, as well as their country of residence, country of citizenship,

nationality, age, gender, visa class, city and country where visa was issued, first address of intended

visit in the United States, passport issuing country, and the record identification number unique to

that individual, reveals personal information of private parties, but reveals nothing about the

operations and activities of the government.

     **3.**      **There is No Reasonably Segregable I-92 data or I-94 data that Can Be Produced from the Databases**

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided

to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C.

§ 552(b); see Billington v. Dep't of Justice, 233 F.3d 581, 586 (D.C. Cir. 2000).  To establish that

all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. Armstrong v. Exec. Off. of the President, 97 F.3d 575, 578-79 (D.C. Cir. 1996); Canning v. Dep't of Justice, 567 F. Supp. 2d 104, 110 (D.D.C. 2008).  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester.  Sussman, 494 F.3d at 1117.  Non-exempt portions of records need not be disclosed if they are "inextricably intertwined with exempt portions."  Mead Data Cent., Inc. v. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977); Truesdale v. Dep't of Justice, Civ. A. No. 03-1332 (GK), 2005 WL 3294004, at *8 (D.D.C. Dec. 5, 2005).  Moreover, the agency is not required to "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content."  Mead Data, 566 F.2d at 261, n.55.

Here, material withheld either was exempt from disclosure under FOIA or inextricably intertwined with information exempt from disclosure under FOIA.  With respect to the I-94 data that contains personally identifiable information, the material is not reasonably segregable from the database because that data cannot be stripped from the database.  Def's Ex. I at ¶ 15 (Huether Decl.).  To produce any information from the database without the inclusion of the information protected by Exemption 6 would require either the creation of new records anonymizing the data or omission of enough data that the database entries would no longer be unique, which is akin to aggregating the information.  Id.  With respect to the I-92 data, the business confidential data that is protected by Exemption 4 is inextricably intertwined with the remaining data in the database. Id. at ¶ 16.

## III.   THERE IS NO BASIS UPON WHICH TO ORDER DISCOVERY OR HOLD A HEARING IN THIS MATTER

### A.   Discovery Is Unwarranted

The Court has the authority to—and should—grant summary judgment to Defendant without discovery, as Plaintiff has failed to show that discovery is necessary in this FOIA action. "In FOIA cases, discovery is both rare and disfavored." Freedom Watch v. Bureau of Land Mgmt., Civ. A. No. 16-992 (CKK), 2016 WL 6304653, at *2 (D.D.C. Oct. 27, 2016).  "Courts must deny requests for discovery 'where an agency's declarations are reasonably detailed, submitted in good faith, and the court is satisfied that no factual dispute remains.'" Competitive Enter. Inst. v. Off. of Sci. & Tech. Policy, 161 F. Supp. 3d 120, 136 (D.D.C. 2016).  "Even if, however, the Court concluded that [the agency's] declarations were insufficient, discovery would not be the remedy of first resort." Freedom Watch, 2016 WL 6304653, at *3.  Instead, "the Court might first 'request that the agency supplement its supporting declarations.'" Id.

While the question as to "[w]hether the circumstances warrant a continuance to permit discovery is a decision that falls within the discretion of the district court," Scott-Blanton v. Universal City Studios Prods. LLP, 246 F.R.D. 344, 346 (D.D.C. 2007) (citing Stella v. Mineta, 284 F.3d 135, 147 (D.C. Cir. 2002)), courts have consistently explained that discovery in FOIA matters is disfavored and have limited discovery to extraordinary cases.[12]  Plaintiff has not given any reasonable grounds that justify discovery in this case.  See, e.g., Wilson v. Dep't of Transp., No. 10-5295, 2010 WL 5479580, at *1 (D.C. Cir. Dec. 30, 2010) (per curiam) (holding that "[b]ecause appellant offered no evidence of bad faith to rebut agency's affidavits, he is not entitled

---

[12]   This concept that discovery in a FOIA action is unusual and extraordinary is further recognized by the Local Civil Rules. Indeed, FOIA cases have been excluded from the typical meet and confer requirements of the Rules and Local Civil Rules because "Freedom of Information Act actions . . . typically do not require discovery[.]"  See LCvR 16.3(b), cmt..

to discovery"). Discovery should not be permitted in order to "afford the plaintiff an opportunity to pursue a bare hope of falling upon something that might impugn the affidavits" submitted by the government. <u>Ocasio v. Dep't of Justice</u>, 67 F. Supp. 3d 438, 440 n.6 (D.D.C. 2014) (quoting <u>Flowers v. IRS</u>, 307 F. Supp. 2d 60, 68 (D.D.C. 2004)). This fits with the "presumption of good faith" accorded to agency declarations in FOIA matters, which "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." <u>SafeCard Servs., Inc. v. SEC</u>, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted).

Plaintiff's argument for discovery consists of an assertion that Defendant has made "conflicting representations," but this is not accurate. Contrary to Plaintiff's assertion, Defendant's Renewed Motion does not "attach[] a sworn declaration from one [Department] employee stating that a prior sworn declaration from another [Department] employee does not mean what it states." Pl. Opp. at 22. Rather, Defendant submitted a declaration with its Renewed Motion that clarified imprecise language in the Erdmann Declaration and, much to Plaintiff's chagrin, confirmed that Plaintiff had been mischaracterizing Mr. Erdmann's statements—submitted in a different, albeit related case—in an attempt to support his argument that the Department failed to properly respond to the FOIA request. Indeed, even Plaintiff's argument about the alleged "conflicting representations" does not actually explain how the statements in the declarations attached to the Renewed Motion are factually inconsistent with the Erdmann declaration.

If Plaintiff had a basis for imploring the Court to grant discovery, then he could have easily filed (in lieu of, or in the alternative to, his Renewed Cross-Motion) a motion seeking discovery under Rule 56(d). However, if he had done so, then he would have had to justify the request for discovery by asserting with particular specificity facts that he intends to discover, explaining why

he could not produce those facts in opposition to the motion for summary judgment, and describing why those facts are necessary and showing that the information is in fact discoverable and would alter the court's determination.  See Convertino v. Dep't of Justice, 684 F.3d 93, 99-100 (D.C. Cir. 2012).  Plaintiff cannot meet this standard, and there is no basis for discovery.

### B.    Oral Argument Is Unnecessary

Under the Local Rules of this Court, "[a] party may in a motion or opposition request an oral hearing, but its allowance shall be within the discretion of the court." LCvR 7(f).  In this case, the parties' counsel have submitted to the Court pleadings and legal briefing that articulate their positions and provide relevant law and facts; thus, both parties have had a full and fair opportunity to address all the pertinent issues in their written submissions to the Court.  As such, the Court should only schedule oral argument if it requires further clarification of the parties' positions.

### CONCLUSION

For the foregoing reasons, the Court should conclude that Defendant complied with its FOIA obligations and grant summary judgment in the Department's favor.

Dated: February 19, 2021

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

By:  /s/ *April Denise Seabrook*
APRIL DENISE SEABROOK
D.C. Bar # 993730
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2525
April.Seabrook@usdoj.gov

*COUNSEL FOR DEFENDANT*