# Exhibit I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID YANOFSKY, | |
| PLAINTIFF, | |
| v. | CIV. A. NO. 19-2290 (KBJ) |
| U.S. DEPARTMENT OF COMMERCE, | |
| DEFENDANT. | |

## DECLARATION OF VICTOR E. POWERS

I, Victor E. Powers, declare under penalty of perjury, that the following statements are true and correct to the best of my knowledge and belief:

1.      I am the Director of the Management Operations Division in the International Trade Administration (ITA), a component of the U.S. Department of Commerce (DOC, Commerce, or the Department). I have held this position since 2007.

2.      In this capacity, I serve as the principal officer pursuant to the Freedom of Information Act (FOIA) for ITA. My duties as Chief FOIA Officer for ITA include supervising the intake, processing, and response of all FOIA requests directed to ITA.

3.      My statement in this declaration is based on my personal knowledge, information provided to me by employees under my supervision, information obtained by me, and information contained in the records of ITA.

4.      I am familiar with several FOIA requests made by David Yanofksy related to I-94 and I-92 data.

## PLAINTIFF'S FOIA REQUESTS
## RELATED TO I-94 AND I-92 "DATA FILES"

5.     On March 10, 2015, Mr. Yanofsky requested copies of the National Travel and Tourism Office's (NTTO's) "'Air Arrivals I-94 Database Annual Datafile' from 2014, 2013, 2012, and 2011" and "'U.S. International Air Travel Statistics Report (APIS/I-92) Data files' from 2014, 2013, 2012, and 2011". A copy of the request, which was assigned tracking number DOC-ITA-2015-001055, is attached as **Attachment 1**.

6.     On November 25, 2015, Mr. Yanofsky requested records of emails sent by NTTO officials "after March 9, 2015 that include in their subject line or body text any of the following phrases: Yanofsky, Quartz, qz.com, Atlantic Media, DOC-ITA-2015-001055, Justin.Guz@trade.gov, Justin Guz." A copy of the request, which was assigned tracking number DOC-ITA-2016-000279, is attached as **Attachment 2**.

7.     On November 30, 2015, Mr. Yanofsky requested "completed copies" of order forms received by NTTO "for the 'Air Arrivals I-94 Database Annual Datafile' and/or the 'U.S. International Air Travel Statistics Report (APIS/I-92) Data files." A copy of the request, which was assigned tracking number DOC-ITA-2016-000295, is attached as **Attachment 3**.

8.     On February 26, 2016, counsel for Mr. Yanofsky submitted the FOIA request that is the subject of this civil action. The introductory portion of the letter containing the FOIA request stated: "Mr. Yanofsky is now submitting this new and updated FOIA request for access to and copies of [NTTO's] 'Air Arrivals I-94 Annual Datafile' and [NTTO's] 'U.S. International Air Travel Statistics Report (APIS/I-92) Data Files'". The actual FOIA request described the records sought by stating that Mr. Yanofsky was seeking "copies of [NTTO's] 'Air Arrivals I-94 Annual Datafile'" and "'U.S. International Air Travel

Statistics Report (APIS/I-92) Data Files' for 2015, 2014, 2013, 2012 and 2011". A copy of the request, which was assigned tracking number DOC-ITA-2016-000872, is attached as **Attachment 4**.

9.   ITA understood DOC-ITA-2015-001055's request for copies of the "Air Arrivals I-94 Database Annual Datafile" from 2011-2014 and DOC-ITA-2016-000872's request for copies of the "Air Arrivals I-94 Datafile" from 2011-2015 were both seeking data files, derived from the I-94 Database, that correspond to the annual issues of the I-94 Program standardized reports that ITA publishes for the specified years.

10.   ITA understood DOC-ITA-2015-001055's request for copies of the "U.S. International Air Travel Statistics Report (APIS/I-92) Data files" for 2011-2014 and DOC-ITA-2016-000872's request for the "U.S. International Air Travel Statistics Report (APIS/I-92) Data Files" from 2011-2015 were both seeking data files, derived from the I-92 Database, that correspond to the annual issues of the I-92 Program standardized reports that ITA publishes for the specified years.

11.   On June 5, 2018, in response to this Court's order in 16-cv-951, remanding FOIA request DOC-ITA-2016-000872 to ITA to reevaluate the fees to be charged, my office produced to Plaintiff, without charge, what it understood to be all records responsive to that FOIA request. A copy of the cover letter accompanying that production is attached as **Attachment 5**.

### PLAINTIFF'S AUGUST 2020 FOIA REQUEST
### SPECIFICALLY SEEKING DATABASE ENTRIES

12.   On August 6, 2020, Mr. Yanofsky requested "copies of all 'Detail Arrival Records' in the National Travel & Tourism Offices' (NTTO) 'Air Arrivals I-94 Database' with entry dates

from January 1, 2018 to the present." A copy of the request, which was assigned tracking number DOC-ITA-2020-001709, is attached as **Attachment 6**.

13. On December 10, 2020, one of my staff provided Mr. Yanofsky a link to publicly available I-94 program data, which constitutes all data in ITA's actual possession. Mr. Yanofsky clarified that he was seeking entries within the databases maintained by ITA's contractor CIC Research. A copy of the email thread reflecting our office's response and Mr. Yanofsky's clarification is attached as **Attachment 7**.

14. On February 11, 2021, my office made a determination that there were no records responsive to Mr. Yanofsky's request, as the database entries sought are not agency records. A copy of the determination letter is attached as **Attachment 8**.

## THE DATABASE ENTRIES PLAINTIFF NOW SEEKS ARE NOT AGENCY RECORDS PURSUANT TO FOIA

15. The database entries in the I-92 database maintained by ITA's Office of the Chief Information Officer and the five I-94 databases (one each for 2011, 2012, 2013, 2014, and 2015) maintained by CIC Research, Inc. are not agency records as defined by FOIA.

16. The U.S. Customs and Border Protection (CBP) is the creator of all substantive data originally input into those databases.

17. By contractual agreement between CBP and NTTO controlling the terms of provision of said data, CBP has clearly relayed its intent to retain control over the data. Among other things, Defendant is prohibited by the contractual agreement from disclosing the data provided by CBP without first processing it to anonymize and aggregate the data. See Declaration of David Huether ¶¶ 6-14 (discussing contractual agreements governing provision of data by CBP and the transmission and handling of data provided by CBP).

18.     Although ITA's Office of the Chief Information Officer has access to the raw I-92 data and uses it to create the data files and reports used by NTTO, NTTO personnel do not have access to either the I-92 or the I-94 data provided by CBP except for the anonymized, aggregated reports of the data provided in the Standardized Reports. NTTO personnel have neither read nor relied upon the database entries provided by CBP and stored in the databases.

19.     ITA does not store the I-94 database entries in an operational data system on ITA servers.


I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief. Executed on this 18th day of February 2021.

Victor Powers   Digitally signed by Victor Powers
Date: 2021.02.18 13:30:52 -05'00'

_____

Victor E. Powers

# Attachment 1

David M Yanofsky



dyanofsky@qz.com

**March 10, 2015**

Freedom of Information Officer
202.482.7937
FOIA@trade.gov

International Trade Administration
Room 4001
14th and Constitution Avenue, N.W.
Washington, D.C. 20230

**FOIA REQUEST**

**Fee benefit requested**

**Fee waiver requested**

Dear FOIA Officer:

Pursuant to the federal Freedom of Information Act, 5 U.S.C. § 552, I request access to and copies of the Office of Travel & Tourism Industries' "Air Arrivals I-94 Database Annual Datafile" from 2014, 2013, 2012, and 2011 and its associated technical documentation. I also request access to and copies of the Office of Travel & Tourism Industries' "U.S. International Air Travel Statistics Report (APIS/I-92) Data files" from 2014, 2013, 2012, and 2011 and its associated technical documentation. I would like to receive the information in electronic format.

As a representative of the news media I am only required to pay for the direct cost of duplication after the first 100 pages. Through this request, I am gathering information on the manner in which tourism and travel affect the US economy a matter that is of current interest to the public. This information is being sought on behalf of *Quartz,* an Atlantic Media publication, for dissemination to the general public.

Please waive any applicable fees. Release of the information is in the public interest because it will contribute significantly to public understanding of a significant driver of the US economy.

If my request is denied in whole or part, I ask that you justify all deletions by reference to specific exemptions of the act. I will also expect you to release all segregable portions of otherwise exempt material. I, of course, reserve the right to appeal your decision to withhold any information or to deny a waiver of fees.

As I am making this request as a journalist and this information is of timely value, I would appreciate your communicating with me by telephone or email, rather than by mail, if you have questions regarding this request.

I look forward to your reply within 20 business days, as the statute requires.

Thank you for your assistance.

Sincerely,

David M Yanofsky

# Attachment 2

# DOC-ITA-2016-000279 Request Details   Clock Days: 169   Backlogged

**Case Phase:** Closed   **Case Status:** Closed   **Due Date:** 12/24/2015

## Requester Information

| | |
|---|---|
| **Requester** | David Yanofsky |
| **Organization** | Quartz |
| **Requester Has Account** | Yes |
| **Email Address** | dyanofsky@qz.com |
| **Phone Number** | ███████ |
| **Fax Number** | |
| **Address** | ███████ |
| **City** | ███████ |
| **State/Province** | ██ |
| **Zip Code/Postal Code** | ████ |
| **Tracking Number** | DOC-ITA-2016-000279 |
| **Submitted Date** | 11/25/2015 |
| **Received Date** | 11/25/2015 |
| **Perfected Date** | 11/25/2015 |
| **Last Assigned Date** | 12/09/2015 |
| **Assigned To** | Justin Guz (International Trade Administration) |
| **Last Assigned By** | Justin Guz () |
| **Request Track** | Simple |
| **Fee Limit** | $25.00 |

## Closure Information

| | |
|---|---|
| **Closed Date** | 07/28/2016 |
| **Disposition** | Partial Grant/Partial Denial |
| **"Other" Disposition** | |
| **Exemptions Used** | |
| **Statutes Used** | |
| **Subtypes Used** | |

## Request Handling

| | |
|---|---|
| **Requester Info Available to the Public** | Yes |
| **Request Track** | Simple |
| **Fee Category** | Select Fee Category |
| **Fee Waiver Requested** | Yes |
| **Fee Waiver Status** | Not Billable |
| **Expedited Processing Requested** | No |
| **Expedited Processing Status** | |

| | |
|---|---|
| **Request Type** | FOIA |
| **Request Perfected** | Yes |
| ★ **Perfected Date** | 11/25/2015 |
| **Acknowledgement Sent Date** | |
| **Unusual Circumstances** | No |
| **Litigation** | No |
| **5 Day Notifications** | |

## Description

617/2000

Pursuant to the Freedom of Information Act, I hereby request the following records. Any emails sent or received by International Trade Administration, Office of Travel and Tourism Industries officials after March 9, 2015 that include in their subject line or body text any of the following phrases: Yanofsky, Quartz, qz.com, Atlantic Media, DOC-ITA-2015-001055, Justin.Guz@trade.gov, Justin Guz. In the interest of expediency and to minimize the research and/or duplication burden on your staff, please send records electronically if possible. Since time is a factor, please communicate with me by telephone or email.

