# Exhibit J

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID YANOFSKY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:19-cv-02290 (KBJ) |
| ) | |
| U.S. DEPARTMENT OF COMMERCE, ) | |
| ) | |
| Defendant. ) | |

## SECOND DECLARATION OF ISABEL HILL

I, Isabel Hill, declare under penalty of perjury, that the following statements are true and correct to the best of my knowledge and belief:

1. I am the Director of the National Travel and Tourism Office (NTTO), International Trade Administration (ITA), U.S. Department of Commerce (DOC, Commerce, or the Department). I have held this position since 2013.

2. My statement in this declaration is based on my personal knowledge, information provided to me by employees under my supervision, information obtained by me, and information contained in the records of NTTO. I am personally familiar with Plaintiff's FOIA request at issue in this civil action.

3. This Declaration is provided in support of Defendant's reply in support of its motion for summary judgment in this matter. This is my second declaration in this matter.

## ALL DATA FILE RECORDS CREATED BY ITA FOR THE I-92 PROGRAM HAVE BEEN FURNISHED TO PLAINTIFF

4. As previously affirmed, the I-92 program is a joint effort between CBP and NTTO to provide international air travel statistics data to the government and the travel industry.

5. CBP provides data directly to ITA in accordance with the 2002 Memorandum of Understanding between DOC and the Immigration and Naturalization Service (now CBP) division of the Department of Homeland Security ("DHS-DOC MOU"), which addresses the protection of sensitive information. The DHS-DOC MOU was included as Exhibit 1 of my first declaration.

6. The Department's Technology, Services, and Innovation (TSI) [formerly the Office of the Chief Information Officer (OCIO)} processes and aggregates the CBP data to create seven tables of information for each year with different parameters. These tables are set forth in standardized reports known as the *U.S. International Air Travel Statistics Report*.

7. For each of these tables of information, a data file exists containing the same data in the standardized report. The only difference between the data file and the report is its format: the report is a printable file in pdf format, whereas the data file is an excel workbook that permits the data to be manipulated.

8. NTTO has provided to plaintiff the data files corresponding to all the processed and aggregated data it has created for the I-92 program with respect to the years 2011 through 2015, with the exception of three custom reports commissioned by businesses which contain business proprietary information about those customers and their internal software programs and capabilities. There are no additional data files created and maintained by NTTO, ITA, or DOC.

9. Specifically, until recently, the Department maintained a SQL database which contains only data that came directly from CBP and is subject to the DHS-DOC MOU. This database contains business proprietary information.

10. Recently, the Department migrated the I-92 data from SQL to Microsoft Power BI, and the SQL system was decommissioned.

11. In order to produce the CBP data in the Department database, data parameters would have to be selected which do not reveal business proprietary information, and the database extracted into a datafile. NTTO does not have the capability to compile and program the data, and would have to pay the contractor to create the datafile. (Such a data extraction would be referred to as a custom report in the contract.) The cost to NTTO to prepare a datafile with all the non-business proprietary information from CBP's data for 2011 through 2015 would be thousands of dollars. This does not include the hours of labor to identify the parameters which do not constitute business proprietary information that should be extracted from the database. The extracted information would have no data interpretation documentation associated with it.

12. Such an expense would be an undue burden upon NTTO. FOIA does not require agencies to expend thousands of dollars to pay contractors to extract information from a database to respond to FOIA requests, especially when the records in the database were provided by another agency.

13. Producing such a datafile to plaintiffs would violate the terms of the DHS-DOC MOU (see below) and likely result in CBP's termination of sharing the underlying data with ITA.

## ALL DATA FILE RECORDS CREATED BY ITA FOR THE I-94 PROGRAM HAVE BEEN FURNISHED TO PLAINTIFF

14. As previously affirmed, the I-94 Program is a joint effort between CBP and NTTO to provide travel statistics data for use by the government and the travel industry. Overseas arrivals data are provided by CBP in accordance with the DHS-DOC MOU.

15. CBP securely transmits records directly to NTTO's contractor, CIC Research, Inc. (CIC). This information is supplemented by information from Statistics Canada and Instituto Nacional de Estadística y Geografía to properly tally all international arrivals data to the United States based on the World Tourism Organization (UNWTO) definition of visitors.

16. Pursuant to the contract between ITA and CIC, CIC creates information from the data it receives from CBP. Specifically, CIC is obligated to extract, aggregate, and anonymize data relevant to travel and tourism. The information produced by CIC under contract is transmitted to ITA as summary tables of monthly data known as NTTO's *Summary of International Travel to the United States* report. A copy of the contract with CIC is attached as Exhibit 1 to this declaration.