**Has Description Been Modified**

**Description Available to the Public**   Yes

**Short Description**

## Attached Supporting Files

**Attachments Available to the Public**   No

| Attached File Name | Size (MB) | File Type | Remove |
|---|---|---|---|
| No supporting files have been uploaded. | | | |

# Attachment 3

# DOC-ITA-2016-000295 Request Details    **Clock Days:** 38    **Backlogged**

**Case Phase:** Closed    **Case Status:** Closed; Appealed    **Due Date:** 01/11/2016

## Requester Information

| | |
|---|---|
| **Requester** | David Yanofsky |
| **Organization** | Quartz |
| **Requester Has Account** | Yes |
| **Email Address** | dyanofsky@qz.com |
| **Phone Number** | ▮▮▮▮▮▮▮ |
| **Fax Number** | |
| **Address** | ▮▮▮▮▮▮▮ |
| **City** | ▮▮▮▮▮▮▮ |
| **State/Province** | ▮▮ |
| **Zip Code/Postal Code** | ▮▮▮▮ |
| **Tracking Number** | DOC-ITA-2016-000295 |
| **Submitted Date** | 11/30/2015 |
| **Received Date** | 12/01/2015 |
| **Perfected Date** | 12/10/2015 |
| **Last Assigned Date** | 12/09/2015 |
| **Assigned To** | Justin Guz (International Trade Administration) |
| **Last Assigned By** | Justin Guz () |
| **Request Track** | Simple |
| **Fee Limit** | $25.00 |

## Closure Information

| | |
|---|---|
| **Closed Date** | 02/05/2016 |
| **Disposition** | No Records |
| **"Other" Disposition** | |
| **Exemptions Used** | |
| **Statutes Used** | |
| **Subtypes Used** | |

## Request Handling

| | |
|---|---|
| **Requester Info Available to the Public** | Yes |
| **Request Track** | Simple |
| **Fee Category** | Media |
| **Fee Waiver Requested** | Yes |
| **Fee Waiver Status** | Not Billable |
| **Expedited Processing Requested** | No |
| **Expedited Processing Status** | |

| | |
|---|---|
| **Request Type** | FOIA ▾ |
| **Request Perfected** | Yes ⌄ |
| ★ **Perfected Date** | 12/10/2015 |
| **Acknowledgement Sent Date** | |
| **Unusual Circumstances** | No |
| **Litigation** | No ⌄ |
| **5 Day Notifications** | |

## Description

601/2000



Pursuant to the federal Freedom of Information Act, 5 U.S.C. &sect; 552, I request the following records. All completed copies of the "National Travel and Tourism Office (NTTO) - Order Form" received by the Office of Travel &amp; Tourism Industries for the "Air Arrivals I-94 Database Annual Datafile" and/or the "U.S. International Air Travel Statistics Report (APIS/I-92) Data files." If my request is denied in whole or part, I ask that you justify all deletions by reference to specific exemptions of the act. I will also expect you to release all segregable portions of otherwise exempt material.

| | |
|---|---|
| **Has Description Been Modified** | |
| **Description Available to the Public** | Yes ⌄ |
| **Short Description** | |

## Attached Supporting Files

| | |
|---|---|
| **Attachments Available to the Public** | No ⌄ |

| **Attached File Name** | **Size (MB)** | **File Type** | **Remove** |
|---|---|---|---|

No supporting files have been uploaded.

# Attachment 4

# QUARTZ

Marisa Johnson
Senior Counsel
The Atlantic Monthly Group, Inc.
600 New Hampshire Ave., NW
Washington, D.C. 20037
mjohnson@atlanticmedia.com

February 26, 2016

<u>VIA EMAIL</u>

Dear FOIA Officer,

I am writing as counsel to The Atlantic Monthly Group, Inc. and its publication Quartz (qz.com) on behalf of David Yanofsky, a journalist employed by Quartz. Please consider this letter a new request for records on behalf of Mr. Yanofsky under the federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

As you may know, the Department of Commerce ("DOC") previously denied a FOIA request filed by Mr. Yanofsky in March 2015. In response to Mr. Yanofsky's prior FOIA request, the DOC asserted that the requested records were withheld under FOIA's "displacement provision," 5 U.S.C. § 552(a)(4)(A)(vi), and that the records Mr. Yanofsky sought could be obtained only pursuant to 15 U.S.C. § 1525, which operates as a superseding fee statute. Mr. Yanofsky administratively appealed the denial of his previous request, and his appeal was denied.

As discussed in more detail herein, and as I have outlined in prior correspondence, the DOC's position is erroneous. Mr. Yanofsky is entitled to obtain the records he has requested under FOIA, and he is entitled to a fee benefit as a representative of the news media, as well as a fee waiver. In an attempt to avoid unnecessary litigation over this matter, and to give the DOC an opportunity to revisit its incorrect position, Mr. Yanofsky is now submitting this new and updated FOIA request for access to and copies of the Office of Travel Tourism Industries' ("OTTI") "Air Arrivals I-94 Annual Datafile" and OTTI's "U.S. International Air Travel Statistics Report (APIS/I-92) Data Files" and their associated technical documentation. In responding to this request, the DOC should consider the arguments made in support of Mr. Yanofsky's prior request that it previously declined to consider, as well as the additional information provided below, that show that Mr. Yanofsky is entitled to the requested records, to a fee benefit as a representative of the news media, and to a fee waiver.

<u>Background</u>

Mr. Yanofsky previously filed a FOIA request on March 10, 2015, for access to and copies of OTTI's "Air Arrivals I-94 Database Annual Datafile" and its associated technical documentation and OTTI's "U.S. International Air Travel Statistics Report (APIS/I-92) Report" and its associated technical documentation from 2014, 2013, 2012 and 2011. A true and correct copy of that request is attached hereto as Attachment A. The International Trade Administration ("ITA") denied the request. A true and correct copy of that denial is attached hereto as Attachment B.

Mr. Yanofsky filed an administrative appeal of the denial of the request, a true and correct copy of which is attached hereto as Attachment C. The DOC denied that administrative appeal on November 17, 2015. A true and correct copy of that denial is attached hereto as Attachment D. In denying Mr. Yanofsky's administrative appeal, the DOC raised new legal issues not included in the ITA's initial denial of the request.

On December 14, 2015, I sent a letter on Mr. Yanofsky's behalf asking the DOC to reopen the administrative appeal. A true and correct copy of that letter is attached hereto as Attachment E. Among other things, that letter responded to the DOC's new purported grounds for denying the request that the DOC had raised for the first time in its November 17 denial of Mr. Yanofsky's administrative appeal, which Mr. Yanofsky had not previously had a chance to address. In response, the DOC declined to reopen the administrative appeal or consider the arguments in my letter. By letter dated December 28, 2015, a true and correct copy of which is attached hereto as Attachment F, the DOC stated that the November 17, 2015 denial of Mr. Yanofsky's administrative appeal constituted the agency's final administrative action on the matter.

FOIA Request

I now write on Mr. Yanofsky's behalf to resubmit his March 10, 2015 FOIA request, attached hereto as Attachment A, and to update that request to include records from 2015. Accordingly, you should consider this letter to be a new FOIA request by Mr. Yanofsky for the following records:

Mr. Yanofsky requests access to and copies of OTTI's "Air Arrivals I-94 Annual Datafile" from 2015, 2014, 2013, 2012 and 2011 and its associated technical documentation. Mr. Yanofsky also requests access to and copies of OTTI's "U.S. International Air Travel Statistics Report (APIS/I-92) Data Files" for 2015, 2014, 2013, 2012 and 2011 and its associated technical documentation. Mr. Yanofsky would like to receive the requested records in electronic format.

Request for a Fee Benefit

In connection with his request, Mr. Yanofsky requests a fee benefit as a representative of the news media pursuant to 5 U.S.C. § 552(a)(4)(A)(ii). Mr. Yanofsky, a journalist for Quartz, is a member of the news media. Mr. Yanofsky intends to use the requested records to gather information of potential interest to the public, namely, information about the operations of the DOC and other government agencies and about travel and tourism in the United States. Mr. Yanofsky will use his editorial skills to turn the requested records into a distinct work and will distribute that work to the readers of Quartz via its website, qz.com.

For these reasons, Mr. Yanofsky is entitled to a fee benefit as a representative of the news media and fees for his request shall be limited to a reasonable standard charge for document duplication. If you anticipate the duplication fees will exceed $25.00, please contact me in advance of incurring the charges.

Request for a Fee Waiver

In addition, Mr. Yanofsky requests a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Mr. Yanofsky is entitled to a fee waiver because the disclosure of the requested records (1) sheds light on the operations or activities of the government; (2) is likely to contribute significantly to the public understanding of those operations or activities; and (3) is not primarily in the commercial interest of the requester. *See id.*; *Cause of Action v. Federal Trade Commission*, 799 F.3d 1108, 1115 (D.C. Cir. 2015).

The requested records shed light on the operations and activities of the DOC and other government agencies. Specifically, the requested records will provide:

- evidence of the information that the federal government collects from about foreign visitors to the United States, the information the federal government collects about air traffic to and from the United States, and the government's efficacy in collecting this information;
- information about how OTTI fulfills its mission to collect and disseminate travel and tourism information under the U.S. International Air Travel Statistics (I-92 data) Program and the Visitor Arrivals Program (I-94), which will allow the public to assess the efficacy of OTTI and its expenditure of funding allocated to it;
- official and up-to-date data on foreign travel to and from the United States, which will allow the public to test and evaluate the accuracy of official DOC and other government statistics on travel that are calculated using this data; and
- insight into the data that policy makers use to make decisions, such as visa allocation and levels of infrastructure investment at ports and border crossings.

The requested records are likely to contribute significantly to the public's understanding of the operations of the DOC and other government agencies because they provide the only source of data collected about foreign travel and tourism based on Form I-94 and Advanced Passenger Information System (APIS) arrival/departure records, formerly known as I-92 arrival/departure records.

Finally, the records are not requested primarily for the commercial benefit of Mr. Yanofsky. Rather, Mr. Yanofsky, a representative of the news media, intends to use the requested records to report and write news stories for Quartz about the operations of the DOC and other government agencies, as well as the impact of travel and tourism on the United States.

For these reasons, and those stated in the attached request, administrative appeal, and correspondence concerning Mr. Yanofsky's March 10, 2015 FOIA request, Mr. Yanofsky is entitled to a fee waiver.

Arguments Raised in December 14, 2015 Letter

Based on the DOC's denial of Mr. Yanofsky's previous request and its denial of his administrative appeal, we understand that it is the DOC's position that the requested records are not available pursuant to FOIA and are available only pursuant to 5 U.S.C. § 1525. It is also our

understanding that, based on this position, the DOC is of the view that Mr. Yanofsky is not entitled to a fee benefit or a fee waiver. As a result, Mr. Yanofsky would be required to pay the fees listed on the OTTI website in order to obtain the requested records.[1]  By our calculations, these fees would total $173,775.00 for this request, which includes records from 2015.

For the reasons stated in my December 14, 2015 letter, we believe this position is incorrect as a matter of law. Mr. Yanofsky is entitled to the requested records under FOIA, in addition to a fee benefit and fee waiver. In the event that the DOC plans to again assert this erroneous legal position as a basis for denying Mr. Yanofsky's new request, we ask that you consider the arguments raised in my December 14, 2015 letter, attached hereto as Attachment E.

In submitting this new request, we hope that the DOC will revisit and reverse its incorrect legal position, which has deeply troubling ramifications for members of the news media who seek access to agency records under FOIA for the purpose of keeping the public informed about government conduct. We hope that by providing the DOC with the opportunity to take a fresh look at these issues, we can avoid unnecessary litigation. We look forward to your reply to Mr. Yanofsky's request within 20 business days, as required by FOIA.  5 U.S.C. § 552(a)(6)(A)(i).

Sincerely,

Marisa Johnson

Enc.

cc:   David Yanofsky
      Katie Townsend, Litigation Director, Reporters Committee for Freedom of the Press

---

[1] *See* http://travel.trade.gov/research/reports/i92/index.html (Price for 2015 I-92 Data File); http://travel.trade.gov/research/reports/i92/historical/index.html (Price for historical I-92 Data Files); http://travel.trade.gov/research/reports/i94/index.html (Price for 2015 I-94 Data File); http://travel.trade.gov/research/reports/i94/historical/index.html (Price for historical I-94 Data Files).