17. For each of these reports, a data file exists containing the exact same data as what is contained in the summary report. The only difference between the data file and the report is its format: the report is a printable file in pdf format, whereas the data file is an excel workbook that permits the data to be manipulated.

18. The contract between ITA and CIC is a performance-based contract. Although we understand that CIC maintains a database of information in a proprietary SAS format, NTTO, ITA, and DOC are unaware of the details of precisely what is maintained. All that ITA can assure is that CIC is capable, as required by the contract, to extract and produce data relevant to travel and tourism based on the UNWTO definition of visitors from the data supplied by CBP.

19. ITA has furnished to plaintiff all of the data file records in its possession for 2011 through 2015 created by CIC pursuant to the contract.

20. Specifically, CIC has neither created nor transmitted to ITA pursuant to the contract any data beyond what is in the data files corresponding to the standardized reports titled *Summary of International Travel to the United States*. All of those data files were furnished to the plaintiff. ITA does not have possession of any further data.

21. Although CIC has processed government data on behalf of ITA and maintains a database of visitor arrival records, ITA does not have possession or access to this database.

22. ITA does have the right to require CIC to extract records from its database if it pays for the level of effort required to perform the work.

23. Custom reports of visitor arrival data are available as a result of this contractual right to have CIC extract records from its database. The number of custom reports sold for the years in question is zero, so the number of records created for ITA as a result of the custom report capability is zero.

24. In theory, ITA could require CIC to extract all visitor arrival records from its database from 2011 through 2015, excluding the fields that CBP indicates comprise personally identifiable information, and create a datafile with such information.

25. CIC has advised NTTO that the level of effort to perform such work would be $ 32,640 and would take approximately two months to produce. This is just the estimate for contractor time and does not include any margin for profit as permitted by the contract. The estimate also does not include administrative costs associated with producing or transmitting the data files that would be created.

26. CIC started a new contract with NTTO in 2019. As part of the competition for the new contract, NTTO's sought improvements over the creation of custom reports. As a result, compared to the contracts that were in place during the years when the data for 2011 through 2015 were being processed, CIC developed new in-house software that permits it to more readily create custom reports. CIC also expanded its programming and storage capabilities and assigned additional staff resources to NTTO's account.

27. The quoted level of effort of $32,640 to create an I-94 based custom report reflects the improvement between the current contract and the prior contract made possible by the development of new software. Were an extraction of such data ordered under the prior contract,

the level of effort to perform that work would have been an order of magnitude greater, well over $100,000.

28. Even the much more modest expense of $32,640 would be an undue burden upon NTTO. Furthermore, if the court were to order production of such information, plaintiff would undoubtedly demand creation of such records for subsequent time periods.

29. Furthermore, other parties could also request custom database extractions. Unfortunately, each extraction has a cost associated with it, and can unlikely be reused between requests. Such a burden would divert funds appropriated to fund the current requirements of the contract. Additionally, it would significantly hinder the contractor's ability to deliver what is required under the contract as labor would have to be diverted to accomplish the task. CIC is a small business and does not have the extra capacity to accommodate unscheduled tasks.

30. Producing such a datafile to plaintiff would also violate the terms of the DHS-DOC MOU (see below) and likely result in CBP's termination of sharing the underlying data with ITA.

## SHARING CBP DATA IS PROHIBITED EXCEPT AS AUTHORIZED BY CBP

31. The MOU with CBP for I-92 and I-94 data articulates that DOC uses the data "for the express purpose of calculating monthly, quarterly, and annual calendar year total, world region, and country specific international travel figures and to calculate the monthly and quarterly estimates of international travel and passenger fare exports used in the balance of trade for the United States and ultimately is factored into the calculation of the Gross Domestic Product."

32. The MOU with CBP for I-92 and I-94 data recognizes that "[t]he DOC and travel industry heavily depend upon the Form I-92 and Form I-94 data to define the size and scope of the international travel market to and from the United States. The data is critical to define the

size and scope of international travel to and from the United States."

33. The MOU also reflects that "[t]he arrival data is used in determining the economic impact of international travel on state economies. The arrival data also comprises part of the Travel and Tourism Satellite Accounts Program. None of these programs could exist if DOC did not obtain the arrival data from [CBP]."

34. The MOU prohibits releasing information "in any form identifiable to any individuals." The MOU also prohibits disclosure of any data beyond "the number of arrivals into the United States; the total number of travelers using business, pleasure, and student visas; estimates on the number of individuals arriving by air, land, and sea; and age group data falling under selected categories, including the destination and port-of-entry at the time of arrival."

I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief. Executed on this Thirty-First day of January 2020.

_____

Isabel Hill

Director, National Travel and Tourism Office