# Attachment 5

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, DC  20230

June 5, 2018

Mr. David M. Yanofsky
Quartz

███████████████

RE:  No. 16-cv-00951 (D.D.C.) and DOC-ITA-2016-000872

Dear Mr. Yanofsky:

This letter is regarding your Freedom of Information Act (FOIA) request to the International
Trade Administration (ITA), dated February 26, 2016. The request sought copies of the I-92 and
I-94 Data Files from 2011 through 2015, along with the accompanying technical documentation.

With regard to the records sought in your FOIA request, this letter is in response to the remand
of the United States District Court for the District of Columbia in your case No. 16-cv-00951
(D.D.C.).

ITA has located 40 Excel spreadsheet files responsive to your request and is releasing them to
you in full.  These records will be sent to you in a message to follow, via Accellion file sharing.
Processing fees associated with your request have been discretionarily waived, given the posture
of the request.

ITA has also located potentially responsive disks of data that originated with U.S. Customs and
Border Protection (CBP). Per your counsel's email dated May 24, 2018, these records are being
referred to CBP for a disclosure determination and direct response to you.

If you have any questions or concerns or would like to discuss any aspect of your request, you
may contact me as ITA's FOIA Public Liaison:

> Victor Powers
> Acting FOIA Officer
> International Trade Administration
> 1401 Constitution Avenue, NW
> Washington DC  20230
> (202) 482-5436; foia@trade.gov



Thank you for your interest in the International Trade Administration.

Sincerely,

Victor E. Powers
Director
Management Operations
Office of the Chief Financial and
Administrative Officer

# Attachment 6

David Yanofsky
Things Editor, Quartz
dyanofsky+ita2020@qz.com

August 6, 2020

VIA EMAIL

Dear FOIA Officer,

I am a professional journalist employed at Quartz Media, LLC, a subsidiary of Uzabase Inc. and publisher of qz.com. Pursuant to the federal Freedom of Information Act, 5 U.S.C. § 552, I request access to and copies of all "Detail Arrival Records" in the National Travel & Tourism Offices' (NTTO) "Air Arrivals I-94 Database" with entry dates from January 1, 2018 to the present and its associated technical documentation. I would like to receive the information in electronic format.

As you may know, the Federal District Court for the District of Columbia ruled in the case of *Yanofsky v. Dept. of Commerce,* No. 16-cv-00951 KBJ (D.C. Cir. Mar. 30 2018) that previous iterations of materially equivalent records maintained by ITA are subject to the FOIA without exception. The court held that the Mutual Educational and Cultural Exchange Act of 1961 and the Appropriations Act of 2016 do not separately or jointly constitute a supercedeing fee statute.

In addition, the Assistant General Counsel for Litigation, Employment and Oversight at the Department of Commerce has already determined materially equivalent data to be "'agency records' for FOIA purposes" in a letter to me on Nov. 17, 2015.

The director of the NTTO, Isabel Hill, has declared to the Federal District Court for the District of Columbia that the records I seek are maintained by the CIC research on behalf of the NTTO through a contractual arrangement.

The court's decision, letter, and declaration are attached to this request.

Ms. Hill's declaration makes clear that the NTTO:

- Has directed CIC to create these records by combining data from Customs and Border Protection with other information and standardising them to international standards. (¶¶ 15-16)
- Has the intent to retain control over the records, as evidenced by its competitive contracting (¶¶ 26)
- Has the ability to use and dispose of the records as it sees fit (¶¶ 22-24)
- Relies on these records for its essential functions of providing statistical information (¶¶ 16, 22-23)

I will remind you that in *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996), the court found that even where records are "neither created by agency employees" nor "currently located on agency property," they are still "created" by the agency so long as the contractor "acted on behalf of [the agency] in creating the" records at issue.

CIC has created the Air Arrivals I-94 Database on behalf of the NTTO.

**Request for a Fee Waiver**

In addition, I request a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). I am entitled to a fee waiver because the disclosure of the requested records (1) sheds light on the operations or activities of the government; (2) is likely to contribute significantly to the public understanding of those operations or activities; and (3) is not primarily in the commercial interest of the requester. See id.; *Cause of Action v. Federal Trade Commission*, 799 F.3d 1108, 1115 (D.C. Cir. 2015).

The requested records shed light on the operations and activities of the DOC and other government agencies, Specifically, the requested records will provide:

- evidence of the information that the federal government collects from about foreign visitors to the United States, the information the federal government collects about air traffic to and from the United States, and the government's efficacy in collecting this information;
- information about how NTTO fulfills its mission to collect and disseminate travel and tourism information under the Visitor Arrivals Program (I-94), which will allow the public to assess the efficacy of NTTO and its expenditure of funding allocated to it;
- official and up-to-date data on foreign travel to and from the United States, which will allow the public to test and evaluate the accuracy of official DOC and other government statistics on travel that are calculated using this data; and
- insight into the data that policy makers use to make decisions, such as visa allocation and levels of infrastructure investment at ports and border crossings.

The requested records are likely to contribute significantly to the public's understanding of the operations of the DOC and other government agencies because they provide the only source of data collected about foreign travel and tourism based on Form I-94 records.

Finally, the records are not requested primarily for commercial benefit. Rather, as representative of the news media, I intend to use the requested records to report and write news stories for *Quartz* about the operations of the DOC and other government agencies, as well as the impact of travel and tourism on the United States.

For these reasons, I am entitled to a fee waiver.

**Request for a Fee Benefit**

In the alternate, I would request a Fee Benefit. As a representative of the news media I am only required to pay for the direct cost of duplication after the first 100 pages. Through this request, I am gathering information on the manner in which tourism and travel affect the US economy as well as the potential effects of current and proposed government immigration policy, matters that are of current interest to the public. This information is being sought on behalf of *Quartz* for dissemination to the general public.

I request a fee benefit as a representative of the news media pursuant to 5 U.S.C. § 55i(a)(4)(A)(ii), as I intend to use the requested records to gather information of potential interest to the public, namely, information about the operations of the DOC and other government agencies and about travel and tourism in the United States. I will use my editorial skills to turn the requested records into a distinct work and will distribute that work to the readers of *Quartz* via its editorial website, newsletters, and apps.

For these reasons, I am entitled to a fee benefit as a representative of the news media and fees for my request shall be limited to a reasonable standard charge for document duplication. If you anticipate the duplication fees will exceed $25.00, please contact me in advance of incurring the charges.

If my request is denied in whole or part, I ask that you justify all deletions by reference to specific exemptions of the act. I will also ask you to release all segregable portions of otherwise exempt material. I reserve the right to appeal your decision to withhold any information or to deny a waiver of fees.

As I am making this request as a journalist and this information is of timely value, I would appreciate your communicating with me by telephone or email, rather than by mail, if you have questions regarding this request. I look forward to your reply within 20 business days, as the statute requires.

Thank you for your assistance.

Sincerely,

David M Yanofsky

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

DAVID YANOFSKY,

      Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
COMMERCE,

      Defendant.

</td><td>

No. 16-cv-00951 (KBJ)

</td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

Because the information and records that an agency possesses rightfully belong to the public, one of the key commitments underlying the Freedom of Information Act ("the FOIA"), 5 U.S.C. § 552, is the principle that the federal government should not profit from its dissemination of documents in response to FOIA requests. *See* H.R. Rep. No. 99-560, at 26 (1986) (explaining that the FOIA reflects "[t]he policy of providing government documents at a price based on the cost of dissemination"). The FOIA accordingly contains an express provision that permits agencies to charge FOIA requesters only those fees that are reasonably necessary to recoup the funds that the government spends on searching for, duplicating, and reviewing responsive documents. *See* 5 U.S.C. § 552(a)(4)(A)(ii). Significantly for present purposes, however, the statute also contains a provision that clarifies that the FOIA's fee-setting prescriptions do not supersede "a statute specifically providing for setting the level of fees for particular types of records." *Id.* § 552(a)(4)(A)(vi).

The parties in the instant case are engaged in a pitched battle over whether or not Congress intended the Mutual Educational and Cultural Exchange Act of 1961 ("the MECEA"), 22 U.S.C. § 2451, *et seq.*, and the Consolidated Appropriations Act of 2016 ("the Appropriations Act"), Pub L. No. 114-113, § 9(B), 129 Stat. 2242, 2287 (2015) to displace the standard FOIA fee-setting requirements by authorizing an agency practice that allows the Department of Commerce (DOC") to charge thousands of dollars for certain data files. Plaintiff David Yanofsky filed the instant action after he received a bill for $173,775 in connection with a FOIA request that he submitted to the DOC for information about the number of visitors and international flights to the United States. (*See* Def.'s Resp. to Pl.'s Statement of Material Facts as to Which There Is No Genuine Issue ("Consol. SUMF Part II"), ECF No. 23-1, ¶ 70.) The DOC maintains that it regularly disseminates such information as part of a subscription-based program that has many institutional clients, and that the agency properly "collects, retains, and expends user fees pursuant to delegated authority under the [MECEA] as authorized in annual appropriations acts." (Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 20, ¶ 5.) Yanofsky's five-count complaint claims that the DOC "has unlawfully withheld the requested records by, *inter alia*, unlawfully denying [Yanofsky's] request for a fee waiver and informing [him] that he would have to purchase the requested records" at a price that is "far in excess of the fees [the DOC] is permitted to charge under the FOIA." (Compl., ECF No. 1, ¶ 2.)

Before this Court at present are the parties' cross-motions for summary judgment (*see* Def.'s Mot.; Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 21-1), which are fully briefed and ripe for

decision (*see* Reply Mem. in Further Supp. of Def.'s Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ J. ("Def.'s Reply"), ECF No. 23; Reply Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 25).  The parties address three related issues in these motions: (1) whether the DOC should be permitted to contend that the MECEA and the Appropriations Act displace the FOIA's fee-setting provisions in the instant proceedings, when the agency did not rely on those statutes in the administrative proceedings below; (2) whether the MECEA and the Appropriations Act together supersede the FOIA's fee-setting provisions; and (3) whether those statutes also displace the FOIA's fee-waiver provisions.

For the reasons explained below, this Court agrees with the DOC that the agency can argue that the MECEA and the Appropriations Act constitute superseding fee statutes despite not doing so in its administrative proceedings, but given that the MECEA and the Appropriations Act neither identify a "particular type[] of records" nor "set [a] level of fees[,]" 5 U.S.C. § 552(a)(4)(A)(vi), this Court does not find this argument persuasive.  And *Oglesby v. United States Department of the Army*, 79 F.3d 1172 (D.C. Cir. 1996), definitively forecloses the DOC's arguments to the contrary.  Consequently, Plaintiff's cross-motion for summary judgment will be **GRANTED** and Defendant's motion for summary judgment will be **DENIED**.[1]  A separate Order consistent with this Memorandum Opinion will follow.

---

[1] The Court's conclusion that the MECEA and Appropriations Act do not displace the FOIA's fee-setting provisions means that the Court need not further opine as to the effect of those statutes on the FOIA's fee-waiver provision.

# I.    BACKGROUND

## A. Yanofsky's FOIA Request And The Accompanying Administrative Proceedings

### 1.    Yanofsky Seeks Data Files That The DOC Compiles

On February 26, 2016, Yanofsky filed a FOIA request with the DOC, requesting records relating to that agency's I-92 and I-94 Programs. (*See* Pl.'s Combined Statement of Material Facts and Resp. to Def.'s Statement of Material Facts ("Consol. SUMF Part I"), ECF No. 21-2, ¶ 8.) The I-92 Program provides "international air traffic statistics to the government and the travel industry" (*id.* ¶ 2), while the I-94 Program "provides the official U.S. monthly and annual overseas visitor arrivals to the United States" (*id.* ¶ 4). One of the DOC's bureaus—the International Trade Administration ("the ITA")—uses the statistics that are collected through the I-92 program to generate a publication called the *U.S. International Air Travel Statistics Report*, and to create an underlying data file related to that report ("the I-92 Data File"). (*See id.* ¶ 3.) Meanwhile, that same bureau uses the information obtained via the I-94 Program to create another record—the *Summary of International Travel to the United States*—and to generate another data file ("the I-94 Data File") that consists of anonymized data about foreign visitors to the United States. (*See id.* ¶ 4.) The DOC then sells these reports and data files to the public. (*See id.* ¶¶ 3–4.)

In his FOIA request, Yanofsky sought copies of the I-92 and I-94 Data Files from 2011 through 2015, along with the accompanying technical documentation (*see id.* ¶ 8), and he also requested "a fee benefit as a representative of the news media pursuant to 5 U.S.C. § 552(a)(4)(A)(ii) and a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii)" (*id.* ¶ 10). Yanofsky supported these requests by explaining that he is a "journalist for

4

Quartz," a digital publication of the Atlantic Monthly Group, and that he intended to use the requested records to gather information of potential interest to the public; specifically, "information about the operations of the DOC and other government agencies and about travel and tourism in the United States." (*See* Feb. 26, 2016 Request ("FOIA Request"), Ex. A to Erdmann Decl., ECF No. 20-1, at 8; *see also* Consol. SUMF Part II ¶ 61.) Yanofsky further explained that the requested records would shed light on the operations or activities of the DOC in a manner that was likely to contribute significantly to the public understanding of those operations or activities, and that he was not seeking the records primarily for commercial-interest purposes. (*See* FOIA Request at 9; Consol. SUMF Part II ¶¶ 63−66.)

Notably, Yanofsky's February 2016 FOIA request was not the first time he had made these arguments or requested these records. Yanofsky had filed a materially identical FOIA request the year before, on March 10, 2015 (*see* Consol. SUMF Part II ¶¶ 27−30), but the DOC denied this previous request. Initially, the agency insisted that "ITA does not maintain the [I-94 data] records[,]" and with respect to the I-92 Data Files, the agency asserted that ITA uses this data to develop reports that are offered for sale, and that "records which are published and offered for sale are excluded from the definition of subsection 5 U.S.C. § 552(a)(2) records[.]" (*Id.* ¶¶ 32−33 (internal quotation marks omitted).) Yanofsky filed an administrative appeal, after which the DOC subsequently acknowledged that all of the records Yanofsky requested were "agency records" for FOIA purposes, and thus could not be withheld for the reasons previously stated, but the DOC then offered an alternative basis for denying Yanofsky's request. (*See id.* ¶¶ 40−41.) It explained that both the I-92 and I-94 Data Files were

being withheld based on the FOIA's displacement provision (5 U.S.C.

§ 552(a)(4)(A)(vi)), and that the relevant superseding fee statute was 15 U.S.C. § 1525.

(*See id.* ¶¶ 42–43.)  Yanofsky filed the FOIA request that is the subject of the instant

action in February of 2016, after he unsuccessfully sought to appeal the agency's

conclusion that the FOIA's fee-setting requirements had been displaced.[2]

2.  The Administrative Appeal Of Yanofsky's February 2016 FOIA
Request

On March 30, 2016, the DOC sent Yanofsky a letter denying his February 2016

request for the I-92 and I-94 Data Files.  The letter explained that all of the "records are

being withheld under 5 U.S.C. § 552(a)(4)(A)(vi), which provides that FOIA fees are

superseded by 'fees chargeable under a statute specifically providing for setting the

level of fees for particular types of records.'"  (*See* ITA's Resp. to Request ("Denial

Letter"), Ex. D to Erdmann Decl., ECF No. 20-1, at 18; *see also* Consol. SUMF Part II

¶¶ 77–78.)  According to the DOC's correspondence, "where documents otherwise

responsive to a FOIA request are maintained for distribution by an agency according to

a fee schedule that is assessed pursuant to a 'superseding fee statute,' requesters must

obtain the documents from that source and pay the applicable fees designated by the

agency under that statute[.]"  (Denial Letter at 18 (citing OMB Fee Guidelines, 52 Fed.

Reg. at 10,012–13, 10,017–18).)

---

[2] In his second administrative appeal of the agency's denial of his March 2015 request, Yanofsky
maintained that (1) the displacement provision provides no basis for denying a fee *waiver* (where the
requirements for a fee waiver are otherwise satisfied); (2) 15 U.S.C. § 1525 does not constitute a
superseding fee statute as defined in the displacement provision; and (3) "the $136,210.00 fees
demanded for the requested records bears no relationship to the 'actual or estimated costs' of making
them available in electronic format."  (Consol. SUMF Part II ¶ 51; *see id.* ¶¶ 47, 50.)  The DOC denied
this appeal, asserting that Yanofsky was not entitled to another appeal merely because his initial
"appeal was denied under a basis different than that asserted by ITA[.]"  (*Id.* ¶ 53 (internal quotation
marks omitted).)

The DOC's denial letter to Yanofsky also specifically maintained that the

relevant superseding fee statute was 15 U.S.C. § 1525.  (*See id.*)  That statute provides:

> The Secretary of Commerce is authorized . . . to make special studies on
> matters within the authority of the Department of Commerce; to prepare
> from its records special compilations, lists, bulletins, or reports; . . . and
> to furnish transcripts or copies of its studies, compilations, and other
> records; upon the payment of actual or estimated cost of such special
> work.

15 U.S.C. § 1525.  In its denial letter, the DOC explained that Section 1525 qualifies as

a FOIA displacement statute under 5 U.S.C. § 552(a)(4)(A)(vi), because it specifically

provides for setting the level of fees for particular types of records.  (*See* Denial Letter

at 19.)  Consequently, the denial letter further rejected Yanofsky's request for a fee

benefit or a fee waiver (*see* Consol. SUMF Part II ¶¶ 82–83), and directed him to the

DOC's website, where he could "purchase the I-94 and I-92 [Data Files]" by paying the

fees outlined by the agency (Denial Letter at 19).  Those fees totaled $173,775.

(Consol. SUMF Part II ¶ 70.)

On March 31, 2016, Yanofsky administratively appealed the denial of his FOIA

request and his fee waiver request.  (*See id.* ¶¶ 85, 91; *see also* Mar. 31, 2016

Administrative Appeal ("Admin. Appeal"), Ex. E to Erdmann Decl., ECF No. 20-1, at

25–26.)[3]  Yanofsky raised three arguments on appeal.  First, he argued that a

superseding fee statute must require the agency to establish fees for particular

documents, and that section 1525 of Title 15 does nothing of the sort.  (*See* Admin.

Appeal at 25; *see also* Consol. SUMF Part II ¶ 86.)  Next, Yanofsky maintained that the

"FOIA's Displacement Provision does not allow an agency to withhold, wholesale,

---

[3] It appears that Yanofsky's appeal did not address the agency's determination regarding his request for
a media-member fee benefit.  (*See* Admin. Appeal at 25–28.)

records requested under FOIA[,]" but instead only authorizes the agency to charge fees

pursuant to a superseding statute rather than FOIA.  (Admin. Appeal at 26 & n.1; *see*

*also* Consol. SUMF Part II ¶ 87.)  He further noted that, by its own terms, section 1525

permits an agency to "charge only the actual duplication costs associated with providing

copies" of existing documents.  (Admin. Appeal at 26 & n.1; *see also* Consol. SUMF

Part II ¶ 87.)  Finally, Yanofsky argued that the "FOIA's Displacement Provision

applies only to FOIA's fee *setting* requirements and does not apply to FOIA's fee

*waiver* requirements."  (Admin. Appeal at 26 (emphasis in original); *see also* Consol.

SUMF Part II ¶ 88.)

The DOC acknowledged receipt of Yanofsky's administrative appeal on April 8,

2016.  (*See* Consol. SUMF Part II ¶ 92.)  But it did not issue a decision with respect to

Yanofsky's appeal within twenty business days, as the FOIA requires.  (*See id.* ¶ 93.)

## B. Procedural History

On May 19, 2016, Yanofsky filed the five-count complaint in the instant case,

challenging the DOC's withholding of the requested records and its denial of his fee-

waiver requests.  (*See* Compl., ECF No. 1, ¶¶ 59–91 (claiming Violation of FOIA for

Unlawful Withholding of Agency Records (Count I); Violation of FOIA for Failure to

Grant Fee Waiver (Count II); Violation of FOIA for Improper Assessment of Fees by

Improper Application of 5 U.S.C. § 552(a)(4)(A)(vi) and 15 U.S.C. § 1525 (Count III);

Violation of FOIA for Failure to Grant News Media Fee Status (Count IV); and

Violation of FOIA for Improper Assessment of Fees Under 15 U.S.C. § 1525 (Count

V)).)  Yanofsky's complaint seeks an order requiring the DOC to disclose records

responsive to Yanofsky's request, as well as a declaration that, *inter alia*, the DOC has

improperly assessed the fees it may charge for disclosure of the requested records. (*See* Compl., Request for Relief, ¶¶ 1–6.)

The DOC answered Yanofsky's complaint on July 22, 2016. (*See* Consol. SUMF Part II ¶ 96.) Notably, among other things, the DOC represented that "the superseding fee statute cited in ITA's Determination (15 U.S.C. § 1525) was cited in error and [] the superseding fee statute applicable to the February 2016 Request is the Consolidated Appropriations Act[,]" which pertains to a term in the MECEA. (Answer, ECF No. 14, ¶ 53; *see also* Consol. SUMF Part II ¶ 99 (acknowledging that the DOC's answer "is the first time it cited the Consolidated Appropriations Act for 2016 as a basis for denying Plaintiff's Request").) The parties have now filed cross-motions for summary judgment, and have fully briefed those motions. This Court held a motion hearing on May 16, 2017. (*See* Minute Entry for May 16, 2017.)

## II.   STATUTORY FRAMEWORK AND LEGAL STANDARDS

### A.  Summary Judgment In FOIA Cases

"FOIA cases typically and appropriately are decided on motion[s] for summary judgment." *Lieberman v. DOT*, 227 F. Supp. 3d 1, 8 (D.D.C. 2016) (quoting *Bigwood v. DOD*, 132 F. Supp. 3d 124, 134 (D.D.C. 2015)). Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56, and, in the context of a dispute over the FOIA's fee-setting and fee-waiver provisions, it is the requester who bears the burden to demonstrate that he is entitled to a fee waiver, *see Citizens for Responsibility & Ethics in Wash. v. DOJ*, 602 F. Supp. 2d 121, 125 (D.D.C. 2009) (citing *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1126 (D.C. Cir. 2004)).

When reviewing "any action by [a FOIA] requester regarding the waiver of fees," the district court must "determine the matter de novo." 5 U.S.C. § 552(a)(4)(A)(vii). However, section 552(a)(4)(A)(vii) limits the scope of a court's review in these matters to "the record before the agency." *Id.*; *see also Cause of Action v. FTC*, 799 F.3d 1108, 1114 (D.C. Cir. 2015). And courts typically understand "the record before the agency" to include "the initial FOIA request, the agency's response, and any subsequent materials related to the administrative appeal," *Schoenman v. FBI*, 604 F. Supp. 2d 174, 188 (D.D.C. 2009) (quoting *Jarvik v. CIA*, 495 F. Supp. 2d 67, 71 (D.D.C. 2007)), along with prior FOIA requests and the administrative proceedings related to those requests, if the previous FOIA requests relate to the same dispute over the same documents, *see Cause of Action*, 799 F.3d at 1114. In addition, "because FOIA's terms apply government-wide[,] . . . [courts] generally decline to accord deference to agency interpretations of the statute, as [they] would otherwise do under *Chevron*." *Al–Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001).

## B. FOIA's Fee-Setting, Fee Waiver, And Displacement Provisions

The FOIA provides a detailed statutory scheme for the charging of fees to FOIA requesters in conjunction with their FOIA requests. *See* 5 U.S.C. § 552(a)(4)(A). The statute generally instructs the Office of Management and Budget ("OMB") to promulgate regulations that will provide for a "uniform schedule of fees," *id.* § 552(a)(4)(A)(i), and mandates that those regulations place FOIA requests into one of three categories, each of which results in a different set of fees, *see id.* § 552(a)(4)(A)(ii). Specifically, and as relevant here, when records are requested for commercial use, "fees shall be limited to reasonable standard charges for document search, duplication, and review[,]" *id.* at § 552(a)(4)(A)(ii)(I); when records are not

10

sought for commercial use and the request is made by "a representative of the news media[,]" then "fees shall be limited to reasonable standard charges for document duplication[,]" *id.* § 552(a)(4)(A)(ii)(II); and when the request does not fit into either of the first two categories "fees shall be limited to reasonable standard charges for document search and duplication[,]" *id.* § 552(a)(4)(A)(ii)(III).

Two other fee-related provisions of the FOIA statute are relevant to the issues presented in this case. First, the FOIA contains what is often referred to as a "fee-waiver provision," which permits requesters to obtain records "without any charge or at a charge reduced below the fees established" above "if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." *Id.* § 552(a)(4)(A)(iii). Second, the FOIA contains one final caveat—notwithstanding the detailed provisions that govern the setting of fees—the "displacement provision[,]" which states: "Nothing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records." *Id.* § 552(a)(4)(A)(vi).

### C. The Mutual Educational And Cultural Exchange Act Of 1961 And The Appropriations Act Of 2016

The dispute in the instant case centers on whether the Mutual Educational And Cultural Exchange Act of 1961 ("the MECEA") and the Appropriations Act of 2016 ("the Appropriations Act") together serve as a superseding statute that displaces the FOIA's fee-setting provisions. Congress enacted the first of these statutes to "enable the Government of the United States to increase mutual understanding between the people of the United States and the people of other countries by means of educational

11

and cultural exchange," 22 U.S.C. § 2451, and by its terms, the MECEA authorizes

educational and cultural exchange programs, *id.* § 2452, international expositions, *id.*

§ 2452(b), and the establishment of the Fulbright scholarship board, *id.* § 2456. The

statute further specifically provides that

> [f]oreign governments, international organizations and private individuals,
> firms, associations, agencies, and other groups shall be encouraged to
> participate to the maximum extent feasible in carrying out this chapter and
> *to make contributions of funds*, property, and services which the President
> is authorized to accept, *to be utilized to carry out the purposes of this
> chapter.* Funds made available for the purposes of this chapter may be used
> to contribute toward meeting the expenses of activities carried out through
> normal private channels, by private means, and through foreign
> governments and international organizations.

22 U.S.C. § 2455(f) (emphasis added). In the Appropriations Act of 2016, Congress

clarified the word "contributions" as it appears in the MECEA, explaining that

"contributions under the provisions of the [MECEA] shall include *payment for

assessments for services* provided as part of these activities." § 9(B), 129 Stat. at 2287

(emphasis added).

## III. ANALYSIS

In response to Yanofsky's claim that the DOC is charging unlawfully exorbitant

fees for access to data that the agency is required to disseminate under the FOIA, the

DOC contends that it has the authority to sell the requested information, because the

MECEA has displaced the FOIA's fee-setting provisions, as clarified in the

Appropriations Act. Yanofsky's first response to the agency's argument is that the

DOC is precluded from relying on the combination of the MECEA and the

Appropriations Act as a superseding statute because, at the administrative level, the

DOC maintained that 15 U.S.C. § 1525 was the fee statute that displaced the FOIA's fee

provisions, and this Court's review of the DOC's FOIA determination is limited to the

administrative record under 5 U.S.C. § 552(a)(4)(A)(vii).  (*See* Pl.'s Mot. at 17–19.)

For the reasons discussed below, this Court has concluded that the FOIA does not

prevent this Court from considering the DOC's argument that the MECEA and the

Appropriations Act work in tandem to displace the FOIA's fee setting provisions.  But

the Court also finds that those statutes do not constitute a superseding fee statute that

displaces the FOIA's fee-setting provisions, because neither statute "provid[es] for

setting the level of fees[,]" nor do they do so for "particular types of records[,]" as the

FOIA requires.  5 U.S.C. § 552(a)(4)(A)(vi).

### A. The DOC's Reliance On 15 U.S.C. § 1525 Below Does Not Prevent The Agency From Arguing That The MECEA And The Appropriations Act Displace The FOIA's Fee-Setting Provisions

As noted above, "in any action . . . regarding the waiver of fees under" section

552(a)(4)(A), a court must review the parties' dispute *de novo*, but it has to limit its

review to "the record before the agency" when the agency made its decision.  *See id.*

§ 552(a)(4)(A)(vii).  Yanofsky insists that this limitation prevents this Court from

considering the DOC's current contentions regarding the displacement power of the

MECEA and the Appropriations Act.  As Yanofsky reads section 552(a)(4)(A)(vii) of

the FOIA, "both the requester and the agency are limited to the arguments contained in

the administrative record" (Pl.'s. Mot. at 17 (emphasis removed)), and here, the DOC is

admittedly relying on an entirely different statute to justify its fees than it asserted at

the administrative level (*see id.* at 18 (noting that "the DOC relied exclusively on the

Special Works Statute to deny [Yanofsky's] Request for I-92 and I-94 Data Files at the

administrative stage, arguing that it was a superseding fee statute for purposes of

FOIA's Displacement Provision")).  This Court disagrees with Yanofsky's analysis of

the implications of section 552(a)(4)(A)(vii) for one very simple reason: while it is

13

certainly true that a court's review "is limited" to the facts submitted to the agency, and that "the agency must stand on whatever reasons for denial it gave in the administrative proceeding[,]" *Friends of the Coast Fork v. U.S. Dep't of the Interior*, 110 F.3d 53, 55 (9th Cir. 1997), there is a world of difference between providing *new* reasons for the agency's decision at the district court stage and merely refining the same legal arguments that the parties advanced in the proceedings below.

D.C. Circuit precedent explains that difference in this way: "[i]ssues and legal theories not asserted [below] ordinarily will not be heard on appeal[,]" but litigants may, of course, "offer[] new legal authority for the position" that they previously advanced. *United States v. Rapone*, 131 F.3d 188, 196 (D.C. Cir. 1997). Indeed, the circuit panel specifically noted that, with respect to "a question of law that [a court] review[s] de novo, [] we do not think it appropriate to ignore relevant legal authority simply because it was not considered in the court below." *Id.* at 197 (emphasis omitted). In other words, it is well established that "when a [] court reviews a question of law de novo, the court must use its 'its full knowledge of its own [and other relevant] precedents.'" *Id.* (alteration in original) (emphasis removed) (quoting *Elder v. Holloway*, 510 U.S. 510, 516 (1994)). This prevents "a windfall to a party 'because of shortages in counsel's or the court's legal research or briefing.'" *Id.* (quoting *Elder*, 510 U.S. at 515 & n.3); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) (noting that courts have an "independent power to identify and apply the proper construction of governing law").

In the instant case, the DOC unquestionably asserted at the administrative stage the displacement provision of the FOIA as its reason for denying Yanofsky's FOIA

request (*see* Denial Letter at 18), such that any fair reading of the arguments that the

DOC now makes compels the conclusion that its current position is a mere refinement

of the legal argument that the DOC has advanced ever since Yanofsky filed his FOIA

request.  Indeed, the DOC's denial letter of March 30, 2015, which was addressed to

Yanofsky, expressly stated that

> [b]oth the I-94 and the I-92 records *are being withheld under 5 U.S.C.*
> *§ 552(a)(4)(A)(vi)*, which provides that FOIA fees are superseded by "fees
> chargeable under a statute specifically providing for setting the level of fees
> for particular types of records."

(Denial Letter at 18 (quoting 5 U.S.C. § 552(a)(4)(A)(vi)) (emphasis added).)  This is

the same argument that the DOC made when it answered the complaint in the instant

case (Answer ¶ 29), and it is also the DOC's asserted grounds for summary judgment

(*see, e.g.*, Def.'s Mot. at 11).  Therefore, Yanofsky cannot credibly claim that the

DOC's reliance on the FOIA's displacement provision is a new matter or issue that is

not part of the administrative record in this case.

To be sure, at the administrative stage, the DOC also expressly asserted that 15

U.S.C. § 1525 is the statutory provision that displaces the FOIA's fee-setting

provisions.  (*See* Denial Letter at 18–19.)  However, in this Court's view, the DOC's

present assertion that the MECEA and the Appropriations Act qualify as the pertinent

superseding statute implicates considerations of law that this Court must evaluate by

virtue of the DOC's persistent contention that the FOIA's displacement provision

applies.  It makes little sense for this Court to be stuck analyzing the legal effect of a

statutory provision that the DOC has long since abandoned, and while any such analysis

is necessarily substantively different than the one conducted during the administrative

process, the Court is still evaluating displacement as a matter of law—not a *new* or

*different* reason for the denial of Yanofsky's fee waiver in violation of 5 U.S.C.
§ 552(a)(4)(A)(vii).  Rather, the DOC has merely cited and quoted different "legal
authority" for its abiding assertion that the FOIA's fee-setting provisions have been
superseded with respect to the FOIA request at issue in this case.  *Rapone*, 131 F.3d at
196.

In other words, when determining the scope of this Court's review authority
under section 552(a)(4)(A)(vii) of the FOIA, "[w]hat matters is that the core of
[Defendant's] argument . . . remained the same."  *Flyers Rights Educ. Fund, Inc. v. Fed.
Aviation Admin.*, 864 F.3d 738, 748 n.6 (D.C. Cir. 2017).  So it is here, and as a result,
this Court will now conduct a de novo review of the legal arguments that the DOC is
currently making in support of its long-standing view that the FOIA's fee-setting
provision has been superseded within the meaning of the displacement provision for
purposes of Yanofsky's FOIA request.

### B.  The MECEA And The Appropriations Act Do Not Displace The FOIA's Fee-Setting Provisions Under § 552(a)(4)(A)(vi)

The substantive arguments in this case turn on whether the MECEA and the
Appropriations Act constitute superseding fee-setting statutes as defined in 5 U.S.C.
§ 552(a)(4)(A)(vi).  Yanofsky contends that these statutes do not constitute superseding
fee statutes because they neither identify "particular types of records" nor do they "set[]
the level of fees" for these records.  (*See* Pl.'s Mot. at 21–26.)  For its part, the DOC
insists that the MECEA and Appropriations Act together meet both of these
displacement requirements.  (*See* Def.'s Mot. at 10–13.)  This Court concludes that
Yanofsky has the better of this argument.

As explained above, the FOIA's displacement provision provides that nothing in

the FOIA's fee-setting scheme "shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records." 5 U.S.C. § 552(a)(4)(A)(vi). By its plain text, then, the FOIA fee-setting provision is superseded when Congress otherwise (1) "provid[es] for setting the level of fees[,]" and (2) does so "for particular types of records." *Id.* The seeming clarity of this displacement principle might help to explain why there is a relative dearth of case law regarding the meaning of these two requirements in practice. Indeed, the D.C. Circuit has interpreted this provision only once before, in the case of *Oglesby v. United States Department of the Army*, 79 F.3d 1172 (D.C. Cir. 1996).

In *Oglesby*, the plaintiff sought a number of records from the National Archives and Records Administration ("NARA") and requested that the agency grant him a fee waiver under the FOIA's fee-waiver provision. *See* 79 F.3d at 1176–77. NARA denied Oglesby's request for a fee waiver, arguing that, pursuant to 5 U.S.C. § 552(a)(4)(A)(vi), section 2116(c) of Title 44 of the U.S. Code ("the NARA statute") displaced the FOIA's fee-setting and fee-waiver provisions. *See id.* at 1177. The NARA statute expressly authorized the Archivist "to recover the costs for making or authenticating copies or reproductions of materials transferred to [his] custody[,]" and the statute further stated that "[s]uch fee shall be fixed . . . at a level which will recover, so far as practicable, all elements of such costs[.]" 44 U.S.C. § 2116(c). Oglesby maintained that this statute did not displace the FOIA's fee-setting provisions, because it did not "provide[] a set formula for the imposition of fees [or] mandate[] the assessment of fees[,]" *Oglesby*, 79 F.3d at 1177 (internal quotation marks and citation omitted), nor did it "describe particular types of records," *id.* (internal quotation marks

and citation omitted).

The D.C. Circuit disagreed.  Based on the "plain language" of the NARA statute, that court concluded that the statute did, in fact, qualify as a superseding statute under the FOIA's displacement provision, because it both set "the level of fees" (insofar as it specified that the fees "shall be fixed at a level" that "will recover . . . all elements of [the Archivist's] costs" for making and authenticating copies or reproductions), and described "particular types of records" (it specifically pertained to "copies or reproductions of materials" in the Archivist's custody).  *Id.*[4]  Given this conclusion, it is clear to this Court that the MECEA and Appropriations Act do not specifically pertain to any identifiable set of records, nor set the level of fees for an agency's dissemination of such records, and as such, they do not qualify as superseding statutes for the purpose of the FOIA's displacement provision.

     1.   The MECEA And The Appropriations Act Do Not Identify "Particular Types Of Records"

When read in conjunction, the MECEA and the Appropriations Act provide that "[f]oreign governments, international organizations and private individuals, firms, associations, agencies, and other groups shall be encouraged . . . to make contributions . . . to carry out the purposes of this chapter," 22 U.S.C. § 2455(f), and such contributions "include payment for assessments for services provided as part of these activities," Appropriations Act § 9(B), 129 Stat. 2287.  Not even the most probing evaluation of this language could reasonably lead one to conclude that it identifies any "particular types of records."  5 U.S.C. § 552(a)(4)(A)(vi).  That is, neither statute

---

[4] The D.C. Circuit left open the question of whether a statute that displaces the FOIA's fee-*setting* provisions also displaces the FOIA's fee-*waiver* provisions, because the plaintiff failed to raise that argument in a timely fashion.  *Oglesby*, 79 F.3d at 1178.

refers to any records, documents, or written materials at all, much less the type of data that the I-92 or I-94 Data Files contain.  *See* 22 U.S.C. § 2455(f); Appropriations Act § 9(B), 129 Stat. 2287.  This fact alone distinguishes the MECEA and Appropriations Act from the statute at issue in *Oglesby*, which "accurately identified" particular records among the many records NARA possesses by specifically referencing the "materials transferred to [the Archivist's] custody."  *Oglesby*, 79 F.3d at 1177.

The DOC acknowledges that the closest that either statute comes to suggesting that an agency can charge fees for its dissemination of particular records is when the Appropriations Act clarifies that an agency may receive payments for assessments "for services provided as part of these activities."  § 9(B), 129 Stat. 2287.  (*See* Def.'s Reply at 11–12.)[5]  But the phrase "services provided" does not specifically connote the collection and distribution of *documents*; indeed, as Black's Law Dictionary defines it, a "service" typically refers to "[l]abor performed in the interest or under the direction of others" or "an intangible commodity in the form of human effort such as labor, skill or advice."  *Black's Law Dictionary* 1576 (10th ed. 2014).  Thus, by saying that the DOC may collect payments for "services provided" for its activities, Congress appears to be suggesting that the DOC can receive compensation for its labor pertaining to international trade activities, *not* the cost of distributing records or documents, much less payment for the documents themselves.

Leaving dictionaries aside, the *Oglesby* court's discussion of a statute that did *not* qualify as a superseding statute—31 U.S.C. § 9701(b)—forecloses any argument that the phrase "services provided" could possibly be interpreted as identifying

---

[5] The "activities" that the Appropriations Act refers to include any "international trade activities of the [DOC] provided for by law" or "trade promotional activities abroad."  § 9(B), 129 Stat. 2286.

19

particular records.  Section 9701 of Title 31 states that "the head of each agency . . .
may prescribe regulations establishing the charge for a service or thing of value
provided by the agency."  31 U.S.C. § 9701(b).  The D.C. Circuit explained that the
phrase "'thing of value' clearly does not describe 'particular types of records[,]'" but
that court did not even deign to address the possibility that the statute's reference to "a
service . . . provided by the agency" satisfied the displacement provision's "particular
types of records" requirement.  *Oglesby,* 79 F.3d at 1177 (emphasis omitted).
Similarly, the phrase "services provided as part of these activities" in the MECEA and
the Appropriations Act does not "accurately identif[y]" a "particular type[] of record[,]"
*id.*, and certainly not the category of documents that Yanofsky has requested in this
case.

The DOC's only response to this analysis is to direct this Court's attention to
*Wade v. Department of Commerce*, 1998 U.S. Dist. LEXIS 23251 (D.D.C. Mar. 16,
1998), which the agency says supports the conclusion that the MECEA and
Appropriations Act are "sufficiently specific to qualify as a superseding fee statute."
(Def.'s Reply at 10–11.)  But that case is actually inapposite, because the parties in
*Wade* apparently *agreed* that the statute in that case constituted a superseding fee
statute, *see Wade*, 1998 U.S. Dist. LEXIS 23251, at *8, and neither the parties nor the
district court specifically addressed whether the statute at issue in that case qualified as
a superseding fee statute under 5 U.S.C. § 552(a)(4)(A)(vi).

Moreover, and notably, the statute at issue in *Wade* was materially different from
the MECEA and the Appropriations Act; it specifically provided that the Secretary of
Commerce could establish "a schedule or schedules of reasonable fees or charges for

services performed *or documents or other publications* furnished under [15 U.S.C.

§§ 1151–57.]."  15 U.S.C. § 1153.  Thus, section 1153 expressly identified particular

types of records.  Consequently, if anything, the comparison between the statute at issue

in *Wade* and the MECEA/Appropriations Act *undercuts* the government's argument, by

suggesting that when Congress wants to reference documents it does do explicitly and

does not typically use the term "services" to identify the records that an agency creates.

2.  The MECEA And The Appropriations Act Do Not Set A "Level Of Fees"

This Court also has serious doubts about whether the MECEA and the

Appropriations Act authorize the DOC to set any "fees" at all.  The provisions to which

the DOC points appear to address the agency's interaction with "[f]oreign governments,

international organizations and private individuals, firms, associations, agencies and

other groups[,]" and Congress merely stated that such entities "shall be encouraged to

participate to the maximum extent feasible in carrying out this chapter[,]" 22 U.S.C.

§ 2455(f), including by "mak[ing] contributions of funds, property, and services which

the President is authorized to accept[,]" *id.*  This encouragement and authorization

seems far closer to permitting foreign entities to make a lawful donation to the DOC

than allowing the DOC to charge a "fee."

In any event, nothing in the MECEA or the Appropriations Act speaks to the

agency's task of "setting the level of fees," as the FOIA's displacement provision

requires.  5 U.S.C. § 552(a)(4)(A)(vi).  At best, these statutes authorize the DOC to

collect "payment for assessments for services," Appropriations Act § 9(B), 129 Stat.

2287, but that language provides no guidance as to *how* the DOC should calculate these

"assessments."  Must the DOC set these assessments at a level that merely recoups its

21

costs?  Can the agency merely dictate a fee for each service, without regard to the costs
it incurs in providing that service?  And if so, is the agency entitled to set the fees at
whatever level it thinks appropriate?  The MECEA and Appropriations Act contain no
answers, and thus, it cannot be said that these statutes "provide[] for setting the level of
fees" for the purposes of the FOIA's displacement provision.  5 U.S.C.
§ 552(a)(4)(A)(vi).

This silence regarding how the fees are to be calculated stands in stark contrast
to the statutes that the D.C. Circuit and Congress have acknowledged as superseding
fee-setting statutes within the meaning of the FOIA.  In *Oglesby*, for example, the
NARA statute that displaced the FOIA's fee-setting provisions specifically stated that
"fees shall be fixed . . . *at a level which will recover, so far as practicable, all elements
of such costs.*"  79 F.3d at 1177 (alteration in original) (emphasis added) (quoting 44
U.S.C. § 2116(c)).  Similarly, when members of Congress discussed inserting a
displacement provision into the FOIA, *see* 132 Cong. Rec. 29618 (1986), they indicated
that 44 U.S.C. § 1708 would qualify as a displacing statute, because that statute states
that "[t]he price at which additional copies of government publications are offered for
sale to the public by the Superintendent of Documents shall be *based on the cost as
determined by the Public Printer plus 50 percent*," 44 U.S.C. § 1708 (emphasis added).
Put simply, like the NARA statute, 44 U.S.C. § 1708 sets "a level of fees" that applies
*in a specific manner*, even though the final cost is not predetermined.  It also
demonstrates that a proper superseding fee statute reflects Congress's intent as it relates
specifically to the agency's task of setting the level of fees for records.  Neither the
MECEA nor the Appropriations Act speaks to how the DOC's fees with respect to its I-

92 and I-94 data need to be determined, and thus this Court concludes that those statutes do not qualify as laws that supersede the fees provided for in the FOIA.

In resisting this conclusion, the DOC maintains that "providing for setting the level of fees" for the purpose of section 552(a)(4)(A)(vi) does not require that a statute "identify the fee amount or define a method to determine it."  (Def.'s Reply at 11.)  This Court largely disagrees with the latter part of this contention for the reasons already discussed, but even if that is so, after *Oglesby*, there can be no doubt that the statute in question must say *something* to authorize the agency to set fees pertaining to the agency's dissemination of records in *some* manner.  The statutes at issue here miss this mark entirely, for they provide only that the DOC may receive "payment for assessments for services provided as part of these activities[.]"  Appropriations Act § 9(B), 129 Stat. 2287.  And even if the word "assessments" *implies* that it is the DOC that will determine what fees are owed with respect to the service of providing records to the public (Def.'s Reply at 11–12), nothing in the text of the MECEA or the Appropriations Act tells the agency how to go about calculating those assessments, which means that they cannot plausibly be read to have the character of a superseding fee-setting provision, as the D.C. Circuit has interpreted the 5 U.S.C. § 552(a)(4)(A)(vi).

Ultimately, this Court's analysis ends where it began: with the plain language of the FOIA displacement statute, as illuminated by D.C. Circuit precedent.  The only statute that supersedes the FOIA's specific fee-setting prescriptions is one that "specifically provide[s] for setting the level of fees for particular types of records."  5 U.S.C. § 552(a)(4)(A)(vi).  And while the DOC has struggled valiantly to repackage the

MECEA and the Appropriations Act as statutes that trump the FOIA's fee-setting
provisions in a manner that justifies the $173,775 bill the agency presented to Yanofsky
for the records at issue in this case, neither of those statutes actually satisfies this
standard.  As a result, the DOC must follow the FOIA, and determine the fees that are
applicable to Yanofsky's FOIA's request in accordance with the FOIA's fee-setting and
fee-waiver provisions.[6]

## IV.    CONCLUSION

For the reasons explained above, the Defendant's motion for summary judgment
is **DENIED**, the Plaintiff's motion for summary judgment is **GRANTED**, and this case
will be remanded to the agency for a reevaluation of the fees that Yanofsky will be
charged, consistent with the reasoning of this Opinion.  A separate order will follow.

DATE: March 30, 2018

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

---

[6] To this Court's knowledge, the only jurisdiction other than the D.C. Circuit that has analyzed the
FOIA's displacement provision is the Ninth Circuit.  *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
432 F.3d 945, 948–49 (9th Cir. 2005).  But the Ninth Circuit's analysis differs from the D.C. Circuit's
insofar as the Ninth Circuit apparently affords *Chevron* deference to the Office of Management and
Budget's regulations relating to 5 U.S.C. § 552(a)(4)(A).  *See id.*  The D.C. Circuit does not defer to
agencies in the FOIA context, *see, e.g.*, *DeNaples v. Office of the Comptroller of the Currency*, 706
F.3d 481, 487 (D.C. Cir. 2013); *Al–Fayed*, 254 F.3d at 307; therefore, the Ninth Circuit's precedent is
of limited utility.



**UNITED STATES DEPARTMENT OF COMMERCE**
Office of the General Counsel
Washington, D.C. 20230

NOV 17 2015

David Yanofsky

███████████████

      Re: FOIA Appeal DOC-ITA-2015-001055

Dear Mr. Yanofsky:

This letter is in response to your Freedom of Information Act (FOIA) (5 U.S.C. § 552) appeal for documents withheld in response to your March 10, 2015 FOIA request to the International Trade Administration (ITA). Your request sought the "Air Arrivals I-94 Database Annual Datafile" from 2011 through 2014 and the associated technical documentation (I-94 records) and the "U.S. International Air Travel Statistics Report (APIS/I-92) Data files" from 2011 through 2014 and the associated technical documentation (I-92 records).

By letter dated June 24, 2015, ITA FOIA Officer Justin Guz informed you that ITA was withholding all responsive records, explaining that ITA does not maintain the I-94 records, and that the I-92 records are not available under the FOIA but, instead, are available for sale. After considering your arguments, your appeal is denied on an alternative basis.

At issue in this appeal are two sets of records, the I-94 records and the I-92 records. In your appeal, you correctly argue that the I-94 records are in fact "agency records" for FOIA purposes. You also correctly argue that the I-92 records cannot properly be withheld under 5 U.S.C. § 552(a)(2). Nevertheless, on appeal, both sets of ITA records are being withheld on under 5 U.S.C. § 552(a)(4)(A)(vi), which provides that FOIA fees are superseded by "fees chargeable under a statute specifically providing for setting the level of fees for particular types of records." This is referred to as the "displacement provision."

Under the displacement provision, where documents otherwise responsive to a FOIA request are maintained for distribution by an agency according to a fee schedule that is assessed pursuant to a "superseding fee statute," requesters must obtain the documents from that source and pay the applicable fees designated by the agency under that statute. *See* OMB Fee Guidelines, 52 Fed. Reg. at 10,012-13, 10,017-18. The relevant superseding fee statute in this case is 15 U.S.C. § 1525, which provides in relevant part:

> The Secretary of Commerce is authorized, upon the request of any person, firm, organization, or others, public or private, to make special studies on matters within the authority of the Department of Commerce; to prepare from its records special compilations, lists, bulletins, or reports; to perform the functions authorized by section 1152 of this title; and to furnish transcripts or copies of its studies, compilations, and other records; upon the payment of the actual or estimated cost of such special work.

2

Section 1525 "specifically provid[es] for setting the level of fees for particular types of records" and therefore qualifies as a FOIA displacement statute. 5 U.S.C. § 552(a)(4)(A)(vi). Additionally, Department of Commerce FOIA Regulations specifically recognize 15 U.S.C. § 1525 as a FOIA displacement statute. 15 C.F.R. § 4.3(c).

Both the I-94 and I-92 records you requested are compilations of data which the ITA has authority to assemble and provide to members of the private sector upon request and payment of the specified fees gathered in order to "support the cost of this program." *See* http://travel.trade.gov/research/index.html (explaining how to purchase the I-94 and I-92 records and outlining the required fees). As a result, these records are not available under the FOIA pursuant to the displacement provision.[1]

If you are interested in purchasing these records, please contact the National Travel and Tourism Office at (202) 482-0140 or at ntto@trade.gov.

This is the final decision of the Department of Commerce. You have the right to obtain judicial review of this denial as provided for in 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Benjamin Friedman
Assistant General Counsel
    for Litigation, Employment and Oversight

---

[1] Additionally, because no records are being released in response to this appeal, there is no need to address your request for a fee waiver.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAVID YANOFSKY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-02290 (KBJ) |
| | ) | |
| U.S. DEPARTMENT OF COMMERCE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SECOND DECLARATION OF ISABEL HILL

I, Isabel Hill, declare under penalty of perjury, that the following statements are true and correct to the best of my knowledge and belief:

1.   I am the Director of the National Travel and Tourism Office (NTTO), International Trade Administration (ITA), U.S. Department of Commerce (DOC, Commerce, or the Department).  I have held this position since 2013.

2.   My statement in this declaration is based on my personal knowledge, information provided to me by employees under my supervision, information obtained by me, and information contained in the records of NTTO.  I am personally familiar with Plaintiff's FOIA request at issue in this civil action.

3.   This Declaration is provided in support of Defendant's reply in support of its motion for summary judgment in this matter. This is my second declaration in this matter.

## ALL DATA FILE RECORDS CREATED BY ITA FOR THE I-92 PROGRAM HAVE BEEN FURNISHED TO PLAINTIFF

4.   As previously affirmed, the I-92 program is a joint effort between CBP and NTTO to provide international air travel statistics data to the government and the travel industry.

5.   CBP provides data directly to ITA in accordance with the 2002 Memorandum of Understanding between DOC and the Immigration and Naturalization Service (now CBP) division of the Department of Homeland Security ("DHS-DOC MOU"), which addresses the protection of sensitive information. The DHS-DOC MOU was included as Exhibit 1 of my first declaration.

6.   The Department's Technology, Services, and Innovation (TSI) [formerly the Office of the Chief Information Officer (OCIO)} processes and aggregates the CBP data to create seven tables of information for each year with different parameters. These tables are set forth in standardized reports known as the *U.S. International Air Travel Statistics Report*.

7.   For each of these tables of information, a data file exists containing the same data in the standardized report. The only difference between the data file and the report is its format: the report is a printable file in pdf format, whereas the data file is an excel workbook that permits the data to be manipulated.

8.   NTTO has provided to plaintiff the data files corresponding to all the processed and aggregated data it has created for the I-92 program with respect to the years 2011 through 2015, with the exception of three custom reports commissioned by businesses which contain business proprietary information about those customers and their internal software programs and capabilities. There are no additional data files created and maintained by NTTO, ITA, or DOC.

9.   Specifically, until recently, the Department maintained a SQL database which contains only data that came directly from CBP and is subject to the DHS-DOC MOU. This database contains business proprietary information.

10.   Recently, the Department migrated the I-92 data from SQL to Microsoft Power BI, and the SQL system was decommissioned.

11.  In order to produce the CBP data in the Department database, data parameters would have to be selected which do not reveal business proprietary information, and the database extracted into a datafile. NTTO does not have the capability to compile and program the data, and would have to pay the contractor to create the datafile. (Such a data extraction would be referred to as a custom report in the contract.) The cost to NTTO to prepare a datafile with all the non-business proprietary information from CBP's data for 2011 through 2015 would be thousands of dollars. This does not include the hours of labor to identify the parameters which do not constitute business proprietary information that should be extracted from the database. The extracted information would have no data interpretation documentation associated with it.

12.  Such an expense would be an undue burden upon NTTO. FOIA does not require agencies to expend thousands of dollars to pay contractors to extract information from a database to respond to FOIA requests, especially when the records in the database were provided by another agency.

13.  Producing such a datafile to plaintiffs would violate the terms of the DHS-DOC MOU (see below) and likely result in CBP's termination of sharing the underlying data with ITA.

### ALL DATA FILE RECORDS CREATED BY ITA FOR THE I-94 PROGRAM HAVE BEEN FURNISHED TO PLAINTIFF

14.  As previously affirmed, the I-94 Program is a joint effort between CBP and NTTO to provide travel statistics data for use by the government and the travel industry.  Overseas arrivals data are provided by CBP in accordance with the DHS-DOC MOU.

15.  CBP securely transmits records directly to NTTO's contractor, CIC Research, Inc. (CIC). This information is supplemented by information from Statistics Canada and Instituto Nacional de Estadística y Geografía to properly tally all international arrivals data to the United States based on the World Tourism Organization (UNWTO) definition of visitors.

16.  Pursuant to the contract between ITA and CIC, CIC creates information from the data it receives from CBP. Specifically, CIC is obligated to extract, aggregate, and anonymize data relevant to travel and tourism. The information produced by CIC under contract is transmitted to ITA as summary tables of monthly data known as NTTO's *Summary of International Travel to the United States* report. A copy of the contract with CIC is attached as Exhibit 1 to this declaration.

17.  For each of these reports, a data file exists containing the exact same data as what is contained in the summary report. The only difference between the data file and the report is its format: the report is a printable file in pdf format, whereas the data file is an excel workbook that permits the data to be manipulated.

18.  The contract between ITA and CIC is a performance-based contract. Although we understand that CIC maintains a database of information in a proprietary SAS format, NTTO, ITA, and DOC are unaware of the details of precisely what is maintained. All that ITA can assure is that CIC is capable, as required by the contract, to extract and produce data relevant to travel and tourism based on the UNWTO definition of visitors from the data supplied by CBP.

19.  ITA has furnished to plaintiff all of the data file records in its possession for 2011 through 2015 created by CIC pursuant to the contract.

20.  Specifically, CIC has neither created nor transmitted to ITA pursuant to the contract any data beyond what is in the data files corresponding to the standardized reports titled *Summary of International Travel to the United States*. All of those data files were furnished to the plaintiff. ITA does not have possession of any further data.

21.  Although CIC has processed government data on behalf of ITA and maintains a database of visitor arrival records, ITA does not have possession or access to this database.

22.  ITA does have the right to require CIC to extract records from its database if it pays for the level of effort required to perform the work.

23.  Custom reports of visitor arrival data are available as a result of this contractual right to have CIC extract records from its database. The number of custom reports sold for the years in question is zero, so the number of records created for ITA as a result of the custom report capability is zero.

24.  In theory, ITA could require CIC to extract all visitor arrival records from its database from 2011 through 2015, excluding the fields that CBP indicates comprise personally identifiable information, and create a datafile with such information.

25.  CIC has advised NTTO that the level of effort to perform such work would be $ 32,640 and would take approximately two months to produce. This is just the estimate for contractor time and does not include any margin for profit as permitted by the contract. The estimate also does not include administrative costs associated with producing or transmitting the data files that would be created.

26.  CIC started a new contract with NTTO in 2019. As part of the competition for the new contract, NTTO's sought improvements over the creation of custom reports. As a result, compared to the contracts that were in place during the years when the data for 2011 through 2015 were being processed, CIC developed new in-house software that permits it to more readily create custom reports. CIC also expanded its programming and storage capabilities and assigned additional staff resources to NTTO's account.

27.  The quoted level of effort of $32,640  to create an I-94 based custom report reflects the improvement between the current contract and the prior contract made possible by the development of new software. Were an extraction of such data ordered under the prior contract,

the level of effort to perform that work would have been an order of magnitude greater, well over $100,000.

28.  Even the much more modest expense of $32,640 would be an undue burden upon NTTO. Furthermore, if the court were to order production of such information, plaintiff would undoubtedly demand creation of such records for subsequent time periods.

29.  Furthermore, other parties could also request custom database extractions. Unfortunately, each extraction has a cost associated with it, and can unlikely be reused between requests. Such a burden would  divert  funds appropriated to fund the current requirements of the contract.  Additionally, it would significantly hinder the contractor's ability to deliver what is required under the contract as labor would have to be diverted to accomplish the task.  CIC is a small business and does not have the extra capacity to accommodate unscheduled tasks.

30.  Producing such a datafile to plaintiff would also violate the terms of the DHS-DOC MOU (see below) and likely result in CBP's termination of sharing the underlying data with ITA.

### SHARING CBP DATA IS PROHIBITED EXCEPT AS AUTHORIZED BY CBP

31.  The MOU with CBP for I-92 and I-94 data articulates that DOC uses the data "for the express purpose of calculating monthly, quarterly, and annual calendar year total, world region, and country specific international travel figures and to calculate the monthly and quarterly estimates of international travel and passenger fare exports used in the balance of trade for the United States and ultimately is factored into the calculation of the Gross Domestic Product."

32.  The MOU with CBP for I-92 and I-94 data recognizes that "[t]he DOC and travel industry heavily depend upon the Form I-92 and Form I-94 data to define the size and scope of the international travel market to and from the United States. The data is critical to define the

size and scope of international travel to and from the United States."

33.  The MOU also reflects that "[t]he arrival data is used in determining the economic impact of international travel on state economies. The arrival data also comprises part of the Travel and Tourism Satellite Accounts Program. None of these programs could exist if DOC did not obtain the arrival data from [CBP]."

34.  The MOU prohibits releasing information "in any form identifiable to any individuals." The MOU also prohibits disclosure of any data beyond "the number of arrivals into the United States; the total number of travelers using business, pleasure, and student visas; estimates on the number of individuals arriving by air, land, and sea; and age group data falling under selected categories, including the destination and port-of-entry at the time of arrival."

I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief. Executed on this Thirty-First day of January 2020.

Isabel Hill

Director, National Travel and Tourism Office

# Attachment 7

| | |
|---|---|
| **From:** | David Yanofsky |
| **To:** | Brian Yanos |
| **Subject:** | Re: ITA FOIA Request DOC-ITA-2020-001709 |
| **Date:** | Thursday, December 10, 2020 7:19:50 PM |
| **Attachments:** | D - Hull Declaration 12-7-2020 signed (003).pdf |
| | 18-17356.pdf |

Hello Brian,

As I mentioned in my request, I am seeking access to and copies of all "Detail Arrival Records" in the National Travel & Tourism Offices' (NTTO) "Air Arrivals I-94 Database"

The https://www.trade.gov/visitor-arrivals-program-i-94-data page that you pointed me towards lists 12 different files:

1. 2020 Quick Release - Country of Residence (COR)
2. 2020 Quick Release - Country of Citizenship (COC)
3. 2019 Quick Release - Country of Residence (COR)
4. 2019 Quick Release – Country of Citizenship (COC)
5. Arrivals Data - Country of Residence (COR)
6. Arrivals Data - Country of Citizenship (COC)
7. Trend Line Data - Country of Residence (COR)
8. Top Ports - Country of Residence (COR)
9. Top Ports - Country of Citizenship (COC)
10. Port Comparison (ADIS/I-94 v. APIS/I-92 v. Airport Data)
11. Business, Pleasure, and Student - Country of Residence (COR)
12. Business, Pleasure, and Student - Country of Citizenship (COC)

None of them contain "Detail Arrival Records" or the "Air Arrivals I-94 Database."

As noted on this page https://www.trade.gov/visitor-arrivals-program-i-94-data the ITA (and/or its contractors) maintains records subject to FOIA known as "Detail Arrival Records" which this page leads me to believe are contained in the "Air Arrivals I-94 Database"

In addition to the declaration of Isabel Hill that I referenced and attached to my request, a recent declaration submitted to the Federal District Court for the District of Columbia is relevant to my request for these records. Warren Hull—the director CIC Research (an ITA contractor that may maintain these records) states in that declaration that on behalf of the ITA his company creates a SAS database of I-94 arrival records (¶¶ 4-5), removes duplicates (¶¶ 7), and calculates additional information to add to records (¶¶ 8). Attached is a copy of that declaration.

The best I can tell, the cleaned and augmented entries in that database are the agency records that constitute the "Detail Arrival Records" and the database itself constitutes the "Air Arrivals I-94 Database."

I also want to alert you to the recent opinion by the US Court of Appeals for the Ninth Circuit in the case of *The Center for Investigative Reporting vs US Dept. of Just.* No. 18-17356 (9th Cir. Dec. 3, 2020). It held that "the use of a query to search for and extract a particular arrangement or subject of existing data from the Firearms Tracing System database did not require the creation of a 'new' agency record under FOIA." By that logic, querying the CIC

database for all records while excluding any aspects of the records exempted by FOIA would not constitute the creation of a 'new' agency record. I have also attached the decision for your convenience.

Thank you for your diligence,

David Yanofsky

On Thu, Dec 10, 2020 at 7:38 AM Brian Yanos <Brian.Yanos@trade.gov> wrote:

> Yes, please provide additional clarification. That would be greatly appreciated.
>
>
> **From:** David Yanofsky <dyanofsky+ita2020@qz.com>
> **Sent:** Thursday, December 10, 2020 10:33 AM
> **To:** Brian Yanos <Brian.Yanos@trade.gov>
> **Subject:** Re: ITA FOIA Request DOC-ITA-2020-001709
>
>
> Hello Brian,
>
>
> I did not request that information. Please re-read my request. If you need further clarification I can provide you more information later today.
>
>
> David
>
>
> On Thu, Dec 10, 2020 at 7:09 AM Brian Yanos <Brian.Yanos@trade.gov> wrote:
>
>> Good Morning Mr. Yanofsky,
>>
>>
>> This email is in regards to your ITA FOIA request concerning records for "Detail Arrival Records" in the National Travel & Tourism Offices' (NTTO) "Air Arrivals I-94 Database". This information is publicly available and can be found in the link below:
>>
>>
>> https://www.trade.gov/visitor-arrivals-program-i-94-data

As this information is publicly available, our office will proceed to administratively close your request.


Regards,


**Brian Yanos, Esq.**

FOIA Analyst

Panum Group LLC, Contractor

U.S. Department of Commerce

International Trade Administration

1401 Constitution Avenue, N.W.

Washington, D.C. 20230

(202) 482-0549

# Attachment 8

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, DC  20230

February 11, 2021

Mr. David Yanofsky
Quartz Media, LLC
675 Avenue of the Americas, Suite 410
New York, NY 10010

dyanofsky+ita2020@qz.com

RE:  DOC-ITA-2020-001709

Dear Mr. Yamofsky:

This letter is in response to your Freedom of Information Act (FOIA) request received by the
International Trade Administration (ITA) on August 6, 2020.  In your request, you sought:

> Access to and copies of all "Detail Arrival Records" in the National Travel &
> Tourism Offices' (NTTO) "Air Arrivals I-94 Database" with entry dates from
> January 1, 2018 to the present and its associated technical documentation.

Based on your clarification dated December 10, 2020, via email with ITA, you are seeking all
entries within the databases maintained by CIC, a contractor to NTTO, for the calendar years
2018 and 2019, and the entries in the database for 2020 from January 1, 2020 through August 6,
2020.  It further appears from your clarification that by "Detail Arrival Records" you are
referring to all data from each entry in the database, not just the "Detail Arrival Records" as sent
by Custom and Border Protection (CBP) to CIC.  We do not understand your request for "access
to" all records in the databases to be seeking login access to CIC's database; instead we interpret
"access to and copies of" records to mean simply a "copy of" the databases in question.

After careful consideration of your request, we have concluded that the records you are seeking
are not agency records.  The Supreme Court of the United States has held that in order for
requested materials to qualify as "agency records", an agency must either create or obtain the
requested materials, and "must be in control of the requested materials at the time the FOIA
request is made."  *U.S. Department of Justice v. Tax Analysts*, 492 U.S. 136, 144-45 (1989).  The
Court of Appeals for the D.C. Circuit "has identified four factors relevant to a determination of
whether an agency exercises sufficient control over a document to render it an 'agency record':
(1) the intent of the document's creator to retain or relinquish control over the records; (2) the
ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency
personnel have read or relied upon the document; and (4) the degree to which the document was



integrated into the agency's record system or files." *Burka v. U.S. Department of Health and Human Services et al.*, 87 F. 3d 508, 515 (D.C. Cir. 1996) (internal quote marks and citations omitted). Here, each factor points unambiguously to the conclusion that NTTO does not control the data you are seeking.

First, the "creator" of the data, CBP, has clearly indicated an intent to retain control over the records in question. The records are provided only under the terms of a Memorandum of Agreement (MOA) and Interconnection Security Agreement (ISA), which provides data from CBP to NTTO for a limited period of time, with restrictions on disclosure, with specified security procedures for the transmission, storage, and access to the data, and with provisions permitting CBP the right to monitor compliance with these terms and limitations. CBP's intent to retain control over the data is further evidenced by the potential consequence of immediate, unilateral termination of data sharing for failure to comply with the terms and limitations of the agreement.

Second, ITA is prohibited by the MOA and ISA from using and disposing of the data from CBP as it wishes. More specifically, NTTO is prohibited from sharing data other than reports which contain only anonymized, aggregated information. Furthermore, ITA and NTTO may not retain data transmitted from CBP for longer than 36 months [since 2017].

Third, ITA personnel do not rely on the individual database entries you are seeking, but rather only on anonymized, aggregated summaries of these entries. By contrast, the data which ITA personnel *do* rely upon are contained in the summary reports, which are agency records. ITA personnel do not have access or actual possession of the database entries you are seeking, so they simply cannot have read or relied upon those entries.

Fourth, the database entries you are seeking have never been integrated into ITA's record system or files. The databases are maintained by a contractor on the contractor's own servers and IT systems, with the stipulation that they must abide by all the limitations and security procedures in the MOA and ISA. The MOA specifically states that ITA may store CBP data as a file on its network, but that the data should not be contained in an operational data system and should not be retained for more than 36 months. Data may be shared with a contractor for data processing, but the MOA stipulates that the contractor stores CBP data on its private computers and permit access only to authorized contractor personnel.

In short, an analysis of each of the four factors weighs in favor of concluding that the records you are seeking are not agency records. Overall, the balance is overwhelming.

We therefore conclude that there are no "agency records" responsive to your FOIA request. Since no records are being withheld, we do not consider this to be an adverse determination within the meaning of FOIA.



If you have any questions or concerns or would like to discuss any aspect of your request, you may contact the analyst who processed your request, Brian Yanos, at 202-482-0549 or Brian.Yanos@trade.gov.

You may also contact ITA's FOIA Public Liaison, using the following information:

>Victor E. Powers
>Director, Management Operations Division
>Office of the Chief Financial and Administrative Officer
>International Trade Administration
>1401 Constitution Avenue, N.W., Room 40003
>Washington, D.C.  20230
>(202) 482-5436, foia@trade.gov

Please refer to your FOIA request tracking number, DOC-ITA-2020-001709 when contacting ITA.

In addition, you may seek FOIA mediation services offered by the National Archives and Records Administration, Office of Government Information Services (OGIS).  You may contact OGIS using the following information:

>Office of Government Information Services
>National Archives and Records Administration
>8601 Adelphi Road-OGIS
>College Park, MD  20740-6001
>(202) 741-5770 or toll free, 1-877-684-6448
>facsimile: (202) 741-5769; email: ogis@nara.gov

In accordance with 15 C.F.R. §§ 4.10(a) and (b), you have the right to appeal this determination within 90 calendar days from the date of this letter. The Department deems appeals arriving after normal business hours (8:30 a.m. to 5:00 p.m., Eastern Time, Monday through Friday) as received on the next normal business day.  If the 90th calendar day for submitting an appeal falls on a Saturday, Sunday or legal public holiday, an appeal received by 5:00 p.m., Eastern Time, the next business day will be deemed timely.  The appeal should include a copy of the original request, this response, and a statement of the reasons why you consider the Department made this determination in error.  Please mail written appeals to:

>Assistant General Counsel for Litigation, Employment, and
>   Oversight
>U.S. Department of Commerce
>1401 Constitution Avenue, N.W. Room 5896
>Washington, D.C.  20230



You may send an appeal by e-mail to FOIAAppeals@doc.gov, or through FOIAonline at https://www.foiaonline.gov/foiaonline/action/public/home if you have a FOIAonline account. Clearly mark "Freedom of Information Act Appeal", in the e-mail subject line, or on both the appeal letter and envelope.

Sincerely,

Victor
Powers

Digitally signed by
Victor Powers
Date: 2021.02.10
20:00:06 -05'00'

Victor E. Powers
Director
Management Operations
Office of the Chief Financial and
Administrative Officer

4



INTERNATIONAL
**T R A D E**
ADMINISTRATION